UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MILTON HILL,
　　　Plaintiff,

v.

　　　　　　　　　　　　　　　　　　　　Civil Action No. 06-1233 (JDB)

DIRK KEMPTHORNE,
　　　Defendant.

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

　　　Defendant respectfully submits this Motion for Summary Judgment pursuant to Fed. R. Civ. P.

56.

　　　Plaintiff, Milton Hill, was an employee of the U.S. Department of the Interior, Bureau of Land

Management.  Amended Complaint (herein after Complaint) at ¶ 1, 5.  Plaintiff brings this suit pursuant

to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., claiming discrimination on the

basis of reprisal. [1]  Plaintiff's claims are summarized below:

---

　　　　[1]  Although plaintiff's Complaint indicates that his claims also are on the basis of race
and sex, plaintiff's responses to interrogatories and deposition testimony clarified that his
remaining  claims are solely on the basis of reprisal for alleged prior EEO activity.   See chart
summarizing allegations, and Hill 2007 Depo at p.  125-126.  (The only claim of race and sex
discrimination was the "Thompson" claim, Count 6, which has been dismissed.)

1

SUMMARY OF ALLEGATIONS

| Amended Complaint | Supplemental Interrogatory Response summarized |
|---|---|
| ¶ 7. Count 1 - Performance Appraisal Fabrication<br><br>"In September 1999, management officials allowed Plaintiff's co-workers and peers to have input into his performance appraisal which negatively impacted his appraisal such that he did not receive an annual award for that year. . . ." | * Plaintiff did not receive a performance appraisal for FY 1998.<br><br>* Robert Doyle generated a performance appraisal for which he received input from one of plaintiff's co-workers.<br><br>* "Although the overall evaluations were achieve or not achieve, you could get an award if the comments the rater made were sufficiently complementary."<br><br>* Plaintiff did not receive an award<br><br>* The basis for the claim is retaliation for prior EEO activity described in response to interrogatory 17.<br><br>* Initial EEO contact on October 12, 1999<br><br>SupRog  p. 3-4 (Paragraph 7 -Count1) |
| ¶ 8, Count 2 - Travel Fund Refusal<br><br>"In September 1999, management officials refused to provide plaintiff with travel vouchers and funds to perform his job and tasks. . . ." | *  During detail to the Office of Small Business, Robert Doyle refused to provide travel funds. As a result plaintiff was unable to travel to the National Black Chamber of Commerce conference.<br><br>* Basis for claim is retaliation based on protected activity described in Interrogatory 17.<br><br>* Initial EEO contact October 12, 1999.<br>SupRog p. 4-5,  Paragraph 8- Count 2 (Allegation 9) |
| ¶9, Count [3]-- Career Training Refusal<br><br>"In November 1999, management officials refused to allow Plaintiff to apply for career enhancing/growth training." | * "In November of 1999, Plaintiff was serving a detail to the Office of Secretary, Office of Environmental Policy.  This was terminated by Robert Doyle and Warren Johnson for no reason prior to its completion."<br><br>* Basis for claim is retaliation based on protected activity described in Interrogatory 17.<br><br>SupRog p. 5 at Paragraph 9(Allegation 6) |

| | |
|---|---|
| ¶ 10, Count 4 -- Career Inhibiting Assignments<br><br>"In December 1999, management officials assigned Plaintiff to non-career enhancing details and jobs without his approval and without consulting him." | * "In November 1999, Plaintiff's position description was rewritten after he began EEO activity. The new description narrowed the scope of his employment and was a de facto reassignment. The description was rewritten by Joseph Federline and Thomas Walker."<br><br>* Basis for claim is retaliation based on protected activity described in Interrogatory 17.<br><br>SupRog p. 5-6, Paragraph 10 -- Count 4 (Allegation 12) |
| ¶ 11 [Count 5] -- Career Inhibiting Job Blocking/Steering<br><br>"In December 1999, management officials deliberately attempted to either (sic) plaintiff away from career enhancing assignments." | * "In December 1999 while Plaintiff was serving the detail referred in Paragraph 9, Joseph Federline and Robert Donelson were promoted to acting group manager and he was not."<br><br>* Basis for claim is retaliation based on protected activity described in Interrogatory 17.<br><br>SupRog p. 6, Paragraph 11 - Count 5 (Allegation 13) |
| ¶ 12, Count 6 - Career Inhibiting Training Refusal<br><br>August 2000  Phyllis Thompson expressed racist and sexist views of plaintiff which influenced Nina Hatfield decision to deny request<br><br>**Note: On motion of plaintiff, this count was dismissed in open Court.** | * In August 2000 Plaintiff was not selected for the BLM Congressional Fellows program. This occurred because management officials permitted Phyllis (Twinkle) Thompson to have input into whether Plaintiff should be allowed to go."<br><br>* Basis for the claim is "race and gender because Ms. Thompson had made racist and sexist comments about him in the past."<br><br>*Basis also is retaliation based on protected activity described in Interrogatory 17.<br><br>SupRogs p. 6-7, Paragraph 12 -- Count 6 (Allegation 11) |

| ¶ 13, Count 7 -- Non Selection WO 99-015<br><br>"In January 2000, plaintiff was not selected for a supervisory Personnel Specialist position GS 15, advertised under vacancy announcement No. WO 99 015. . . . Plaintiff has established a prima facie case of discrimination based on retaliation and that the selecting official, upon becoming aware that plaintiff applied for the position, rewrote the job description to fit the selectee's qualifications . . . .Plaintiff's qualifications were superior." | not addressed in response |
|---|---|
| ¶ 14, Count 8 -- Refusal to Submit Application<br><br>"In November 1999, management officials refused to submit Plaintiff's application for the position of Assistant BLM director Eastern States Office.  At the EEOC, this claim was designated as allegation 15."<br><br>Basis of claim is reprisal.<br>_ | not addressed in response |

As is set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff did not timely contact an EEO counselor concerning some of his claims,  plaintiff has not met his burden of establishing all essential elements of his claims,  there are no material facts in genuine dispute, and defendant is entitled to judgment as a matter of law.   Alternatively, pursuant to Fed. Rule Civ. P. 8 (e), assuming hypothetically, that plaintiff has established a prima facie case as to some of his  claims, defendant has legitimate, non-discriminatory/retaliatory

reasons for its actions.  Wherefore, defendant respectfully requests that plaintiff's complaint be dismissed with prejudice as to all counts.

Respectfully Submitted,

_/ s /_____

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____//s/_____

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____

RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

Counsel for Defendant

OF COUNSEL
PHYLLIS LESLIE
Office of Solicitor
Division of General Law
U.S. Department of the Interior

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MILTON HILL,
    Plaintiff,

v.                                       Civil Action No. 06-1233
                                       (JDB)

DIRK KEMPTHORNE,
    Defendant.


**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Dirk Kempthorne, Secretary of the U.S. Department of the Interior, hereby
respectfully submits this Memorandum of Points and Authorities in Support of Defendant's
Motion for Summary Judgment.

**STATEMENT OF FACTS**

**Background**

Plaintiff is an African American male.  Complaint at ¶1.  In approximately 1990, plaintiff
began work with the Department of Interior as a GS 14 Management Analyst.  Complaint at ¶ 5.
He remained with the Department of Interior until July 2002, when plaintiff obtained a disability
retirement.   Complaint at ¶ 5.

From approximately October 1994 to February 1996, the agency paid plaintiff's salary
while plaintiff worked on Capitol Hill in an American Political Science fellowship detail.  Hill
2007 Depo at p. 22-25.   When plaintiff returned from the fellowship, he returned to the Bureau
of Land Management (BLM)  but worked with getting smaller disadvantaged businesses business
in the federal sector under the supervision of Mr. Niebauer, as well as continuing to do some
management analyses.  Hill 2007 Depo at p. 25-33; Def. Doc. Response at p. 32-33.  Plaintiff
was accepted to another management training program at the Industrial College of Armed Forces

1

(ICAF), and went on detail there from July, 1998 to September 1999.  Hill 2007 Depo at p. 37-38.  When plaintiff came back to BLM from ICAF, he returned to the position he had before he went to ICAF.  *Id* at p. 38.

Upon his return from ICAF, plaintiff was assigned to the Office of Small Business, supervised by Robert Faithful.   Hill 2007 Depo at p. 38.    There, he did work similar to that which he had done before, "at a higher level – trying  to get small business to the Department. . . ."  Hill 2007 Depo at p. 39:8-40:15.

**Count 1 -- FY '98 Performance Evaluation and Award**

While plaintiff was at ICAF, performance evaluations for FY '98 came due.   He did not receive his performance appraisal in September, 1998  for the period Oct. 1, 1997 to Sept. 30, 1998.   Hill 2007 Depo at p. 47- 48.  According to plaintiff, when he did not receive his evaluation, he sent a letter to his supervisor, Peter Niebauer, in the fall of 1998.  Hill 2007 Depo at p. 49-50.   The letter said that plaintiff not only had not gotten an appraisal but also had not received  an award for outstanding work, and that he wanted Niebauer to address the issue.   Hill 2007 Depo at p. 49-51.   Plaintiff testified that he also called Mr. Niebauer, but got no response to his letter or his call.   *Id* at p.  50.   The record reflects a letter to "Peter N" from plaintiff dated January 30, 1999 in which plaintiff states:

> I have not received my EPPR [Employee Performance Plan and Results Report] for FY98. And, with all the innovations, accomplishments and hard work that was done in the acquisition and small business areas over the past 2  1/2 years, I did not receive any compensation for that.   If you could look into these matters to find out the status, I would be most appreciative.

1/30/99 ltr.

Robert Doyle became the Acting Assistant Director, Business and Fiscal Resources in 1998, and as such became plaintiff's second line supervisor.  In about August 1999, when plaintiff was completing his ICAF detail, plaintiff contacted Mr. Doyle for assistance in obtaining an FY '98 appraisal.  Hill 2007 Depo  at p. 51-52.   Mr. Doyle committed to making

sure that plaintiff got a current position description and his performance appraisal.    ROI at p.

266.

A performance appraisal for FY 1998 was prepared which rated plaintiff as "achieved" in

all critical results. 1998 Appraisal, Ex. M    Both plaintiff and Mr. Doyle initialed/signed the

appraisal on **June 30, 1999.** Ex M, Employee Performance Plan and Results Report for rating

period 10/1/97 to 9/30/08.  The ratings which could be entered were "Achieved" or "Not

Achieved." *Id.*

In a memorandum to Mr. Doyle dated September 22, 1999, plaintiff  refers to meeting with

Mr. Doyle on June 29 and August 5, 1999.    09/22/00 ltr, ROI at p.54-56.   The memorandum

indicates that during one of those  meetings,  Mr.  Doyle stated that he got input from plaintiff's

peers when preparing his evaluation.   *Id.*

Plaintiff made initial contact with the EEO concerning his performance evaluation by a

letter dated October 12, 1999, which is date stamped as received on November 2, 1999.   ROI at

p. 33.

**Count 2 -- Travel Fund Refusal**

In September 1999, after plaintiff returned from ICAF, he  was assigned  to the Office of

Small and Minority Business Utilization, under the supervision of Director Robert Faithful.  Hill

2002 Depo. at p. 157-159.  While plaintiff was in Mr. Faithful's office, BLM was required to

provide travel funds for him.  *Id*. at p. 165:20-23.  Plaintiff testified that when he found out that

he was required to travel for the detail, he initially went through Robert Faithful who told

plaintiff he would contact BLM.  Mr. Faithful went to Robert Doyle, and plaintiff subsequently

received a travel authorization in September or October, 1999.   *Id.* at p. 167:24- 168:21.

Plaintiff missed going to the Black Chamber of Commerce meeting at which BLM had

been given a booth where BLM could explain how to write business plans and how to do

business with the federal government.  *Id.* at p. 168:22-169.

3

The Hispanic Chamber of Commerce meeting took place in the latter part of September or October 1999.  Plaintiff received travel authorization for that trip about one week before he was scheduled to go. *Id*. at p. 170:1-13.

**Count 3- Office of Environmental Policy "Detail"**

Plaintiff alleges he was retaliated against when "In November of 1999, Plaintiff was serving a detail to the Office of Secretary, Office of Environmental Policy.  This was terminated by Robert Doyle and Warren Johnson for no reason prior to its completion."  SupRog p. 5 at Paragraph 9 (Allegation 6).

According to plaintiff, when he returned from ICAF, he was directed to report to Robert Faithful's office.  ROI at p. 195, 194-194.    Plaintiff wanted to do other work, so plaintiff met with Dr. Taylor in the Office of Environmental Policy about doing environmental work. *Id.* at 194.

Plaintiff started a "detail" with Dr Taylor.  On November 1, 1999, plaintiff told Warren Johnson about the detail, and on November 1, 1999, Dr. Taylor apparently received a telephone call from Warren Johnson about the detail.  Dr. Taylor told plaintiff that Mr. Johnson had stated that the detail should be stopped and he should get prior approval.  11/3/1999 Hill memo to Fry. Plaintiff objected to Mr. Johnson's phone call in his memorandum to Mr. Fry.  *Id.*

Dr. Taylor wrote up a proposal of what plaintiff's duties on such a detail would be and sent that to Robert Doyle. ROI at p. 194. The proposal from Dr. Taylor was for an estimated 6-month detail at the GS-14 level,  plaintiff's grade at the time.   Hill 2007 Depo at  Ex 1.

In December of 1999, plaintiff was told to return to BLM from his duties in Director Faithful's office.  Hill 2002 Depo  at p. 195.  Plaintiff reported back to BLM from Dr. Faithful's office around December 1999/January 2000.  *Id.* at 196.

However, at that time plaintiff was *not* told to report back from his duties for  Dr. Willie Taylor's office.  *Id.*  Plaintiff was told that once he finished up on the project Dr. Taylor had him

4

doing, that he should come back from Dr. Taylor. *Id* at p. 239-240. "We had a project to finish up. We finished the project up and then came back to the BLM." *Id.* at 196. Plaintiff was involved in doing environmental reviews while on the detail to Dr. Taylor. *Id*. at p. 201.

Plaintiff split his time between his BLM responsibilities and Dr. Taylor's office. *Id.* at 196. In the end of December/beginning of January, 2000, plaintiff committed approximately 70% of his time to Dr. Taylor's office and 30% to BLM. *Id*. at 196-197. In January he spent 50-70 % of his time doing work for Dr. Taylor. *Id*. at p. 199. In February 2000, he spent approximately 50% of his time doing work for Dr. Taylor. *Id.*

In February 2000, plaintiff was wrapping up his work in Dr. Taylor's office. *Id.* at 200-201. In February 2000, Dr. Taylor told plaintiff that "he had spoken with Bob Doyle to try to get some type of arrangement for me to stay there and then . . . he said he . . .talked with Warren Johnson and said that unless he was going to pick up . . . my salary and benefits and travel I couldn't do it." *Id*. at p. 199.

In the Spring of 2000, around March or April, his project with Dr. Taylor was finished, and plaintiff returned to his duties at BLM permanently. *Id*. at p. 240.

**Count 4 -- Position Description Rewritten**

Plaintiff alleges that he was retaliated against when "In November 1999, Plaintiff's position description was rewritten after he began EEO activity. The new description allegedly narrowed the scope of his employment and was a de facto reassignment. The description was rewritten by Joseph Federline and Thomas Walker."

According to plaintiff[2], he told BLM that his position should be a GS-15, and he requested a desk audit. Hill 2007 Depo at p. 116. After he asked for the desk audit, plaintiff was told his position description was being re-written. *Id.* Many of the "taskings" he had been doing were

_____

[2] Viewing the evidence in the light most favorable to plaintiff, defendant assumes hypothetically that the facts occurred as recounted by plaintiff.

being "farmed out to other folks, Special Assistants, the Deputy Director . . . ."  Hill 2007 Depo at p. 117-118.  Plaintiff believes that the taskings being reassigned to others were those duties which made the job a GS-15 versus a GS-14.  *Id.* at p. 118-122.

## Count [5] -- Acting Supervisory Position

Plaintiff alleges that "In December 1999 while Plaintiff was serving the detail referred to in Paragraph 9 [i.e. The detail to the Office of Environmental Policy with Dr. Taylor from November 1999 to March/April 2000], Joseph Federline and Robert Donelson were promoted to acting group manager and he was not."  Sup.Rog at p. 5-6.

The federal payroll records for BLM reflect that during the period 1999 to April 2000, Joseph Federline received a temporary promotion to the GS-15 level as  Deputy Assistant Director effective July 18, 1999 not to exceed (NTE) August 31, 1999.  HR Dec at ¶2.  The system reflects no temporary promotions for Robert Donelson during that time period.  *Id*.

Plaintiff did not return to BLM  from ICAF until September, 1999.  9/29/99 memo to Berry.

Count 6 --   DISMISSED                                   .

## Count 7  -- NON SELECTION WO 99-015

Plaintiff claims that "In January 2000, plaintiff was not selected for a supervisory Personnel Specialist position GS 15, advertised under vacancy announcement No. WO 99 015."  Complaint at ¶13.

A GS-15 supervisory position for an individual to serve as the "Chief, Human Resources Management for the Executive Services/Initiative Group, Assistant Director for Human Resources Management" was advertised in vacancy announcement no. WO-99-15.  Def. Doc. Response at p.  1-4.  The opening date was 2/10/1999 and the closing date was 3/11/1999.  *Id.* at p. 1.  The vacancy announcement  described the position as "Human Resources Specialist, Supervisory"  in the series and grade "GS-0301-15."  *Id.*

6

Vacancy announcement WO-99-15 was canceled.   *Id.* at p. 9 & 34.   The position was readvertised in vacancy announcement WO-99-27.   Def.  Doc. Response at p. 5-8.   The announcement was open from April 19, 1999 to May 18, 1999.  *Id.* at p. 5.  The vacancy announcement described the position as "Supervisory Personnel Specialist,"  in the series and grade "GS-0201-15."  *Id.*

The major duties and knowledges, skills and abilities (KSA's) required in both announcements  were exactly the same.   Compare *Id.* at p. 2 with *Id.* at p.  6-7.

Plaintiff was rated  among the best qualified and his name was referred to the selecting official, Warren Johnson.   *Id.* at p. 43,    Another individual, Concetta Stewart, was selected for the position.  *Id.*

### Count 8 ¶ 14 -- Refusal to Submit Application re Eastern States

Plaintiff alleges that  "In November 1999, management officials refused to submit Plaintiff's application for the position of Assistant BLM Director Eastern States Office."

In his investigator's interview plaintiff explained his complaint in the following manner:

A.  Yes.  That states: "In November 1999, management officials refused to submit Mr. Hill's application for the Assistant Director Eastern States Office Position."

Q.  When you say "they refused to submit it," you normally would do that, wouldn't you?

A.  Yes, sir.   I normally would have done that.  What transpired here was I had a meeting with the director, Tom Fry and Warren Johnson, AD, during that period of time, where we talked about my concerns on what my perception of the practices or lack thereof of getting minorities in certain leadership positions in the Bureau of Land Management.
     Mr. Tom Fry, who was the director at the time, was asking me what positions I would be interested in.  I informed him that one of the positions was the Assistant Director Eastern States Office, which is in Springfield Virginia.   He wanted my application.  He said that when a position came open he would make sure it would be submitted and I would have an opportunity to compete.

ROI at p. 189-190.

According to plaintiff's subsequent testimony,  in November 1999, the Assistant Secretary

of the Interior, John Berry, directed plaintiff to meet with the Director of BLM, Tom Fry, to "resolve" plaintiff's issues concerning  not being selected for certain jobs.  Hill 2007 Depo at p. 97.  He met with Mr Fry and Warren Johnson, BLM's Human Resources Director.  *Id* at p.  99. Plaintiff allegedly gave Mr. Fry his resume, and Mr. Fry allegedly told Mr. Johnson to submit applications on plaintiff's behalf for four particular jobs, including the Assistant Director of the Eastern States Office, and a District Manager in New Mexico.  *Id*. at p. 100-101.[3]  According to plaintiff at the time this was going on in November 1999, he did not believe that Mr. Fry had any intention of having Mr.  Johnson send out his resume.  *Id.*  at 101-103 ("In my mind it was just to get me out of the Office." . . .   Q.  My question is when he said it in the Office . . .it was your belief that he had no intention of having Mr. Johnson do that?   Is that you testimony?  A.  I'm saying he wasn't sincere,  right." . . .   Q.  So at that meeting you came away not believing that Mr. Johnson was going to be sending out your resume?   A. Right. . . .That this was all a charade.").

Plaintiff testified that in addition to hand delivering a copy of his application  to Tom Fry in November1999, he also  mailed a copy "To the Eastern States Office, Human Resources Office in Eastern States."   Hill 2002 Depo at p.  324, 330-331;  Hill 2007 Depo at p. 109-110.

Plaintiff also testified that he was not asking for any special treatment from Mr. Fry.  He did not want Mr. Fry to tell the selecting officials to select him and did not want any pre-selection of himself; he just wanted his application to be there so he could compete.   Hill 2007 depo at p. 105- 107.

After plaintiff's November 1, 1999 meeting with Mr. Fry, Mr. Fry learned that plaintiff had sent a letter to Senator Sarbanes on October 13, 1999, "in which you appealed for his assistance

---

[3]  Neither Mr. Fry nor Mr. Johnson confirm that they ever agreed to send in plaintiff's resume.  However, viewing the evidence in the light most favorable to plaintiff, defendant assumes hypothetically that the facts occurred as recounted by plaintiff.

in matters related to your career with the Bureau of Land Management." 11/23/99 ltr.  In the letter, plaintiff had named Mr. Fry as a top-level management official who had made an "assault on my career goals." 10/13/99 ltr.   Mr. Fry felt there was a contradiction between the letter and plaintiff's conversation with him, in which plaintiff had indicated that he had no problems with Mr. Fry   11/23/99 ltr.   Mr. Fry, therefore, told plaintiff that "your failure to be completely candid with me has led me to decide that under these circumstances, it would be unfair to me, and perhaps you, for me to be involved in any management decisions concerning your career. Therefore, I have decided to recuse myself from any decisions by BLM management that may affect your career." 11/23/99 ltr.

Plaintiff responded by letter dated December 9, 1999:   "Regarding your letter to me, I now understand your defensiveness and hostility towards me in our meeting that included Warren Johnson.   You never had any intentions of resolving my issues or the broader issues of the bureau-wide assault on African-American employees." 12/9/99 ltr.

Well before plaintiff's November 1999 meeting with Mr.  Frye, another individual, Gwen Mason, was in the position of Associate State Director.   She was in the position beginning in 8/16/98 through June 2000.   HR  Dec. at ¶3.

The Vacancy Announcement for Associate State Director Eastern States in Springfield Va. opened April 10, 2000 and closed May 9, 2000.   Vacancy Announcement.    The Selectee for the position was Michael Nedd.  Gail Gordon Depo at p. 12-13.

**ARGUMENT**

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27

9

F.3d 635, 638 (D.C.Cir.1994). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. The mere existence of a factual dispute, however, will not defeat summary judgment. The non-moving party must show that the dispute is genuine and material to the case. That is, the factual dispute must be capable of affecting the substantive outcome of the case and be supported by sufficiently admissible evidence that a reasonable trier of fact could find for the non-moving party. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id. (citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

**Retaliation Claim**

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates: (1) that he engaged in protected behavior, (2) defendant subjected him to a materially adverse action, and (3) that a causal connection existed between the protected activity and the materially adverse action. *See E.E.O.C. v. Go Daddy Software*, 2006 WL 1791295, *6 (D.Ariz 2006); *Argo v. Blue Cross and Blue Shield of Kansas, Inc*,. 452 F.3d 1193, 1202 (10th Cir 2006); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 ( 2006); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). In defining a materially adverse action, the Supreme Court has ruled that

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

10

*Burlington,* 126 S.Ct. at 2415 (citations omitted).

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows

that for a discrimination claim, i.e. the employer then must articulate legitimate,

nondiscriminatory reasons for its actions. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792,

802 (1973) The plaintiff then has an opportunity to discredit the employer's explanation or

otherwise demonstrate that retaliation was a motivating factor. *Aka v. Washington Hospital*

*Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998). The plaintiff at all times retains the burden of

persuasion. *McDonnell Douglas*, 411 U.S. at 802.

A plaintiff must present substantial and credible evidence of discrimination in order to

survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central

purpose of the summary judgment device, which is to weed out those cases insufficiently

meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson,* 121 F.Supp.2d, 72, 77

(D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for

summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or

personal speculation, but rather must point to 'genuine issues of material fact in the record.'");

*Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001). Additionally, there will be "instances

where, although the plaintiff has established a prima facie case and set forth sufficient evidence

to reject the defendant's explanation, no rational factfinder could conclude that the action was

discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000),

*quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

**Retaliation Claims-Materially Adverse Action**

The Supreme Court has described the required element of a materially adverse action as

follows:

We conclude that the anti-retaliation provision does not confine the actions and

11

> harms it forbids to those that are related to employment or occur at the workplace.
> We also conclude that the provision covers those (and only those) employer actions
> that would have been materially adverse to a reasonable employee or job applicant.
> In the present context that means that **the employer's actions must be harmful** to
> the point that they could well dissuade a reasonable worker from making or
> supporting a charge of discrimination.

*Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006)(emphasis

added). The Court stated that the retaliation must produce an injury or harm.

> The anti-retaliation provision protects an individual not from all retaliation, but from
> retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that
> a reasonable employee would have found the challenged action materially adverse,
> "which in this context means it well might have 'dissuaded a reasonable worker from
> making or supporting a charge of discrimination.' " *Rochon*, 438 F.3d, at 1219
> (quoting *Washington*, 420 F.3d, at 662).

*Id.* 126 S.Ct. at 2414 -2415. The required harm must be material, i.e. significant to a reasonable

employee, and is to be judged by an objective standard. *Id.* In *Totten v. Norton*, 421 F.Supp.2d

115, (D.D.C. 2006), this Court noted that

> Although it is not necessary for a Title VII reprisal plaintiff to show that the "alleged
> retaliation affected his pay or benefits-in other words, an adverse action may involve
> something short of what ordinarily would be considered a "personnel action"– a
> plaintiff nonetheless must point to an action that has "*materially* adverse
> consequences" for him. *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.Cir. 2002); *see
> also Rochon*, at 1219 ("[M]ateriality is implicit in the term 'discriminate' as it is used
> in Title VII."); *Brown v. Brody*, 199 F.3d 446, 457 (1999) (plaintiff must
> demonstrate "materially adverse consequences ... such that a reasonable trier of fact
> could conclude that the plaintiff has suffered objectively tangible harm"). ... The
> touchstone of materiality in this context, the D.C. Circuit has said, is whether the
> "employer's challenged action ... would have dissuaded a reasonable worker from
> making or supporting a charge of discrimination." *Id.* at 1219.

*Totten* at 120-21. In granting that defendant's motion to dismiss the retaliation claim, *Totten*

also stated that the Courts in this Circuit have held that purely psychic injuries -- e.g.

embarrassment, public humiliation, loss of reputation, or mere inconveniences -- do not qualify

as adverse actions for purposes of federal anti-discrimination statutes, noting that *Rochon*, at

1219 stated "[N]ot everything that makes an employee unhappy is an actionable adverse action."

*Totten*, 421 F.Supp.2d at 120 -121. In explaining the retaliation standard of "materially adverse"

actions, the Supreme Court has stated  that

> We speak of material adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth "a general civility code for the American workplace.". . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington*, 126 S. Ct. at 2415 (citations omitted).  The Court also stated that the standard is to be objective.

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

*Burlington*, 126 S.Ct at 2415 (Citations omitted).

**Retaliation Claims in general Causality -- Temporal Proximity**

In order to establish a prima facie case of retaliation, a plaintiff  must show a causal connection existed between the materially adverse action and his statutorily protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984).  "The cases that accept mere temporal proximity between an agency's knowledge of the protected activity and [a materially adverse action] as sufficient evidence of causality to establish a prima facie case, uniformly hold that temporal proximity must be 'very close.'" *Clark County School District  v. Breeden*, 532 U.S. 268 (2001), *citing Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)(three month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(four month period insufficient);  *Mayers v. Laborers' Health & Safety Fund of North America,* 478 F.3d 364, 369 (D.C.Cir.2007)(eight to nine month gap far too long).

**FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

To properly raise a claim under Title VII, a federal employee must contact an EEO counselor

13

within 45 days of the plaintiff's notification of the allegedly discriminatory event.  *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.1995);  42 U.S.C. § 2000e-16(c);  29 C.F.R. § 1614.105(a)(1).  This 45-day time limit is not jurisdictional, but operates as a statute of limitations defense.  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982);  *Armstrong v. Reno*, 172 F Supp. 2d 11, 20 (D.D.C. 2001).  *See also Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (filing period begins at time of alleged discrimination, not when its effects are later felt).

Plaintiff's initial EEO contact concerning the allegations in this case was by memorandum dated October 12, 1999, which is date stamped as received on November 2, 1999.  ROI at p. 33. Using the October date of the memorandum, any alleged discriminatory incidents that occurred before **August 28, 1999**, are barred.  Using the November 2 date of receipt,  any alleged discriminatory acts which occurred before **September 18, 1999,** are barred because plaintiff did not consult with an EEO counselor within 45 days of the incident, as required by 29 C.F.R. § 1614.105(a)(1).  Although defendant believes that the date of receipt of the complaint is the appropriate date to be used to determine initial contact, the difference between the dates appears to be irrelevant in this case.

### EXAMINATION OF PLAINTIFF'S CLAIMS

### Count 1 -- FY '98 Performance Evaluation and Award

To the extent plaintiff complains that in 1998 he did not receive his FY '98 evaluation and an appropriate award for FY '98, he is complaining of acts or omissions of lower level supervisors in 1998.  *See* ROI at p. 54 ("Peter Niebauer and Roger Hildebeidel, my immediate supervisors, have repeatedly refused to provide me an FY 98 EPPR and subsequent awards for my outstanding accomplishment.").  *See also* Sup. Rogs at p. 3-4.  Plaintiff clearly failed to contact the EEO within 45 days of his failure to receive an evaluation or award in 1998.  Thus, any claim for acts or omissions in 1998 and before are barred.

14

Plaintiff next contends that he was retaliated against because the evaluation he and Mr. Doyle signed in June 1999, did not contain complementary statements, and he thus did not receive an award. SupRog at p. 3-4 (Paragraph 7 -Count1) ("Although the overall evaluations were achieved or not achieve, you could get [an] award if the comments the rater made were sufficiently complementary."). Plaintiff signed his evaluation on June 30, 1999. Ex M, Employee Performance Plan and Results Report for rating period 10/1/97 to 9/30/98. At the time plaintiff signed the evaluation, he knew that the evaluation only stated "achieved" and contained no complementary narrative. Ex M, Employee Performance Plan and Results Report for rating period 10/1/97 to 9/30/98. Indeed in his letter, concerning his meetings with Mr. Doyle on June 29 and August 5, plaintiff states

> Yet you still know nothing about me or my abilities but you were willing to sign-off on my FY 98, 12 months past due. But also let it be known that you refused to sign off on a monetary award for my outstanding achievements.

ROI at p. 55. Therefore, plaintiff knew before August 28 /September 18, 1999, that the evaluation contained no complementary narrative and that Mr. Doyle had refused to sign off on a monetary award for him. Thus, he did not make timely contact with an EEO counselor about the contents of the evaluation or Mr. Doyle's refusal to approve or recommend an award.

Plaintiff also did not contact an EEO counselor in a timely manner, to the extent plaintiff contends that his complaint is that Mr. Doyle obtained input from plaintiff's peers concerning the performance evaluation. Plaintiff's September 22, 1999 letter states that he learned at one of his meetings with Mr. Doyle -- either on June 29 or August 5, 1999 -- that Mr. Doyle got input from plaintiff's peers. ROI at p. 54 ("It disturbs me that during the meeting you stated 'I got input from five of your peers. . . .'" Both meetings occurred before August 28/September 18, 1999 -- more than 45 days before plaintiff made initial contact with the EEO office. Therefore, plaintiff did not contact the EEO within 45 days of his learning about the peer input.

Additionally, since plaintiff signed the evaluation on June 30, 1999, the input from plaintiff's

15

peers for the preparation of the evaluation was obtained before June 30, 1999.  The protected

activity which plaintiff claims caused retaliation against him all happened after plaintiff got his

evaluation.    Therefore, there can be no causal connection between obtaining peer input and the acts

of alleged protected activity.  Therefore, obtaining peer input for the evaluation cannot be an act of

retaliation.

   Plaintiff's initial contact with an EEO counselor was October 12/November 2, 1999.  Thus,

his claim -- concerning the June 30, 1999 evaluation, its lack of complementary narrative resulting

in no award, and obtaining peer input -- is barred because plaintiff did not contact an EEO

counselor within 45 days of the alleged act of retaliation or of learning of the alleged act.

**Communications with management were not initiation of EEO Process**

   In his responses to defendant's interrogatories, plaintiff stated that the basis for this claim is

retaliation for prior EEO activity described in his response to interrogatory 17.  SupRog  p. 3-4

(Paragraph 7 -Count1).

   Interrogatory 17 stated:

   As to each adverse action alleged, fully identify and describe the prior protected activity
   causing the alleged acts of reprisal, including the date(s) of the prior protected activity,
   the alleged discriminating official.

Plaintiff's response stated

   The retaliatory animus against Plaintiff was already evident in the false testimony Peter
   Niebauer gave to the security clearance investigator.  It first manifested itself for the
   purpose of this case by the contacts Plaintiff made on 6/29/99, 8/5/99 and 9/22/99 when
   Plaintiff attempted to resolve the issue alleged in Paragraph 7-Count 1 of the
   Complaint.  See ROI p. 000054.

SupRogs at p. 11.  Plaintiff's response then discussed a meeting with Assistant Secretary Berry in

October 1999 and a meeting with Tom Frye in November 1999.  *Id*.  ROI p. 000054, referred to in

plaintiff's response, is the September 11, 1999 memorandum from plaintiff to Robert Doyle.  It

reflects that Doyle met with plaintiff "on June 29 and August 5, 1999 in an attempt to come to

closure on my FY 1998 EPPR and subsequent awards."  ROI p. 000054.

Neither plaintiff's meetings with and memorandum to Mr. Doyle, meetings with Mr. Berry and Frye, nor letters which he sent to various congressmen constitute initiation of the EEO process. A communication outside the EEO counseling process is not sufficient to exhaust administrative remedies where there was no indication that the receiving party considered the communication to be a "formal initiation of EEO counseling," and where subsequently plaintiff did initiate formal EEO counseling. *Carroll v. England*, 321 F. Supp. 2d 58, 66-67 (D.D.C. 2004.)  Engaging in an internal dispute resolution procedure with supervisors and a human resources representative "cannot replace the required initial contact with an EEO Counselor within 45 days of the allegedly offensive incident." *Carter v. Greenspan*, 304 F. Supp. 2d 13, 23 (D.D.C. 2004).  *See Velikonja v. Mueller*, 315 F.Supp.2d 66, 73 (D.D.C.2004) affirmed in part and reversed in part on other grounds by 446 F.3d 122 (D. C. Cir.2006); and see *Cox v. Rumsfeld* WL 21691044, *6 -7  (W.D.Wis.,2003) (discussing  EEOC regulation and concluding that : "[T]he question is whether plaintiff expressed his intent to begin the EEO process to an individual who was sufficiently related to that process.")

Plaintiff has offered no evidence that plaintiff or Mr. Doyle considered their communications -- the two meetings and the September 22, 1999 memorandum,  to be the initiation of EEO counseling.  Indeed, plaintiff initiated EEO counseling on November 2, 1999 with his memorandum which was dated October 12, 1999.

Although plaintiff alleges direct  evidence of retaliatory animus on the part of Mr. Niebauer, he offers no direct evidence of such animus on the part of Mr. Doyle.  Mr. Niebauer's alleged retaliatory animus cannot be imputed to Mr. Doyle, because part of plaintiff's complaint is that Mr. Doyle did the evaluation **without** Mr. Niebauer's input.

Mr. Doyle obtained input from plaintiff's peers and prepared plaintiff's evaluation without complimentary narrative justifying an award prior to the evaluation being signed.    Thus, there is no evidence of a causal connection between the evaluation, lack of award and the alleged protected

activity.  Thus, in addition to not timely contacting the EEO counselor,  plaintiff has failed to
present evidence of an essential element of his claim of retaliation.

**Count 2 -- Travel Request**

Plaintiff alleges that he was retaliated against when, in September 1999, during a detail to the
Office of Small Business, Robert Doyle refused to provide travel funds.  As a result plaintiff was
unable to travel to the National Black Chamber of Commerce conference.  SupRog p. 4-5,
Paragraph 8- Count 2 (Allegation 9) and SupRog 6 at p. 8.

In response to defendant's documentary requests plaintiff submitted as evidence a September
13, 1999 memorandum to Peter Niebauer which included the following:

> I need a travel authorization for my upcoming participation and presentations in several
> conferences.  The first is to begin on 15 September.

SupRog at p. 8 and attachment Ex 7 "Interrogatory #6 )."

Plaintiff missed going to the Black Chamber of Commerce meeting at which BLM had been
given a booth where BLM could explain how to write business plans and how to do business with
the federal government. Hill 2002 Depo at p. 168:22-169.

The Hispanic Chamber of Commerce meeting took place in the latter part of September or
October 1999.  Plaintiff received travel authorization for that trip about one week before he was
scheduled to go. *Id*. at p. 170:1-13.

Plaintiff has offered no evidence that Robert Doyle refused to provide him with travel funds.
Plaintiff sent a memorandum to Mr. Niebauer dated September 13, 1999 which stated "I need a
travel authorization for my upcoming participation and presentations in several conferences.  The
first is to begin on 15 September."  9/13/99 memo; *See* Supp Rog Response 6 at p. 8 (Identifying
the travel request which was made as attached interrogatory 6 which is the above-mentioned
memorandum to Peter Niebauer dated September 13, 1999.)   Indeed, according to plaintiff's own
testimony he received travel funds for the next conference, Hispanic Chamber of Commerce

18

meeting, after Mr. Faithful made a request to Mr. Doyle. Hill 2002 Depo at p. 167:24- 168:21.

Plaintiff has offered no evidence showing any materially adverse action due to his failure to receive a travel authorization, on such short notice, to go to one meeting at which he was to man an information booth. Plaintiff has offered no evidence showing any materially adverse harm to him from not going to the meeting.

**Count 3-- Detail**

Plaintiff alleges he was retaliated against when "In November of 1999, Plaintiff was serving a detail to the Office of Secretary, Office of Environmental Policy. This was terminated by Robert Doyle and Warren Johnson for no reason prior to its completion." SupRog p. 5 at Paragraph 9 (Allegation 6).

Plaintiff has not presented evidence of any materially adverse action. There was no change in plaintiff's salary, grade or benefits. Being on a "detail" implies that one will return to his regular duties after the end of the detail. Plaintiff was on a self-generated detail. See 11/3/99 memo from Hill to Fry. According to plaintiff's memorandum he was on the detail with Dr. Taylor as early as November 2, 1999. *Id. at p. 1* (Dr. Willie Taylor . . . met with me on November 2, 1999 regarding a telephone call he received from Warren Johnson . . . **concerning my current detail to his office**.")(emphasis added). According to plaintiff's memorandum, on November 1, 1999, Warren Johnson called Dr. Taylor about the detail and told Dr. Taylor that the detail should be stopped and prior approval should be obtained. 11/3/99 Hill memo to Fry. Dr Taylor prepared a proposal for an estimated six-month detail. Hill 2007 Depo at Ex.1. Plaintiff remained on detail with Dr. Taylor until approximately April 2000. Hill 2002 Depo at p. 239-240. November 1999 to April 2000 is approximately 5 months. In February 2000, Dr. Taylor told plaintiff that "he had spoken with Bob Doyle to try to get some type of arrangement for me to stay there and then . . . he said he . . .talked with Warren Johnson and said that unless he was going to pick up . . . my salary and benefits and travel I couldn't do it." Hill 2002 Depo. at p. 199. Dr. Taylor advised plaintiff that he could not

pick up plaintiff's salary, benefits and travel. Hill 2007 Depo at p. 68.

When plaintiff finished his project for Dr. Taylor, he returned to doing solely his duties for BLM. Hill 2002 Depo at p. 239-240 ("Q. However, those same dates, January of 2000 and February of 2000, you were still working in Dr. Taylor's office? A. Yes. Q. Did anyone express or object to that arrangement? A. No, they just said once you finish up the project that he had you on come on back. So, that's that's what I did. Q. Are you alleging that in April 2000, that you finished the project with Dr. Willie Taylor? A. Yes, I'm saying we finished up in that Spring and I came back permanently to the Bureau of Land Management. . . .").

Plaintiff has presented no evidence of any harm to him from not remaining any longer on the detail with Dr. Taylor. Plaintiff was asked: "As to each adverse action alleged, fully identify and describe the specific harm caused by the adverse action." See Sup Rog Response 16 at p. 10. Plaintiff referred defendant to his responses to Interrogatory #1. *Id*. Interrogatory 1 at p. 5, (concerning ¶9 of the complaint) states only that the detail "was terminated . . .for no reason prior to its completion." Plaintiff's response does not indicate he was harmed in any manner by the termination of the detail. Moreover, plaintiff has admitted that the proposed detail was estimated to be about six months. Hill 2007 Depo at p. 68-70. Plaintiff admitted that in April 2000, he had finished the project Dr. Taylor had him on. Hill 2002 Depo at p. 239-240. Thus, plaintiff has failed to present evidence of an essential element of his claim, a materially adverse action.

Additionally, defendant has a legitimate, non-retaliatory reason for its actions. Plaintiff was on a self generated "detail" to Dr. Taylor's office. After Mr. Doyle, plaintiff's second line supervisor learned of plaintiff's arrangement, he contacted Dr. Taylor and was told that plaintiff had approached Dr Taylor and told him that plaintiff was available to do work assignments for Taylor. Doyle Dec. at ¶ s. Neither Mr. Doyle nor Mr. Neibauer had approved a detail for plaintiff to Dr. Taylor's office. *Id*. and Niebauer Dec. at ¶ g, k. Mr. Doyle asked Dr. Taylor if terminating the detail would be disruptive, and Taylor responded that it would not. Doyle Dec at ¶s. Mr. Doyle

directed that plaintiff be told to return to his BLM duties. The Director of Human Resources, Warren Johnson also talked with Dr. Taylor about Mr. Hill's arrangement with him. Johnson 2007 Depo at p. 17. Each office was under the impression that the other was supposed to fund the detail. *Id*.at p. 17-18. "Dr. Taylor said that he did not have money to fund the request for the detail, and Mr. Doyle said that he had work for Mr. Hill to perform, and that was the end of it." Johnson 2007 Depo at p 19. It is entirely legitimate and non-retaliatory that the BLM would not want to continue using its funds paying plaintiff's salary, benefits and travel for him to stay working outside of BLM at the Office of the Secretary.

**Count 4 -- Position Description Rewritten**

Plaintiff alleges that "In November 1999, Plaintiff's position description was rewritten after he began EEO activity. The new description narrowed the scope of his employment and was a de facto reassignment. The description was rewritten by Joseph Federline and Thomas Walker." SupRog p. 5-6, Paragraph 10 -- Count 4 (Allegation 12).

**No causal relationship**

Plaintiff has failed to establish a causal relationship between the rewriting of his position description and retaliation. As with his other claims, plaintiff's supplemental interrogatory response identified the protected activity relating to the alleged act of retaliation as being described in response to interrogatory 17. Sup Rog at p. 5-6, 11-12. The alleged protected activity included communications with Mr. Doyle, Mr. Berry, Mr. Fry and Mr. Johnson during June 1999 to November 1999, and also included his initial EEO contact on October 12, 1999. *Id.* at p. 6. On July 20, 2000, Mr. Federline signed a position description for Mr. Hill for the position Senior Business Management Specialist GS-1101-14. July 2000 PD. That was approximately 8 months after the last of plaintiff's alleged protected activity. Therefore, plaintiff cannot establish causality by a close temporal connection to alleged protected activity.

**Classification request**

According to plaintiff, he told BLM that his GS-14 position should be a GS-15, and he requested a desk audit to see if the position should be classified as a GS-15.  Hill 2007 Depo at p. 116.  After he asked for the desk audit, plaintiff was told his position description was being re-written.  *Id.*  Many of the "taskings" he had been doing were being "farmed out to other folks, Special Assistants, the Deputy Director . . . ."  Hill 2007 Depo at p. 117-118.  Plaintiff believes that the taskings being reassigned to others were those duties which made the job a GS-15 versus a GS-14.  *Id.* at p. 118-122.

 In asking for the desk  audit,  plaintiff was asking for a non-competitive upgrade of his position.   Department of the Interior, Departmental Manual Effective Date: 6/9/99 (DMM) provides at 370 DM 335 in pertinent part as follows:

3. Application of Competitive Procedures.

A. Competitive procedures apply to the following actions:
* * *
(6) Promotions due to the addition of substantive, new and higher-graded duties when the new position is not a clear successor to the old position or there are other employees serving in similar or identical positions within the organizational unit to whom the new duties could have been assigned

B. Competitive procedures do not apply to the following actions:
* * *
(3) A promotion resulting from an employee's position being classified at a higher grade (with no further promotion potential) because of additional duties and responsibilities, commonly known as accretion of duties. The noncompetitive upgrade requires the employee to continue to perform the same basic function in the new position that is a clear successor to and absorbs the duties of the old position. In addition, there are no other employees within the organizational unit to whom the additional duties and responsibilities could have been assigned.

To make a prima facie showing that he was entitled to have his position upgraded, plaintiff must show that:  1) he is a member of a protected group, 2) he regularly and consistently performed work at a higher grade level, 3) that he requested and was denied an upgrade, 4) that he continued to do the higher graded work (i.e. that the agency did not remove the higher level duties from him), and 5) [some indicia of discrimination, for example]  that other employees . . .were doing the same

work and given higher grade levels.  *Williamson v. Shalala*, 992 F. Supp. 454, 460 (D.D.C. 1998),

*Alan v. West*, 884 F. Supp. 519, 524 (D.D.C. 1995), *Nelson vs. Secr, U.S. Depart. of Commerce*,

1986 WL 1831 *6 (D.D.C. 1986) (two desk audits concluded plaintiff was performing some of the

higher level functions, but because she was not performing them continuously and independently,

upgrade not required).

    Plaintiff Hill cannot establish a prima facie case showing that he was entitled to have his

position upgraded.  First, plaintiff did not regularly and consistently perform the alleged higher level

duties for the agency.   For the 5 year period from October 1994 to September 1999, plaintiff spent

October 1994 to February 1996  on Capitol Hill in an American Political Science fellowship detail,

and from July, 1998 to September 1999, in a management training program at the Industrial College

of Armed Forces (ICAF). Hill 2007 Depo at p. 22-25; 37-38.   Thus for approximately half of that

five year  period, plaintiff  was not even  performing duties for BLM.  Second, according to

plaintiff, the agency removed the higher level duties from him and gave them to Special Assistants

and the Deputy Director.  Hill 2007 Depo at p.  117-122.  Thus, he did not continue doing higher

level duties.  Therefor, plaintiff has not established that he had any entitlement to an upgraded

position.

    Additionally, if, as plaintiff alleges, he was being paid as a GS-14 level employee but had

been doing GS-15 level work, taking away GS-15 duties was not a materially adverse action.

Taking away GS-15 level duties insured that plaintiff would not be underpaid for doing higher

graded duties, but rather would be given duties commensurate with his GS-14 grade level pay.

Thus, plaintiff has not shown any material harm.

    The agency was not required simply to give plaintiff the higher GS-15 grade in a non-

competitive manner.  To the contrary, the Department Manual requires that competitive procedures

apply when "there are other employees serving in similar or identical positions with the

organizational unit to whom the new duties could have been assigned,"  370 DM 335 A.(6), or if

23

there are "other employees within the organizational unit to whom the additional duties and responsibilities could have been assigned." 370 DM 335 B.(3).  Here the plaintiff has admitted that the duties he considered to be GS-15 level duties were being assigned to "other folks, Special Assistants, the Deputy Director . . . ." Hill 2007 Depo at p. 117-118.

Cases in this Court have recognized that in situations involving requests for reclassification to higher grade levels, the agency properly may readjust the plaintiff's duties to the level of his position.  It can  transfer some of the higher level duties to another employee. *Alan v. West,* 884 F.Supp. 519, 524 (D.D.C.,1995),  *Jehle v. Heckler*, 603 F. Supp. 124,127 (D.D.C. 1985) (if a classification review determines position is mis-classified, government may raise or lower rating of position).  They also could reduce his duties. *Shamey v. Administrator, G.S.A.,* 732 F. Supp.122, 129 (D.D.C. 1990) aff'd, 925 F. 2d 490 (D.D.Cir. 1991)(if desk audit reveals employee is performing above designated GS- level, management retains right to reduce his duties, rather than granting GS- level upgrade). *See also, Milliner v. D.C.*, 932 F. Supp. 345, 348-49 and 351 (D.D.C 1996) (Plaintiff submitted no evidence that, had a Grade 7 position been available, she would have been the most qualified applicant for the position.).  [4]

Therefore reducing this GS-14 grade level plaintiff's duties, by removing duties at the GS-15 level, was not a materially adverse action.  Further, it is a legitimate non-retaliatory reason that a non-competitive upgrade of the position would have been violative of the agency regulations.

**Legitimate Non-retaliatory Reason**

In his September 22, 1999 memorandum to Robert Doyle, one of plaintiff's complaints about his former supervisors was their

Refusal to provide me a position description.  I was the only employee in the office to

---

[4] Moreover, plaintiff has not identified any comparator employee who was treated more favorably than he  – *i.e.* that someone who had not filed EEO claims was allowed to keep higher graded work and had his position upgraded non-competitively.

24

not receive one.  It should be noted that after this refusal, I drafted and submitted a
position description to the personnel office and to Niebauer.  He still refused to provide
me one.  The draft was submitted **over two years ago**.

ROI at p. 55.  (Emphasis added).

Joseph Federline was selected to be Group Manager, and became plaintiff's supervisor in mid

to late 2000.  ROI at p. 288, 294.  When Joe Federline became the new Group Manager in the

Property and Acquisitions Group, Mr. Doyle asked Mr. Federline "to ensure that everyone he

supervised had a current position description and performance rating plan, including complainant."

Doyle Dec. 7/19/2002 at ¶ w.  Mr. Federline remembered that in about August 2000,  plaintiff "was

complaining that he did not have an up-to-date position description."  ROI at p. 295.

> We had a meeting with Personnel and EEO to present his position description
> for the job that he's currently doing in the Property and Acquisition Group.  We
> discussed that position description, and I think he wanted to bring up his past history
> during that time.  We tried to keep him on point saying that this is the position that
> management has for you at this time.  He said he does not agree with that position
> description.
> We said that we prefer for him to agree with the position, but that management
> does not require him to agree with the position on the work that they have for him to do.
> It was the only position description for the work to be done that was classified in his
> current grade level.

ROI at p. 296.

Plaintiff's personnel records reflect a notice of personnel action, a reassignment,  effective

6/06/00, with the remark "result of changes in classification standards."  SF 50-B effective date

6/04/00.  The position title remained Management and Program Analyst. The reassignment only

changed the Occupational code of the position from 345 to 343. *Id.*

On July 20, 2000, Mr. Federline signed a position description for Mr. Hill for the position

Senior Business Management Specialist GS-1101-14.  July 2000 PD.   A Classification Evaluation

was done which found that the position was properly classified at the GS-14 level.  Hill 2007 Depo

at Ex. 3 p. 8-19.  A notice of personnel action, effective 8/13/00, was issued reassigning plaintiff

from the position Management Program Analyst, GS-0343-11 to Senior Business Management

Specialist, GS-1101-14.  SF-50 B effective date 8/13/00.

> In an e-mail to Mr. Federline dated 3/26/2001, plaintiff complained
>
> I never agreed to you re-writing my PD and my EPPRS. . . .When we last talked with the personnel and eeo personnel, you were going to set up a meeting with HRM personnel to discuss my transfer.  The reason this is a sensitive issue with me is because I did not asked (sic) to be, nor did I wanted (sic) to be, transferred to WO-800.  Before agreeing to the move, I met with the Dep Dir (Mat Millenbach) and the Grp Mgr (P.Niebaurer)[5] who agreed that I would "**help out the small business pgm for a couple of years**" but I would continue as a GS-343 and be involved in organizational planning, public and strategic planning, and other assignments that were commensurate with my skills and training; and, that would enhance my career.  I never agreed to be an "eternal" BEDP person and have you (and) others to attempt to confine me to a dead end job and clerical duties.

Hill 2007 Depo Ex.3 at the two pages following p. 19 (Ex.O) (emphasis added).  Mr. Federline

replied:

> I wrote your PD for the work in the WO-850 group for which you were assigned by management, We discussed and made one change to the PD in our meeting last August stating that you would coordinate your  work with Group manager as you requested.  The PD was classified at you current grade, GS-14.  Personnel and EEO agreed that it was a good PD.  Personnel, EEO and I thought that after we made the change that you requested, and you didn't have any other problems with the remainder of the PD, the PD was ok with you.  However, the PD does not require agreement by the employee.
> * * *
> I'm sorry that you feel that the BLM Business and Economic Development Program and Greening Program are dead end jobs with clerical duties.  The classification statement indicates otherwise.  Achieving diversity in contracting goals and greening goals are very important BLM and Department programs.  Achievements in those programs need strong leadership.

*Id.*

> Thus, the other legitimate, non-retaliatory reason for the change in plaintiff's position

description is that it was  written to describe the job that he then  was assigned to do in the Property

and Acquisition Group.  Although plaintiff may have had a preference to do other duties, the

classification evaluation established that the duties and responsibilities of the position were at

---

    [5]  Plaintiff's resume reflects that in February 1996 plaintiff was placed  under the supervision of Mr. Niebauer after returning from the Congressional Fellowship.  Def. Doc. Response at p. 32-33.

plaintiff's grade level, GS-14.

**Count [5] -- Acting Supervisory Position**

Plaintiff alleges that "In December 1999 while Plaintiff was serving the detail referred to in Paragraph 9 [i.e. The detail to the Office of Environmental Policy with Dr. Taylor from November 1999 to March/April 2000], Joseph Federline and Robert Donelson were promoted to acting group manager and he was not."

Plaintiff has failed to present any evidence that Mr. Federline and Mr. Donelson received temporary promotions to a higher grade level as acting group manager during the period in question. Therefore, he has failed to show any materially adverse action.

The federal payroll records for BLM reflect that during the period 1999 to April 2000,  Joseph Federline only received a temporary promotion to the GS-15 level as  Deputy Assistant Director effective July 18, 1999 Not to Exceed (NTE) August 31, 1999.   HR Dec at ¶ 2.  The records reflect no temporary promotions for Robert Donelson during that time period.  HR Dec at ¶ 2.

Plaintiff did not return to BLM  from ICAF until September, 1999.  Therefore, he was not even available when Mr. Federline was temporarily promoted to a Deputy Assistant Director position.  This temporary promotion occurred before the period complained about by plaintiff, that is, before he was serving on the detail.

After Mr. Niebauer retired from the Group Manager position in September 1999, and during the time while plaintiff was on detail,  Mr. Federline and Mr. Donelson did alternate as acting group manager until the position was filled.  Doyle Dec. at ¶ u; Niebauer Dec. at ¶ a (Mr. Niebauser retired from his position as group manager on September 30, 1999).   But, this Circuit has held that denial of temporary acting designations is not an adverse employment action.  *Stewart v. Evans,* 275 F.3d 1126, 1135 (D.C. Cir.2002).   The non-paid acting  position is distinguishable from the Acting Sergeant position in *Elam v. D.C. Fire and EMS Department*, 2002 WL 1903557, *5-6 (D.D.C.2005) because there was no increase in pay to Mr. Federline or Mr. Donelson while they

were acting as Group Manager.

Additionally, defendant has a legitimate, non-discriminatory reason for its actions. Plaintiff did not express to Mr. Doyle any interest in serving as acting Group Manager and did not complain to Mr. Doyle that he was not given an opportunity to serve in the position while Mr. Federline and Mr. Donelson were acting. Doyle Dec at ¶ u.   During the period in question plaintiff was on a self generated detail to Dr. Taylor's Office, where he wanted to stay. As is discussed above, plaintiff has claimed as one alleged act of retaliation, pulling him off of that detail. Plaintiff could not do two things at once. Plaintiff's desire to remain on the detail with Dr. Taylor is antithetical to any contention that he expressed a desire to return to BLM to serve as acting Group Manager on the same basis as Mr. Federline and Mr. Donelson, that is without a temporary promotion, and to any contention that there was any material harm to him. It is clear from the record that plaintiff was not reticent about complaining about what he considered not to be "career enhancing" assignments. Plaintiff's desire to stay with Dr. Taylor was made quite clear. Yet, he has offered no e-mails, memoranda or letters complaining to Mr. Doyle or other managers, that he was not made, or wanted to be made, acting Group Manager during the period in question.

**COUNT 6 --  DISMISSED**

**COUNT 7 --   NON-SELECTION**

Plaintiff's complaint contends that he has established a prima facie case of discrimination based on retaliation. He claims that the selecting official, upon becoming aware that plaintiff applied for the position, rewrote the job description to fit the selectee's qualifications.   Complaint at ¶13. He also contends that his qualifications were superior to those of the selectee. *Id.* The selecting official for this position was Warren Johnson  who, was the BLM Assistant Director for Human Resources. Johnson Declaration, Ex. 13 at ¶a-c.

**No Materially Adverse Action in changing Vacancy Announcement**

There is no proof that the change of the vacancy announcement was a materially adverse

action, nor can an inference of retaliation be drawn from the change in the vacancy announcement. A GS-15 supervisory position for an individual to serve as the "Chief, Human Resources Management for the Executive Services/Initiative Group, Assistant Director for Human Resources Management" was advertised in vacancy announcement no. WO-99-15.  Def. Doc. Response at p. 1-4.   The vacancy announcement  described the position as **"Human Resources Specialist**, Supervisory"  in the series and grade "GS-0301-15."  *Id.* (emphasis added).   Vacancy announcement WO-99-15 was canceled.  *Id.* at p.  9  & 34.   The position was readvertised in vacancy announcement WO-99-27.  Def.  Doc. Response at p.  5-8.  The vacancy announcement described the position as "**Supervisory Personnel Specialist**,"  in the series and grade "GS-0201-15."  *Id.* (emphasis added).   The major duties and the knowledges, skills and abilities (KSA's) required in both announcements  were exactly the same.   Compare *Id.* at p.  2 with *Id*. at p.  6-7.  Since there was no change in the major duties or in the KSA's, the plaintiff could not have been adversely affected by, and no inference of retaliation can be drawn from,  the simple change in title in the vacancy announcement.

Plaintiff also has failed to establish a prima facie case of retaliation because he has failed to present evidence that a causal connection existed between any protected activity and an alleged materially adverse action.

**No temporal proximinity**:

In Interrogatory 17, plaintiff was asked

As to each adverse action alleged, fully identify and describe the prior protected activity causing the alleged acts of reprisal, including the date(s) of the prior protected activity, the alleged discriminating official.

Sup Rog Response at p. 11.

Plaintiff alleged direct evidence of retaliatory animus on the part of Mr. Niebauer because of allegedly false testimony given to a security clearance investigator.  Sup  Rog Response at p. 11. However, plaintiff has not offered any direct evidence of retaliatory animus on the part of Mr.

Johnson who was the selecting official for the position.

   Plaintiff then stated "It first manifested itself for the purpose of this case by the contacts Plaintiff made on 6/29/99, 8/5/99 and 9/22/99 when Plaintiff attempted to resolve the issue alleged in Paragraph 7-Count 1 of the complaint. See ROI p.  000054"  *Id.*  Paragraph 7  pertains to plaintiff's allegations concerning receipt of his FY '98 performance evaluation.  See complaint at ¶7.  ROI p. 54 is a memorandum to his second line supervisor, Robert Doyle, dated September 22, 1999, which refers to meetings with Mr. Doyle on June 29 and August 5, 1999  "in an attempt  to come to closure on my FY 1998 EPPR and subsequent awards."  ROI at p. 54.  Plaintiff admitted that he first sought EEO counseling concerning these matters on October 12, 1999.  Supp Rogs at p. 3-4.

   Plaintiff then refers to a meeting with an Assistant Secretary Berry in October 1999 and a meeting with Mr. Frye in November 1999.    Supp Rogs at p.  11-12.

   Announcement no. WO-99-15 opened on February 10, 1999 and closed March 11, 1999. Both plaintiff and the selectee, Ms. Stewart applied under the first vacancy announcement. Defendant's Doc. Response at p. 9 & 34.   It was readvertised as WO-99-27 on  April 19, 1999 and closed May18, 1999.   Johnson Dec., Ex 13  at ¶c.   Thus, the rewriting and readvertisement of the position, occurred **before** the first cited meeting with Mr. Doyle on June 29, 1999.    Thus, there can be no causal connection between the meetings and the rewriting and readvertisement of the vacancy announcement.

   On August 23, 1999,  Mr.  Johnson  advised the personnel management specialist that he had selected Connie Stewart for the position.  Johnson Dec at ¶ j and Def. Response at p. 52.  Plaintiff has offered no evidence that the selecting official, Mr. Johnson, had any knowledge of plaintiff's June and August 5, 1999 meetings with Mr. Doyle.  Plaintiff's September 22, 1999 memorandum to Mr. Doyle, the October and November 1999 meetings with Mr. Berry and Mr. Frye, and his initial EEO contact, clearly came after the August 23, 1999 selection of Ms. Stewart,  and thus could have

no causal effect on the selection.

Indeed, the first time Mr. Johnson became aware that plaintiff was making allegations of discrimination was after his selection of Ms. Stewart on August 23, 1999. He became aware of plaintiff's allegations when letters from congressmen were referred to him by the Congressional Affairs Office. Johnson Depo at p. 10. The letters from the congressmen were dated October 18, 19 and November 9, 1999. Johnson Depo at Ex 1-3. The letters from the Congressmen are dated after the selection for the position had been made by Mr. Johnson and after September 12, 1999, the effective date for the promotion of the selectee, Ms. Stewart. Johnson Dec. ¶ j.

Additionally, plaintiff's complaint to Mr. Doyle concerned actions of plaintiff's immediate supervisors Peter Niebauer and Roger Hildebeidel in FY1998 and before. See ROI at p. 54. Mr. Johnson first came to the BLM in June 1998. Johnson Depo at p. 14. One of the things Mr. Johnson did after he came in June 1998 was to write a memorandum to the Assistant Secretary supporting plaintiff's request to go to the War College [ICAF]. Johnson Depo at p. 13-15. Since Mr. Johnson was a new BLM employee not involved in the conduct complained about, plaintiff cannot show any motive or causal connection for any alleged retaliation. Compare *Bieber v. Runyon*, 1996 WL 525372 at *11 (D.D.C. 1996) (plaintiff failed to establish causal connection between her non-selection and a previous EEO complaint where her earlier complaint was not based on actions taken or decisions made by the official who failed to select her for the position, and where plaintiff had not claimed that the official was involved in any way in the facts underlying her previous complaint).

Plaintiff has not otherwise submitted evidence sufficient to raise a inference of retaliation due to his non-selection. Plaintiff contends that an inference of retaliation can be made because he was better qualified for the position than Ms. Stewart. "[T]he D.C. Circuit has explained that discrimination will not be inferred absent a showing that plaintiff's qualifications were far superior to the successful candidate's." *Singleton v. Potter,* 2005 WL 3273133, *15 (D.D.C.2005) (*citing*

*Aka*, 156 F.3d at 1296). *See also Keeley v. Small* 391 F.Supp.2d 30, 50 (D.D.C.2005).  In this case, comparison between Ms. Stewart and plaintiff does not reflect that plaintiff was significantly better qualified, or better qualified at all, than Ms. Stewart.  Compare Stewart Application Def. Doc Response at p. 54-71 and Hill Application.  *Id*. at p.31-39.

    The incumbent of the position at issue was to serve in a GS-15 supervisory position as the "Chief, Human Resources Management for the Executive Services/Initiative Group, Assistant Director for Human Resources Management. " Def. Doc Response at p. 6.  The KSA's required inter alia, a person with a strong background in the federal personnel system.  *Id.*

    Ms. Stewart's application reflects that she began her career with the government in 1973-1980 in the Office of Personnel Management as a Specialist in employee development and relations.  *Id.* at p. 63.  She served as a personnel management specialist GS-12, in the Departments of Interior, Navy and Agriculture.  *Id.*  From 1988 to 1991 she was a GS-13 senior Personnel Management specialist in the Fish and Wildlife Service, DOI, who performed duties in staffing and placement, position management and classification, employee relations and performance management, employee pay and benefits, other personnel related matters, and served as the assistant ethics counselor.  *Id.* at p. 61-62.  From April 1991 to September 1993, she was assigned to the BLM Division of Personnel and, among other duties, "developed Bureau wide personnel guidelines, procedures, policy recommendations in various areas of personnel management such as pay and leave administration, position classification and employee programs and benefits."  *Id.* at p. 59, box 6.  From September 1993 to December 1994, Ms. Stewart was the Branch Chief of Personnel Policy and Studies at BLM supervising  personnel specialists and two clerical employees.  *Id.* at p. 59. From December 1994 to September 1995, she was Acting Team Leader on the BLM Executive Initiatives Team.  *Id.* at p. 57.  From October 1995 to December 1997, Ms. Stewart was the Acting Deputy Assistant Director, BLM, Human Resources Management *Id*. at p. 57.  This was a "dual position . . .previously occupied by GS-15 employees.  These positions were Group Administrator,

which later became Group Manager . . .and to the Deputy Assistant Director. . . ." *Id.*   As Group

Administrator/Group Manager she supervised the Executive Initiatives Group consisting of 3

specialists, one technician and one clerical.  As Deputy Assistant Director, she supervised an

immediate staff of nine employees and two group managers.  *Id.*  Beginning in December 1997 she

was detailed as Acting Deputy Assistant Director, and beginning in February 1999 she was placed

in a temporary promotion to GS-15 as Acting Group Manager Executive Services/Initiatives Group.

*Id* at p. 54.  In those positions Ms. Stewart not only managed and supervised the work of the groups,

but also was the human resources management advisor providing personnel services to the Director,

Deputy Director, their staffs, political appointees and other senior level staff.  *Id.*  See also Ms.

Stewart's KSA's *Id.* at p. 69-71 (She worked closely with Bureau Senior officials, Office of

Solicitor, managers and supervisors in the field and in Washington providing personnel advice and

assistance.  She worked with the Department at the conception of the Department's HRM strategic

Plan; worked on the Bureau strategic plan; was part of the first group to come up with the goals and

measures for the HRM portion of the Bureau's strategic plan. *Id*. at ¶ 1.   She had dealt with issues

of very sensitive, political and controversial nature, has dealt with very visible and sensitive

personnel issues.  *Id* at ¶2.  She has been a supervisor.  *Id* at ¶3.   She has extensive operational and

policy experience in human resources programs in the Bureau and Department. *Id*. at ¶4.  Her

communications skills are documented by her work with high ranking officials in the Bureau and

Department and her work with outside groups.  She has presented briefings, done training, prepared

bureau wide personnel guidance, prepared comments on proposed regulations and legislation, wrote

bureau manual chapters, etc. *Id*. at ¶ 5.   She had extensive experience working on automated

personnel systems, was responsible for working on upgrading the automated systems of the bureau,

had staff participating on work groups looking at automation in the future and was a member of the

Department's User Transition Team.  *Id*. at ¶6.)

     In comparison to the extensive direct and recent employment in personnel

management/human resources at BLM and DOI reflected in Ms. Stewart's application, plaintiff's application reflects that his primary experience at BLM and the Department of Interior was as a management analyst. *See Id* at 32-37. His application does not reflect as extensive current knowledge of or experience in Federal Personnel and Human Resources Management as Ms. Stewart's application. From July 1998 to July 1999 he was away from BLM taking courses at ICAF. *Id.* at p. 32. From February 1996 to July 1998 he was a senior technical Specialist dealing with Federal Acquisition, Business and Economic Development, and procurement issues. *Id.* From October 1994 to February 1996, he was away from BLM on a Congressional fellowship. *Id.* at p. 33. From 1990 to October1994 plaintiff reported numerous positions of undetermined length involving conducting analytical and management studies and various projects. *Id.*

In demonstrating his knowledge of personnel/human resources, Plaintiff's KSAs numbers 1-3 refer to his duties as Technical Advisor to the Federal Quality Institute "awarding of nationwide quality management and re-engineering contract proposals" some time in 1990-1994, *Id.* at p. 33 & 38, and to his duties as a manager and Assistant Director of Personnel and Community Services while at White Sands Missile Range in 1984 to 1990. *Id.*

Plaintiff has neither submitted evidence demonstrating that he was better qualified than nor that his qualifications were far superior to those of Ms. Stewart. Thus, plaintiff has failed to establish facts raising an inference of retaliation and thus has failed to establish a prima facie case.

Defendant also has a legitimate non-discriminatory reason for its actions and the selection of Ms. Stewart. The position description was re-advertised by Mr. Johnson at the direction of the office of the Director of Human Resources for the Department of Interior who wanted the position advertised as "supervisory personnel specialist." Johnson 2007 Depo at p. 31-32. Even though the title changed, the described duties of the position were the same. Johnson Dec. at ¶ d. In recruiting for the position, Mr. Johnson was seeking an individual who had a good understanding of recent human resources automation and who was knowledgeable of the current policy

34

developments in human resources as well as the Office of Personnel Management's strategic plan. *Id.* at ¶ h.   Ms. Stewart  had worked in personnel management for over 20 years, and had worked in the BLM Human Resources Office for more than twelve years as a Personnel Specialist.  *Id.* at ¶ i.    Based on her credentials and current work experience, Mr. Johnson believed her to be the best qualified person for the position.  *Id.*  During her interview, Ms. Stewart talked about the Office of Personnel Management HR Strategic Plan, the Department's HR automation initiatives, and BLM's newly developed HR plan.  *Id.*  Mr. Johnson believed that although plaintiff had some good experience in the area of human resources, he did not have the current experience the Supervisory Personnel Management Specialist would need to have to automate the Human Resources Office. *Id.*

### Count 8 ¶ 14 -- Refusal to Submit Application re Eastern States position

Plaintiff alleges that  "In November 1999, management officials refused to submit Plaintiff's application for the position of Assistant BLM Director Eastern States Office. "

In his investigator's interview plaintiff explained his complaint in the following manner:

A.  Yes.  That states: "In November 1999, management officials refused to submit Mr. Hill's application for the Assistant Director Eastern States Office Position."

Q.  When you say "they refused to submit it," you normally would do that, wouldn't you?

A.  Yes, sir.   I normally would have done that.  What transpired here was I had a meeting with the director, Tom Fry and Warren Johnson, AD, during that period of time, where we talked about my concerns on what my perception of the practices or lack thereof of getting minorities in certain leadership positions in the Bureau of Land Management.
      Mr. Tom Fry, who was the director at the time, was asking me what positions I would be interested in.  I informed him that one of the positions was the Assistant Director Eastern States Office, which is in Springfield Virginia.   He wanted my application.  He said that when a position came open he would make sure it would be submitted and I would have an opportunity to compete.

ROI at p.  189-190.  Thus, plaintiff acknowledged that normally it would have been plaintiff's responsibility to submit his own application.   However, plaintiff claims that in November 1999,

Mr. Fry said that he would make sure the application was submitted.  Thus, plaintiff claims that he was relying on Mr. Fry to do something for which plaintiff normally would have been responsible.

According to plaintiff's subsequent testimony,  in November 1999, the Assistant Secretary of the Interior, John Berry, directed plaintiff to meet with the Director of BLM, Tom Fry, to "resolve" plaintiff's issues concerning  not being selected for certain jobs.  Hill 2007 Depo at p. 97.   He met with Mr. Fry and Warren Johnson, BLM's Human Resources Director.  *Id* at p.  99.  Plaintiff allegedly gave Mr. Fry his resume, and Mr. Fry allegedly told Mr. Johnson to submit applications on plaintiff's behalf for four particular jobs, including the Assistant Director of the Eastern States Office, and a District Manager in New Mexico.  *Id*. at p. 100-101.  However, according to plaintiff, at the time this was going on in November 1999, he did not really believe that Mr. Fry had any intention of having Mr.  Johnson send out his resume.   *Id.*  at 101-103 ("In my mind it was just to get me out of the Office." . . .   Q.  My question is when he said it in the Office . . .it was your belief that he had no intention of having Mr. Johnson do that?   Is that you testimony?  A.  I'm saying he wasn't sincere,  right." . . .   Q.  So at that meeting you came away not believing that Mr. Johnson was going to be sending out your resume?   A. Right. . . .That this was all a charade.").

Plaintiff testified that in addition to hand delivering a copy of his application  to Tom Fry in November1999, he also  mailed a copy "To the Eastern States Office, Human Resources Office in Eastern States."  Hill 2002 Depo at p.  324, 330-331;  Hill 2007 Depo at p. 109-110.

Plaintiff also testified that he was not asking for any special treatment from Mr. Fry.  He did not want Mr. Fry to tell the selecting officials to select him and did not want any pre-selection of himself;  he just wanted his application to be there so he could compete.   Hill 2007 Depo at p. 105-107.

After plaintiff's November 1, 1999 meeting with Mr. Fry, Mr. Fry learned that plaintiff had sent a letter to Senator Sarbanes on October 13, 1999, "in which you appealed for his assistance in matters related to your career with the Bureau of Land Management."  11/23/99 ltr.  In the letter,

plaintiff had named Mr. Fry as a top-level management official who had made an "assault on my career goals."   10/13/99 ltr.    Mr. Fry felt there was a contradiction between the letter and plaintiff's conversation with him in which plaintiff had indicated that he had no problems with Mr. Fry .   11/23/99 ltr.   Mr. Fry, therefore, told plaintiff that "your failure to be completely candid with me has led me to decide that under these circumstances, it would be unfair to me, and perhaps you, for me to be involved in any management decisions concerning your career.   Therefore, I have decided to recuse myself from any decisions by BLM management that may affect your career."   11/23/99 ltr.

Plaintiff responded by letter dated December 9, 1999:   "Regarding your letter to me, I now understand your defensiveness and hostility towards me in our meeting that included Warren Johnson.   You never had any intentions of resolving my issues or the broader issues of the bureau-wide assault on African-American employees."   12/9/99 ltr.

Well before plaintiff's November 1999 meeting with Mr.  Frye, another individual, Gwen Mason, was in the position of Associate State Director, Eastern States.   She was in the position beginning August 16, 1998 through June 2000.  HR  Dec. at ¶3.  When Ms. Mason resigned, the position became available.  Gail Gordon Depo. at p. 7-8.

A Vacancy Announcement for Associate State Director Eastern States in Springfield Va. opened April 10, 2000 and closed May 9, 2000.   Vacancy Announcement.  Plaintiff was not on the list of eligible candidates sent to the selecting official.  Gail Gordon Depo. at p. 10-11   Ms. Gordon selected Michael Nedd for the position because she believed that he was the best qualified.  *Id*. at p. 12-13.   This is the legitimate non-discriminatory reason for Mr. Nedd's selection.

**No materially adverse action**

Plaintiff has failed to prove a materially adverse action from the alleged failure in November 1999 of Mr. Fry and/or Mr. Johnson to submit plaintiff's application for the position of Assistant BLM Director Eastern States Office.  First, plaintiff has offered no evidence that in November

1999, there was a vacancy in the position or that the position was advertised.  Therefore, since there was no vacancy and the position had not been advertised in November 1999, there can be no harm to plaintiff from Fry and Johnson not sending in his resume in November.

Second, plaintiff testified that in November, in addition to giving a copy to Mr. Fry, plaintiff also mailed his resume to the Eastern States Human Resources Office.  "The position hadn't been advertised.  I sent the application in saying that I was interested in applying for the job and it had not been advertised yet. . . . So when I'm mailing it in, I'm not mailing it in because its advertised. I'm mailing it in to tell HRM that I'm interested in the position if it becomes advertised because that's what he's telling me to do."   Hill 2007 Depo. at p. 109.   Since plaintiff had done what Mr. Fry and Johnson allegedly were supposed to do, i.e. send in his application to let Eastern States know of his interest in the position, plaintiff has shown no harm to him from them not sending in his resume.

To the extent plaintiff alleges that he was harmed **because** Mr. Fry or Mr. Johnson did not send in his resume when a vacancy announcement came open in April 2000, plaintiff's argument is meritless even based on his version of the facts.  Plaintiff has offered no evidence to prove that after December 1999, he had any reason to believe Mr. Fry or Mr. Johnson would give him any assistance, including sending in his resume.   First, plaintiff testified that while he was having this conversation with Mr. Johnson and Mr. Fry on November 1,  1999, allegedly about sending in his resume, he did not believe that they intended to send in his resume, and that he walked out of the meeting believing that they had no intention of sending in his resume.  Second, in his November 3, 1999 letter to Mr. Fry, plaintiff accused Mr. Johnson of  never giving him any assistance and of on November 1  "trying to adversely impact my career," concerning his detail with Mr. Taylor. 11/3/99 ltr at p. 2.   Third, Mr. Fry's letter of November 23, 1999, advised plaintiff that Mr. Fry was recusing himself  "from any decisions by BLM management that may affect your career."  11/23/99 ltr.  This letter  would have put any reasonable person on notice that whatever offer of assistance

38

Mr. Fry may have made, had been withdrawn.  Fourth, plaintiff's December 9, 1999 response to Mr.

Fry clearly shows that by December 1999, plaintiff believed that Mr. Fry  "never had any intentions

of resolving my issues or the broader issues of the bureau-wide assault on African-American

employees." 12/9/99 ltr.    Fifth, in plaintiff's December 9, 1990 memorandum to Assistant

Secretary Berry, plaintiff states : "As you can note, Tom Fry and the BLM Human Resource

Director (Warren Johnson) have basically told me . . .that they would continue to treat me and other

African-American employees as third class citizens . . .And if we had problems with their treatment

of me . . .I . . .could file grievances because they would never willingly resolve the issues." 12/9/99

memo to Berry.  Based on this set of events, it is inconceivable that any reasonable person would

have relied to his detriment on an alleged promise of future assistance made in November, 1999.

     As is discussed above, plaintiff had placed the Eastern States Human Resources Office on

notice of his interest in the position should a vacancy come open by sending in his resume in

November 1999.   Plaintiff has offered no evidence that after December 1999,  he had any reason to

believe, or rely on, any alleged promise that Mr. Fry or Mr. Johnson would assist him in getting the

Eastern States position by sending in his resume or through other assistance.   Indeed, plaintiff

testified that he did not believe the alleged promise when it was made,  and he submitted his resume

himself.  Plaintiff had been specifically told  that Mr. Fry was recusing himself from assisting

plaintiff.  Plaintiff testified that he was not asking for any special treatment -- like preselection, or

Mr. Fry telling the selecting official to give him the job.  Hill 2007 depo at p. 105- 107.  Since

plaintiff  testified the only assistance he really expected was that Warren Johnson would mail or

send in his application,   Hill 2007 Depo at p. 107- 108, then the only thing Mr. Fry could be

recusing himself from concerning the Eastern States position was having plaintiff's application sent

in the future.

     Mr. Fry clearly had put plaintiff on notice that he no longer would have anything to do with

matters concerning plaintiff's career.  Since plaintiff has offered no proof of reasonable reliance on

any promise to assist him, to his detriment, following December 1999,  plaintiff has failed to show any harm to himself by the actions, or non-action, of Mr. Fry and Mr. Johnson.   Indeed, any harm to plaintiff would have resulted from plaintiff not taking care to submit his own application as any reasonable person would have.

**Plaintiff was not significantly better qualified than the selectee**

Plaintiff's name did not appear on the list of best qualified applicants sent to the selecting official.  Gail Gordon Depo at p. 10-11.  The Selectee for the Eastern States Associate State Director position was Michael Nedd.  Nedd Vacant position Application.   Ms. Gordon selected Mr. Nedd because she believed him to be the best qualified for the position.  Gail Gordon Depo at p. 12-13.

From October 1996 to his selection for the Eastern States Associate State Director Position, Mr. Nedd was a GS-15 "Deputy Chief Information Officer and senior Information Resource Management (IRM) subject matter expert, managing an annual operating budget in excess of $130 million and 180 plus employees and contractors, provides vision and leadership for the Headquarters Office, National Center and Field Offices in Bureauwide IRM Program Management and related resourses."  Nedd Qualifications Summary.   From April 1991 to September 1996 he was a GS-14, Branch Chief, Information Resources Management, managing a team of managers, technical staff and contractors with an operating budget in excess of $1.5 million.  *Id.*  From June 1989 to April 1991, Mr. Nedd was the Chief, Office of Information Management, "with an operating budget in excess of $2 million and a staff of up to 18 members, provided support for the HQ sites, five subunits, NY area Park Police and a Job Corps Training Center.  Frequently served as Acting Administrative Officer, managing the Personnel, Budget, Contract and Procurement Branches and the Office of Information Management."  *Id.*  Similar to plaintiff,  Mr. Nedd had served in the military.  From 1976 to April 1985 his duties had included serving as a Logistics Officer and he had "[s]erved in highly specialized combat units around the world as a special

40

operations fighter and logistically activated 'The 3rd Ranger Battalion.'"   Also, similar to plaintiff,

Mr. Nedd had had Executive Management Development training .  From March 1993-March1994

Mr. Nedd  had completed an OPM Executive Developmental Training program assignment

including a three month assignment with the office of Congressman James Clyburn and an

assignment as an Associate Director for BLM's Eastern States office.  *Id.*

Comparison of Mr. Nedd's resume and that of plaintiff, reflects that plaintiff was not better

qualified or significantly better qualified than Mr. Nedd.

Conclusion

For the reasons set forth above, defendant's motion for summary judgment should be granted

and plaintiff's complaint should be dismissed.

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____

RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

Counsel for Defendant

OF COUNSEL
PHYLLIS LESLIE
Office of Solicitor
Division of General Law
U.S.Department of the Interior