**Equal Employment Opportunity Commission**
**Washington Field Office**
1400 L Street, N.W., Suite 200
Washington, DC 20005

| | |
|---|---|
| MILTON HILL,<br>    Complainant,<br><br>v.<br><br>GAYLE NORTON, Secretary<br>DEPARTMENT OF THE INTERIOR,<br>    Agency | July 19, 2002<br>EEOC No. 100-A2-7056X<br>Agency No. LLM-97-036<br>            LLM-00-042 |

### DECLARATION OF ROBERT DOYLE

Pursuant to 28 U.S.C. Sec. 1746, I, Robert Doyle, under penalty of perjury, declare and state as follows:

a. I am employed as an Assistant Director in the Bureau of Land Management's ("BLM") Business and Fiscal Resources Office. My office is located at 1849 C Street N.W., Washington, D.C., 20240. From August 1998, to March 1999, I served as the Acting Assistant Director for Business and Fiscal Resources. On March 19, 1999, I became the Assistant Director in this office. BLM is a bureau of the Department of the Interior ("Agency").

b. Some of my duties and responsibilities include, among other things, managing internal and external audits and evaluations of BLM, overseeing the conduct of management and special studies, providing guidance concerning BLM's objectives for implementing the Government Performance and Results Act (GPRA), improving financial management,





EXHIBIT 6

      implementing the Secretary of the Interior's 4C's philosophy by creating more opportunities for community involvement in land management activities and improving overall service delivery, and analyzing customer data and comment cards to ensure that new policies and operational changes are made in response to customer feedback to improve program performance.

c.     I was the selecting official for Vacancy Announcement WO-99-12 for the position of Group Manager, Management Systems Group. Vacancy Announcement WO-99-12 was issued on February 19, 1999. The closing date was extended to April 27, 1999.

d.     The Group Manager position was vacated when David Brown retired in September 1998. Some of the Group Manager's responsibilities include evaluating BLM's land management programs, developing customer surveys involving BLM customers and employees, and identifying programs that reflect BLM's efforts to implement the GPRA.

e.     The complainant applied for Vacancy Announcement WO-99-12. His application was sent to BLM's Eastern States Office before the closing date. This office is the personnel servicing office for BLM Washington Office.

f.     A three member panel reviewed all of the applications and rated the candidates around May 1999. On June 7, 1999, BLM Personnel Specialist Dana McGee forwarded the Candidate Referral Roster to me in my capacity as the selecting official. I believe that the complainant's name was not included in the certificate of eligibles for this position. I did not interview the complainant for the Group Manager position under Vacancy Announcement WO-99-12.

g.     Around November 23, 1999, I prepared a memorandum addressed to the National Personnel Management Committee (NPMC) wherein I informed the committee that I proposed to select Mr. Franklin, an African-American male for the Group Manager position.

h.     Shortly thereafter in December 1999, the NPMC authorized Mr. Franklin's selection as the Group Manager. However, Mr. Franklin declined the position via telephone, citing his interest in pursuing career opportunities with his current employer. Mr. Franklin reported that after talking to his supervisor about the job offer, his employer was willing to promote him, so he decided to remain with his current organization.

i. Given that the certificate of eligibles expired around Saturday, December 4, 1999, I received his denial after the deadline for taking action on this roster. I believe that I received his denial around mid-December 1999.

j. After confirming that Mr. Franklin did not accept the position, I talked to Personnel Specialist Dana McGee about the options available to fill this position. I still needed to hire a Group Manager, particularly since the position was vacant since September 1998, and I needed a permanent manager to run that organization. Based on my conversations with Ms. McGee, I decided to cancel Vacancy Announcement WO-99-12, and then re-advertise it.

k. The Group Manager position was re-advertised under Vacancy Announcement WO-00-21 on January 19, 2000, and closed on February 17, 2000. I was the selecting official for this position. The complainant applied for this position.

l. After reviewing the candidates who made the certificate of eligibles for the GS-15 list, I selected Ms. Janine Velasco for the Group Manager position. I believe that she was the best qualified candidate who applied for the position. Ms. Velasco was articulate and knowledgeable about natural resource programs, having worked for both the Departments of Agriculture and Interior. During the interview, she conveyed a good understanding of management principles and practices as she explained her current role in developing the strategic planning and performance measures for the Bureau of Reclamation. In talking with her supervisor and colleagues, they noted her effectiveness in working with program staff to develop planning documents and performance plans that satisfied GPRA requirements. Her supervisor said that she was effective in balancing multiple assignments and in working with subordinates and senior staff. Her work was considered to be of high quality, timely and complete. Mr. Hill, like many of the other candidates was not as effective as Ms. Velasco in articulating how the various components of the BLM management system - planning, budget, evaluations, and customer service operate to improve program results and advance the agency mission.

m. When the investigator interviewed me to obtain my testimony under oath, I did not have an opportunity to review my office records or refresh my recollection by reviewing any documents pertaining to this case. I mentioned to the investigator that there were two vacant Group Manager positions in my office wherein I selected persons to fill these positions. When the investigator started to ask me about Vacancy Announcement WO-99-12, (which was subsequently canceled) he was unable to

      distinguish which Group Manager position to which he was referring. I could not answer his questions pertaining to this vacancy announcement. I informed him that I did not know which position Vacancy Announcement WO-99-12 covered, so I would have to go back and look at what position the complainant was competing for under this vacancy announcement. I later confirmed after the investigation ended that Vacancy Announcement WO-99-12 was issued for the Group Manager position in the Management Systems Group. The other Group Manager position, which covered the Property and Acquisitions Group, was advertised under WO-00-18.

n.     Concerning Vacancy Announcement UT-97-17, Associate State Director, Utah, I was not involved in any way with the selection process for this vacant position. I am not aware of who served on the panel or who was the selecting official.

o.     Concerning the directed reassignment of Amy Leuders to the position of District Manager, Las Cruces, New Mexico, I was not involved in any way in Ms. Leuders reassignment. I was not involved in the selection process for filling this vacant position.

p.     I became the Acting Assistant Director, Business and Fiscal Resources in August 1998. I recall that the same week that the application was due, I received the complainant's SESCDP No.10 application in my mailbox. The complainant attached a note on the front of the application dated August 31, 1998, wherein he requested that I sign the application and forward it to the Department. The closing date noted on the application form was August 31, 1998. The complainant already had typed in the response he wanted me to sign. Having assumed acting in this position the same week that I received the complainant's application, I did not know the complainant, nor had I ever talked to him or met him. I was not aware of his performance or potential to recommend him for SESCDP No.10. The week that I received his application in my mailbox was the closing week for applying to this program, so there was very little time from when I received it to when it was supposed to be received by the Department. When I reviewed the application, I noticed that his first level supervisor did not sign or approve his application. I tried to contact the complainant to ask him some questions. When I finally contacted the complainant, I learned that he was participating in a long term training program at the Industrial College of the Armed Forces, and that this training program was not scheduled to end until August 1999. Given my previous involvement with this program (I have reviewed applications and served on rating and ranking panels for the SESCDP program), I was aware that the program typically starts the Spring after the closing date, usually in May 1999. I sent

his application back to him, and followed with a note stating that I since I could not reach him prior to the phone conversation that we had about the potential overlap between his year long training and the anticipated start date for SESCDP No. 10, I drafted a brief note that explained why I was returning his application. In my note, I informed the complainant that during the time that I was trying to contact him, I learned that he was participating in a year long training program at the Industrial War College, and that this training was not scheduled to end until August 1999. I noted the potential overlap between his current training program and the anticipated start date for SESCDP No. 10. I recommended that he first complete his commitment to the Industrial War College, after which BLM would be in a better position to assess his development as a result of that training and future work assignments. About a week later after I forwarded this note, the complainant telephoned and asked me why I did not forward his SESCDP No. 10 application. I reiterated what I stated in the note I sent.

q.  During our phone conversation, the complainant accused me of being a racist, which I found to be an insulting statement because I did not know the complainant and had never met him. I did not know who he was when I first assumed responsibilities as acting Assistant Director. When he applied for SESCDP No. 10, I was not aware that he had filed a previous EEO complaint.

r.  I recall after I returned the complainant's SESCDP No.10 application to him, I talked to the complainant several times about his career plans and his position of record. He indicated that he was interested in obtaining a senior level position in the organization. He mentioned that he would be interested in the following potential assignments: strategic planning, National Performance Review, Assistant State Director, Executive Officer (possibly to the Executive Leadership Team), DOI/UN - Latin Institution for Natural Resource Management, and other Departmental position/opportunities. He indicated that his "ideal" position was Chief Executive Officer. I suggested that he also consider Deputy State Director positions in the field since they were primarily administrative and operational and functionally more consistent with his background. He indicated some interest depending on geographic location.

s.  Around the time that the complainant returned to BLM after he completed his Industrial War College training in August 1999, I recall that Mr. Robert Faithful, Director, Office of Small And Disadvantage Business Utilization (OSDBU), called to inform me that he had an opportunity available in his office for someone to participate in a detail. He was aware that the

       complainant had just returned from his training program and thought that he might be a good candidate for this detail. I asked Mr. Niebauer to discuss it with the complainant and see if he would be interested since it represented a senior position (GS-14 and above with national responsibilities) within the Department. Approximately two months after the complainant started his OSDBU detail, I learned that he had an unofficial work arrangement in the Office of Environmental Policy and Compliance (OEPC). I contacted Dr. Taylor, Director, OEPC to inquire about the arrangement. Dr. Taylor informed me that the complainant approached him and said that he was available to work on OEPC assignments. When I informed Dr. Taylor that neither the first line or the second line supervisor had approved this work arrangement, Dr. Taylor informed me that he was under the impression that BLM had authorized this arrangement. I told Dr. Taylor that we would like to terminate this unofficial arrangement but asked if such action would be disruptive to the office work. Dr. Taylor stated that we would not be disrupting anything. I asked Joe Federline, the Acting Group Manager, to contact the complainant and request that he report back to his BLM duties as Senior Business Manager

t.    While the complainant was detailed to Mr. Faithful's office, I do not recall ever talking with Mr. Faithful about a blanket travel authorization for the complainant.

u.    When Mr. Niebauer retired from the Group Manager position, Joseph Federline and Robert Donelson, both GS-14s employees assigned to this group, alternated as acting group managers until the position was filled. It is my practice that when a managerial position becomes vacant in my office, I ask all of the GS-14s within that group if they would be interested in serving as Acting Group Manager while I recruit to fill the position. Those who indicate that they are interested are given an opportunity to act. I don't recall discussing this with Mr. Hill nor do I ever remember him expressing an interest to serve as acting Group Manager or complain he was not given an opportunity while they were acting.

v.    I selected Mr. Federline for the Group Manager position because I believed that he was the best qualified candidate for the position. Mr. Federline had extensive experience in the acquisition field and a demonstrated leader within the Department having served as chairman of the Department-wide Acquisition Partners Council. He is recognized by his peers as an authority on acquisition matters and is often consulted by Departmental officials on technical acquisition issues and for suggestions and ideas to improve the acquisition and property function within Interior.

    w.    When Joe Federline became the new Group Manager in the Property and Acquisitions Group, I asked him to ensure that everyone he supervised had a current position description and performance rating plan, including the complainant.

I declare under penalty of perjury, in accordance with 28 U.S.C. Sec. 1746, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 19th day of July 2002.

_____
Robert Doyle