# CONDENSED TRANSCRIPT

### UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### 1400 L STREET, N.W., SUITE 200
### WASHINGTON, D. C. 20005

Milton Hill,

       Complainant,

                              EEOC No. 100-A2-7056

v.                          Agency Nos.  LLM-97-036
                                          LLM-00-042

Gayle Norton, Secretary    DATE:  March 19, 2002
U. S. Department of the Interior,

       Agency.

~~~~~~~~~~~~~~~~~~~~~~~~~~

The Sworn Interview of **MILTON EARL HILL**, taken in the

above matter in the offices of the **UNITED STATES**

**DEPARTMENT OF THE INTERIOR**, 1849 "C" Street, N.W., Main

Interior Building, Washington, D. C., on the 15th day of

May, 2002, beginning at 9:04 a.m.

## A P P E A R A N C E S

**ON BEHALF OF THE COMPLAINANT:**
    Stephen Domenic Scavuzzo, Esquire

**ON BEHALF OF THE DEPARTMENT OF THE INTERIOR:**
    Phyllis Leslie, Attorney-Advisor
    **UNITED STATES DEPARTMENT OF THE INTERIOR:**

County Court Reporters, Inc.
CCR

Toll Free 800 262-8777

Registered Professional Reporters
Certified Video Technicians
Professional Reporting since 1975

**EXHIBIT**
Hill
2002 Depo

STEPHENSON, VA 22656    WASHINGTON, DC 20007    LEESBURG, VA 20175
1160 Jordan Springs Road    1000 Potomac St., NW, Suite 300    110 Market Street NE

Member: National Court Reporters Association • Virginia Court Reporters Association • Pennsylvania Court Reporters Association
Maryland Court Reporters Association    Society for the Technological Advancement of Court Reporting

CCR@COURTREPORTINGSERVICES.COM    WWW.COURTREPORTINGSERVICES.COM

39 (Pages 154 to 157)

## Page 154

1    that and this is a lie.  And I'm saying that
2    this is a perfect example of someone who is
3    saying, hey, this is, this is not only are
4    they, he's saying that I passed, that I went
5    over the chain of command, that's not true.  I
6    always chain of command things.
7        And this is a fabrication and, and I'm
8    saying this is an example, a perfect example
9    that he's saying that these folks have, these
10   individuals, these management officials have a
11   particular animus against me for the reason I
12   say because of a black male.  It's nothing
13   else.  My work is excellent, my education's
14   excellent, my skills are good.  So, this stuff
15   here is a bunch of crock.
16       Q.  Concerning the dates of investigation
17   which are dated at the top, I'm looking at
18   page, and on the bottom it has a written in
19   number of 29.  It says that the dates of
20   investigation were allegedly conducted from June
21   17th, 1998 to July of 1998.  For the record
22   is there any reference in Mr. Neibower's
23   comments that address or mention your
24   application for the SES Program Number 10?
25       A.  He says, he continually tries to get

## Page 155

1    away from the BLM on training assignments.
2    That's, that's false.  What's happened is that
3    I'm not, I'm not doing anything that anyone
4    else is not doing.  You're applying for
5    training to help you.
6        Q.  Do you believe that that's an
7    interpretation that, as this has stated, he
8    continually, meaning Mr. Hill, continually tries
9    to get away from the BLM on training
10   assignment, that that in fact is a broad way
11   of referencing your application for SES...
12       A.  Yes.
13       Q.  ...Program Number 10?
14       A.  Yes.
15       Q.  Allegation Number 6 which states in
16   November, 1999 and April, 2000 management
17   officials refused to allow Complainant to apply
18   for career enhancing growth training.  In this
19   allegation you reference a particular detail.
20   I believe the detail that you referenced is in
21   the Office of the Secretary, Office of
22   Environmental Policy with Dr. Willie Taylor.
23   On what date did you talk to Dr. Willie Taylor
24   about working in the Office of the Secretary,
25   Office of Environmental Policy?

## Page 156

1        A.  Before or after, after I found out?
2        Q.  The first date that you talked to him
3    about working in his office.
4        A.  It was around September or October of
5    '99, I believe.
6        Q.  Did you have any follow-up
7    conversations with him about working in his
8    office?
9        A.  Yes.
10       Q.  What date or dates did that occur?
11       A.  About the same time.
12       Q.  So, there were a series of
13   conversations, you believe, between September
14   and October of 1999?
15       A.  Yes.
16       Q.  You also mentioned that you spoke to,
17   and you tried to recall the person's name. but
18   you believe that it was at that time Assistant
19   Secretary Walker, on the same date that you
20   spoke to Dr. Willie Taylor?
21       A.  Yes.
22       Q.  Is that correct?
23       A.  Yes, it is.
24       Q.  What exactly took place in the
25   discussions between you, Dr. Taylor and

## Page 157

1    Assistant Secretary Water, Walker, excuse me,
2    and Peter Neibower about this particular
3    detail?
4        A.  Well, I had come back from the
5    Industrial College and ready to go back to my
6    assignments and when I came back, the day
7    before I was supposed to come back Peter
8    Neibower, I called Peter Neibower to find out
9    where I was going to go.  This was in
10   September some time.  And he said that I was
11   going to be reassigned on a detail, I was
12   going to be assigned on a detail to work in
13   the Small Business Office.
14       Q.  Now, is the Small Business Office the
15   same as referenced in your testimony concerning
16   Allegation Number 6 which is Dr. Willie
17   Taylor's office?
18       A.  No.
19       Q.  Okay.
20       A.  It's an office here.  The office, it's
21   the, it's the, it's the Office of Small and
22   Minority Business.
23       Q.  That is the office that you were
24   detailed to...
25       A.  Yes.

County Court Reporters, Inc.
CCR

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM

FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA

Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

## Page 158

1  Q.  ...when you returned from Industrial
2  College?
3  A.  Yes.
4  Q.  Is that the same as Allegation Number
5  9, the same office that you referred to in
6  Allegation Number 9 which you stated in
7  September of 1999 BLM officials refused to
8  provide Complainant travel vouchers and funds
9  in order to perform his job and tasks?
10  A.  Yes, that's one of the offices, yes.
11  Q.  And the official name of that detail
12  is, where is it located?
13  A.  It's located on the 5th floor, Main
14  Interior Building.  It's the Office of Small
15  and Minority Business or something like that.
16  Q.  Who was your supervisor at the time?
17  A.  My supervisor at the time was Peter
18  Neibower.
19  Q.  And still who was your second line
20  supervisor?
21  A.  Robert Doyle.
22  Q.  What exactly did you do in that
23  particular detail to the Office of Small and
24  Minority, is it Office of Small and Minority
25  Business?

## Page 159

1  A.  No, it's the Office of Small and
2  Minority Business Utilization, something like
3  that.  The Director is Robert Faithful.
4  Q.  How long did you serve in that detail?
5  A.  Until December of 1999.
6  Q.  Why did that detail end in December of
7  1999?
8  A.  I was called back by Robert Doyle to,
9  to return to Property and Acquisition Office.
10  Q.  Who were the people who were
11  responsible for assigning you to this detail?
12  A.  That's a good question, it's not clear.
13  I never got any paperwork on it, but the
14  person who I called and who told me to go
15  there, to report there, was Peter Neibower and
16  I'm assuming it was confirmed by his supervisor
17  who, at that time, was Robert Doyle.
18  Q.  And you would say, still, that you
19  found out that you were assigned to this
20  detail the early part of September of 1999?
21  A.  Yes.
22  Q.  Did you want to go on this particular
23  detail...
24  A.  No.
25  Q.  ...to that office?

## Page 160

1  A.  No.
2  Q.  Could you state for the record why you
3  did not want to go?
4  A.  It's not career enhancing.  They had,
5  they had a position there, the Acting Group
6  Manager, and I told them I wanted, I was
7  interested in that position.  I told them I
8  was interested in the Field Manager job and I
9  was also interested in going back to the field
10  and also working in the Office of the
11  Secretary.  All of those tie in with, in my
12  mind, and I was telling them that this is
13  career progression.  Why are you going to get
14  training, get a second Master's, work in a
15  certain field, work in acquisition, work in
16  budget, work in personnel and you're still in
17  the same job?  You want, you're like everybody
18  else, you want to be an AD, you want to be a
19  State Director.  I told them that.
20  Q.  Wasn't this office also under the
21  umbrella of the Office of the Secretary?
22  A.  Yes, it was, but it was something I
23  had already done.  I had already done that.
24  Q.  When do you allege that you did this
25  kind of work before?

## Page 161

1  A.  From 1996 to 1998 before going to
2  ICAF.  We worked directly with the, with the
3  Office of Small Business.
4  Q.  Were you able to use the skills that
5  you acquired at ICAF in your detail?
6  A.  Yes.
7  Q.  Was there anything different in the
8  detail, once you got on the detail, that was
9  different than what you experienced during your
10  ICAF training?
11  A.  No, I had done, it was similar things
12  I had done previously before going to ICAF.
13  Q.  Concerning your allegation that BLM
14  officials refused to provide you travel
15  vouchers and funds in order to perform  your
16  jobs and tasks...
17      MR. SCAVUZZO:  Is that Number
18  9?
19      MS. LESLIE:  That's Allegation
20  Number 9, yes.  I am dealing with Allegation
21  Number 9 because Mr. Hill mentioned the Office
22  of Small and, and I will get the exact title
23  later, but...
24  A.  Okay, yeah.
25      MS. LESLIE:  ...it's on the 5th

County Court Reporters, Inc.
CCR

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM

FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA      •      WASHINGTON, DC      •      LEESBURG, VA      •      HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

41 (Pages 162 to 165)

## Page 162

1  floor of Main Interior and the Director is Mr.
2  Robert Faithful.
3     Q.  Concerning this particular detail, do
4  you know of any other BLM employees or any
5  other detail for that matter, excuse me, do
6  you know of any BLM employees from the
7  Washington Office 800 who received a blanket
8  travel authorization while that person was on a
9  particular detail?
10    A.  Oh, sure.
11    Q.  Can you give me the names of the
12  people?
13    A.  Names of the persons?  Carl Zulick, Z-
14  U-L-I-C-K.
15    Q.  What detail did he go on?
16    A.  He went to National Performance Review.
17    Q.  What is that located?
18    A.  Here on 17th Street Northwest.
19    Q.  How long was he on that detail?
20    A.  About a year, I think.  Well, six
21  months to a year.
22    Q.  How are you aware that he received a
23  blanket travel authorization?
24    A.  He told me.
25    Q.  What date did he tell you?

## Page 163

1     A.  The fall, I guess it was the fall of
2  1999, somewhere around there.
3     Q.  Had he already started his detail at
4  that time?
5     A.  I think he had, he had completed it.
6  I'll tell you what, what I can do, it's
7  several folks.  I can provide you a list of
8  all the folks who were on detail and if they
9  were given blanket travel.
10    Q.  I'm interested in knowing whether you
11  knew that they received a blanket travel
12  authorization at that particular time.
13    A.  Well, you're asking me for the names
14  of the persons that, I mean, it's not the
15  conversation you go and say, well, did you
16  have blanket authorization.  I could go back
17  and ask them did you get a blanket
18  authorization.  I mean, if I, I know they
19  traveled, but for me to say that they got
20  blanket, I'll have to confirm that with them.
21  So, in order for me to do that I'll need to
22  ask them again and then get back with you.
23    Q.  Part of your allegation on Bates Number
24  168 is that it was standard practice for just
25  about everyone to receive a blanket travel

## Page 164

1  authorization, but for some reason you did not
2  receive it.  So, I'm interested in finding
3  out, when you stated...
4     A.  I never said a, I never said a blanket
5  travel, I said travel.  That means that in
6  order for you to have travel you have a travel
7  authorization.
8     Q.  On 167 you indicated, Bates Number 167,
9  that's Tab, Tab Number 6.  When the
10  investigator asked you whether you received a
11  blanket travel authorization you indicated in
12  your answer, no, I didn't have one.  We were
13  requesting that they just give us a blanket
14  travel authorization so we wouldn't have to be
15  going back all the time.
16       Question:  Is it normal to get a
17  blanket one?  Your answer on Bates Number 168
18  is, it is normal.  Question:  Do you know of
19  people who are not of your particular group
20  who got a blanket one?  Your answer, yes.
21  Question:  While they were on detail?  Yes.
22  Question:  What are their names?  Answer:
23  Everyone on detail from Washington Office 800
24  had a blanket, dash, dash, everyone from
25  Washington Office 850 who were on a detail got

## Page 165

1  a blanket travel authorization.  It was normal
2  procedure to do this.
3       So, my question to you was based on,
4  at that time when you were on this detail,
5  when you refer to everyone on detail from
6  Washington Office 800 and also everyone from
7  Washington Office 850 who was on a detail,
8  what exactly is your knowledge or information
9  about that they received a blanket travel
10  authorization?
11    A.  We were authorized to travel.  It's a
12  travel, it's a TA, it's a travel authorization.
13    Q.  Is that different, I'm sorry, is a
14  blanket travel authorization different than just
15  regular travel authorization?
16    A.  Yeah, I think what he was talking
17  about, I guess if he's answering that, I think
18  he was using blanket different.  We're talking
19  about blanket as in terms of a BTA which is
20  different.  We're talking about a travel
21  authorization meaning that when you were
22  detailed and the detail requires you to travel,
23  the Bureau of Land Management pays for that
24  travel.  And when you're in, say, a situation
25  where you're in someone else's office they

County Court Reporters, Inc.
CCR

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

TOLL FREE 800.262.8777                                    FAX 540.667.6562
CCR@COURTREPORTINGSERVICES.COM              WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA      •      WASHINGTON, DC      •      LEESBURG, VA      •      HARRISONBURG, VA
Corporate Offices:  1160 Jordan Springs Road, STEPHENSON, VA 22656

Hill, Milton Earl #13265-3 5/15/02 Leslie O. Scavazzo C

42 (Pages 166 to 169)

## Page 166

1 provide you with materials and office space.
2          I guess to clarify that but, and
3 let's follow up on that then, let me just
4 answer your question the best that I can. The
5 persons that I know who were on detail at
6 that, during that period of time where they
7 had travel authorizations, office space and
8 materials to their use were Carl Zulick, Amy
9 Leuters, Terry Brokovitch.
10     Q.  While you're looking for a particular
11 document, going to Bates Number 167 where the
12 question that was presented to you was did you
13 get a blanket travel authorization when you
14 went over there meaning over to the detail in
15 the Office of the Secretary, the Small and
16 Minority Business Office under Director Robert
17 Faithful, your answer on Bates 167 indicated
18 no, I didn't have one. We were requesting
19 that they just give us a blanket travel
20 authorization, comma, so we wouldn't have to be
21 going back all the time. What did you mean
22 by the phrase, so you wouldn't have to go back
23 all the time?
24     A.  Meaning that instead of giving us,
25 giving a travel authorization for like let's

## Page 167

1 say one trip, an individual trip, they would
2 provide a travel authorization for the year,
3 for the fiscal year.
4     Q.  So, in other words would you substitute
5 the word unlimited for the word blanket?
6     A.  I would substitute the word travel
7 author. it's a TA. I think blanket gives a
8 mis, misnomer. It alludes more to a
9 procurement process than it does to travel.
10     Q.  Concerning what you were complaining
11 about at that time was basically you wanted
12 the authority or the authorization to be able
13 to travel for business related travel without
14 having to go back to the person in your office
15 in BLM to get their approval, is that correct?
16     A.  No. The correct one was they had
17 detailed me to a job that required me to
18 travel and they had not, and it required me to
19 travel and work on the PC and have an office
20 space and they did not, they meaning BLM
21 officials, did not provide me with any travel
22 funds or computer or office space to do
23 anything.
24     Q.  When you found out that you had
25 required travel, who did you contact initially

## Page 168

1 to try to get that authorization for the
2 funds?
3     A.  I went through Robert Faithful.
4     Q.  What did Mr. Faithful say?
5     A.  He said that he'll contact the folks
6 at BLM.
7     Q.  What date did you contact Mr. Faithful?
8     A.  It was September of '99.
9     Q.  What was the first travel or business
10 related travel that you were supposed to take
11 on that you were not able to take on.
12     A.  I think the initial one was the
13 meeting with the Hispanic Chamber of Commerce.
14     Q.  On Bates Number 169 you indicated that
15 Mr. Faithful went to Robert Doyle, you believe,
16 and subsequently you received a blanket travel
17 authorization, is that correct?
18     A.  Yes.
19     Q.  On what date did you receive that form
20 of travel authorization?
21     A.  It was September or October of '99.
22     Q.  According to Bates Number 169 it
23 appears that the job related travel that you
24 missed was the Black Chamber of Commerce
25 meeting, is that correct?

## Page 169

1     A.  Yes.
2     Q.  On what date did that conference occur?
3     A.  I don't remember.
4     Q.  Were you supposed to do anything at
5 that particular conference?
6     A.  We were given a booth there to, we,
7 the Bureau of Land Management had a booth
8 there at their conference to explain how to
9 write business plans and how to do business
10 with the federal government.
11     Q.  Who was able to travel to that
12 particular conference?
13     A.  Besides myself?
14     Q.  Concerning the Black Chamber of
15 Commerce Conference travel, for the record, did
16 you actually attend that meeting the Black
17 Chamber of Commerce meeting?
18     A.  No, I don't think we went to that one.
19     Q.  When you say we, was there anyone else
20 from BLM who went to the Black Chamber of
21 Commerce meeting?
22     A.  No.
23     Q.  And you don't know the date that that
24 occurred?
25     A.  No.

County Court Reporters, Inc.
CCR

TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

Page 170

1   Q.  When did the Hispanic Chamber of
2   Commerce Conference occur?
3   A.  I believe that was October, the latter
4   part of September or October or something like
5   that of '99.
6   Q.  When did you receive the approval to
7   go on the Hispanic Chamber of Commerce
8   Conference trip?
9   A.  You mean when did they finally send me
10  the travel authorization?
11  Q.  Yes, the approval to travel.
12  A.  It was about a week before I was
13  scheduled to go.
14  Q.  Concerning the funds that you needed in
15  order to perform your job and tasks, what
16  funds are you referring to?
17  A.  The funds that you're referring to is
18  the per diem and your travel costs and
19  includes funds for your lodging and per diem.
20  Q.  Was this specifically for the Hispanic
21  Chamber of Commerce Conference?
22  A.  That was one.  There were other, there
23  were other conferences that we were required to
24  go to.
25  Q.  Can you identify them?

Page 171

1   A.  A couple of them were the, let's see,
2   Business Women's, BW, Business Women's Network.
3   Q.  Did you attend that one?
4   A.  No.  There was a Pan Asian Conference.
5   Q.  Did you attend that one?
6   A.  No.
7   Q.  Were there any other conferences that
8   you attended besides the Hispanic Chamber of
9   Commerce Conference?
10  A.  No, I think that was the only one.
11  Q.  Do you know what the amount of the
12  fund was that you were allegedly denied?
13  A.  The amount of the funds?  No.  Well,
14  you can't travel without an authorization.  So,
15  I don't remember the amount of what it was.
16  It would have included the, the flight ticket
17  and lodging, but I had no travel authorization
18  to, to attend.
19  Q.  I'm talking specifically about the
20  Hispanic Chamber of Commerce meeting which you
21  indicated...
22  A.  The one I went, the one I went to?
23  Q.  Yes.
24  A.  Yes.
25  Q.  That you attended.

Page 172

1   A.  How much it was?
2   Q.  Yes, what funds did you, you're
3   alleging that you didn't receive certain funds
4   in order to perform your job and tasks.
5   A.  Mm-hmm.  (Indicating affirmatively.)
6   Q.  I'm trying to understand, when you say
7   funds, what funds are you referring to?
8   A.  Travel funds.  Travel funds and, travel
9   funds which includes lodging and flight for
10  whatever traveling they do.
11  Q.  The only, let me clarify this.  The
12  only trip that you went on during that two
13  month detail to the office that Director Robert
14  Faithful oversees was the Hispanic Chamber of
15  Commerce Conference, correct?
16  A.  (No audible response.)
17  Q.  You believe that the date was somewhere
18  in October, 1999, is that correct?
19  A.  Correct.
20  Q.  You did receive, according to your
21  statement, a travel authorization and you
22  believe that it was maybe a week before the
23  conference took place in October of 1999,
24  correct?
25  A.  Something like that, yes.

Page 173

1   Q.  Concerning the travel authorization, did
2   it authorize your air fare?
3   A.  Yes.
4   Q.  Entirely?
5   A.  Yes.
6   Q.  Did it authorize your lodging?
7   A.  Yes.
8   Q.  Entirely?
9   A.  Yes.
10  Q.  Did it authorize your per diem?
11  A.  Yes.
12  Q.  Entirely?
13  A.  Yes.
14  Q.  Concerning the funds that you allege
15  that you did not receive in order to perform
16  your job and tasks, are there any other funds
17  that you did not receive in order to perform
18  your job and tasks?
19  A.  Not that I recall at this time.
20      MR. SCAVUZZO:  Can we go off
21  the record just a second here?
22          OFF THE RECORD
23      MS. LESLIE:  Back on the
24  record.
25  .

County Court Reporters, Inc.
CCR

Registered Professional Reporters
Certified Video Technicians
Professional Reporting since 1975

TOLL FREE 800.262.0777                                                    FAX 540.667.6562
CCR@COURTREPORTINGSERVICES.COM                          WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA
Corporate Offices:  1160 Jordan Springs Road, STEPHENSON, VA 22656

Page 194

1  there. That's it. I reported there and, of
2  course, I'm, I'm not happy.
3      So, I'm talking to Bob saying, hey,
4  I'll, I'll do the job for you. So, he, we
5  had no funds and no office space, no anything.
6  No, no anything and I told him that I'll be
7  looking for something else because something is
8  not right here. He says, fine. He says, I'm
9  fine with that and I met with Dr. Taylor. He
10 needed some folks to do some of the
11 environmental things which is part of my
12 background.
13     So, he talked with Warren Johnson and
14 Bob Doyle. I was going over there for a
15 detail. He wrote up what my duties were going
16 to be, I sent that over to Robert Doyle. He
17 asked for it and I told Bob Doyle and Peter
18 Neibower I was changing. They said it's up to
19 you, it's up to you which one to do. Fine,
20 I...
21   Q. Did they put that in writing?
22   A. Nothing was in writing. Nothing.
23 This is what's convoluted about all this.
24 There's no, nothing in written form on my
25 detail to Mr. Faithful's office, there's no...

Page 195

1    Q. Is it a detail or did you actually,
2  you were ordered to report to his office and
3  then you were told to report back to BLM in
4  December of 1999?
5    A. Well, how can I, well, I was told to
6  go to his office on a detail. That's the
7  exact words. You are detailed to Bob
8  Faithful's office. Well, where's the
9  paperwork? No paperwork. So, I...
10   Q. Do you object to the description of it
11 as being a detail, though?
12   A. Sure. It's not, it's nothing, it's
13 just you're there, you're floating in air and
14 there's no need to be floating in the air, you
15 know.
16   Q. In December of 1999 who told you that
17 you would come off of or come out of Director
18 Robert Faithful's office, who instructed you to
19 come out of his office?
20   A. Bob Doyle.
21   Q. Okay, and then in December of 1999 did
22 Bob Doyle instruct you to return to your
23 office in BLM on L Street?
24   A. Yes. He did not, he told Warren
25 Johnson who, he told me, then he told Warren

Page 196

1  Johnson and Warren Johnson then told Bob
2  Faithful who then told me, also, to report
3  back to L Street.
4    Q. Did you, in fact, report back to L
5  Street?
6    A. Yes.
7    Q. On what date did you go back to L
8  Street to BLM?
9    A. It was around December of '99 or the
10 first part of January, 2000.
11   Q. During that time when you were told to
12 report back to the BLM office were you also
13 told to report back from Dr. Willie Taylor's
14 office?
15   A. No.
16   Q. You continued to split your time
17 between your BLM responsibilities at that time
18 and Dr. Willie Taylor's office?
19   A. Yes. We had a project to finish up.
20 We finished the project up and then came back
21 to the BLM.
22   Q. As of the end of December, beginning
23 of January, how much time would you say that
24 you committed or put in in Dr. Taylor's
25 office?

Page 197

1    A. Well, it was about 70 percent of the
2  time.
3    Q. And 30 percent, then, in BLM?
4    A. Yes.
5    Q. When were you instructed to stop your
6  detail with Dr. Willie Taylor's office?
7    A. I was never told to stop. I was just
8  told to report back to L Street.
9    Q. When were you told to report back to L
10 Street?
11   A. I think it was some time in January or
12 February of 2000.
13   Q. So, some time either in January or
14 February of 2000 you were no longer in Dr.
15 Robert Faithful's office and also you were no
16 longer in Dr. Willie Taylor's office, is that
17 correct?
18   A. Correct.
19   Q. Concerning your note that you wrote to
20 yourself in Interrogatory G which you labeled
21 February 25th, year 2000 and it indicates that
22 there was a call from Dr. Willie Taylor, were
23 you still interested in trying to stay on the
24 detail in Dr. Willie Taylor's office?
25   A. Yes.

County Court Reporters, Inc.
CCR

TOLL FREE 800.262.8777                    Registered Professional Reporters                    FAX 540.667.6562
CCR@COURTREPORTINGSERVICES.COM            Certified Video Technicians               WWW.COURTREPORTINGSERVICES.COM
                                          Professional Reporting Since 1975

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA

Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

Page 198

1    Q.  Were you trying to work out an
2  arrangement to return to Dr. Willie Taylor's
3  office?
4    A.  Yes.
5    Q.  So, on that date when you drafted the
6  letter which is February 25th, 2000, you were
7  not presently in Dr. Willie Taylor's office, is
8  that correct?
9    A.  I was in his office, I had a space in
10  his office.
11    Q.  When you were told to report back to
12  BLM which you stated was some time either in
13  January or February of 2000, you were still
14  allowed to work in Dr. Willie Taylor's office?
15    A.  There was no space for me in L Street,
16  they had no space.
17    Q.  The question is were you still allowed
18  to work in Dr. Willie Taylor's office?
19    A.  There was no space for me anywhere
20  else to work so they told me to just continue
21  down there.
22    Q.  Did you do work in Dr. Willie Taylor's
23  office in January of 2000?
24    A.  Yes.
25    Q.  Did you do work for Dr. Willie

Page 199

1  Taylor's office in February of 2000?
2    A.  Yes.
3    Q.  In January of 2000?
4    A.  Yes.
5    Q.  How much time did you spend doing work
6  in Dr. Willie Taylor's office?
7    A.  Oh, about a, probably 50 to 70 percent
8  of the time.
9    Q.  In February of 2000 how much time did
10  you spend doing work in Dr. Taylor's office?
11    A.  About half.
12    Q.  Is that 50 percent?
13    A.  50 percent, yes.
14    Q.  When were you told to report back to
15  BLM?
16    A.  I think Dr. Taylor told me in January
17  or February, something like that, that he had
18  spoken with, he had spoken with Bob Doyle to
19  try to get some type of arrangement for me to
20  stay there and then, I don't know, he said he
21  had been talking with Warren, talked with
22  Warren Johnson and said that unless he was
23  going to pick up the, my salary and benefits
24  and travel I couldn't do it.
25    Q.  Is that what's referenced in the letter

Page 200

1  in your Interrogatory G that's dated February
2  25th, 2000, is that what that is in reference
3  to?
4    A.  Yes.
5    Q.  And that's a summary of your
6  conversation with or a call that you received
7  from Dr. Willie Taylor?
8    A.  Yes.
9    Q.  In March of 2000 which office did you
10  report to?
11    A.  I reported to the BLM office on L
12  Street.
13    Q.  Did you report at all to Dr. Willie
14  Taylor's office?
15    A.  No.
16    Q.  Do you know the exact date that you
17  were told to report officially and only
18  officially to BLM?
19    A.  No.
20    Q.  Do you know the date that Mr. Warren
21  Johnson informed you that you could no longer
22  continue the detail in Dr. Willie Taylor's
23  office?
24    A.  He never informed me of such.
25    Q.  Do you know the date that Mr. Robert

Page 201

1  Doyle informed you that you could no longer
2  work on this detail in Dr. Willie Taylor's
3  office?
4    A.  It was about February, January or
5  February time frame, something like that.
6    Q.  Would you say that if it was in
7  February that it was at the end of February
8  that you were wrapping up your work in Dr.
9  Willie Taylor's office?
10    A.  Probably about that time, mid-February
11  or something like that.
12    Q.  Concerning your job responsibilities in
13  the detail, what exactly did you do?
14    A.  On which one?
15    Q.  In the Office of Environmental Policy.
16    A.  We did mostly environmental justice
17  work, worked with the Office of Environmental
18  Protective Agency, I should say the EPA,
19  Environmental Protection Agency, in terms of
20  doing environmental studies, what's called
21  environmental reviews and what's called ground,
22  the ground fields.
23    Q.  So, concerning Allegation Number 6 is
24  it your allegation that it was in November,
25  1999 that you actually, that management

County Court Reporters, Inc.
CCR

TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

## Page 322

1  served as an Acting Group Manager. Do you
2  know that date?
3    A.  The exact dates?  No, I think that's,
4  I'm not sure of those dates.  I remember there
5  was, it began sometime, I think, I think they
6  put him in acting while I was away in school.
7  The semester, my last semester there, I think
8  that's when he became acting, I think
9  temporarily, and then they were rotating.
10    Q.  Do you have a rough idea of when that
11  occurred?
12    A.  That would have been either the summer
13  of 1999, I think.
14    Q.  Concerning Mr. Robert Donaldson, do you
15  know the date that he served as the Acting
16  Group Manager?
17    A.  I think that was around the fall or
18  winter of '99 or even the beginning of 2000,
19  something like that.  The beginning of, the
20  beginning meaning the first quarter of 2000 I
21  think.  I'm not sure.
22    Q.  Concerning your allegation under
23  Allegation 13 that because they were allowed to
24  act as Acting Group Managers, this allegedly
25  set up a process or set a process in motion

## Page 323

1  for a preselection process.  What do you mean
2  by a preselection process?
3    A.  A preselection process in that you
4  advertise a position, but you already know
5  beforehand who you're going to, who you're
6  going to put in the job.
7    Q.  Concerning this particular position
8  which we've gone through before, for the record
9  it was actually advertised, correct?
10    A.  Yes, it was.
11    Q.  And for the record you did make the
12  Certificate of Eligibles?
13    A.  Yes, I did.
14    Q.  All right.  Concerning issue or
15  Allegation 14, BLM management officials
16  falsified Complainant's work accomplishments?
17    A.  Yes.
18    Q.  Do you affirm that this allegation
19  should be combined with Allegation Number 8,
20  which deals with management officials falsified
21  and fabricated Complainant's personnel
22  documents?  Do you affirm that it should be
23  combined?
24    A.  Yes.
25    Q.  Concerning Allegation Number 15, which

## Page 324

1  deals with, excuse me, management officials,
2  BLM management officials refused to submit your
3  application for the position of Assistant
4  Director Eastern States, did you actually apply
5  for the Assistant Director Eastern States
6  position?
7    A.  It was not, it was, yes, I submitted
8  my application, but I don't think, I'm trying
9  to think if it was advertised.  I think they,
10  I think it was advertised.  I think they
11  laterally transferred someone in there.
12    Q.  On what date did you submit your
13  application?
14    A.  I don't recall.
15    Q.  Concerning when you submitted the
16  application, where did you submit the
17  application?
18    A.  To the Eastern States Office, Human
19  Resources Office in the Eastern States.
20    Q.  Did you mail it or did you hand carry
21  it?
22    A.  I mailed it and I gave copies to Tom
23  Frye, the Director at the time.
24    Q.  Did you make the Certificate of
25  Eligibles for that particular position?

## Page 325

1    A.  No.  The position, the person who got
2  the job was laterally transferred in there into
3  the position.
4    Q.  Another question.  If the position you
5  believe was advertised, how was the selectee
6  laterally assigned to that position?
7    A.  Same grade.  You don't have to
8  advertise, that's why I'm saying I'm not sure
9  whether it was advertised or not, but I think,
10  I think it was.  I'm not sure if it was
11  advertised.  I'm not sure.
12    Q.  You indicated in Allegation 15 that Mr.
13  Frye requested your application...
14    A.  Right and...
15    Q.  ...concerning the Director Eastern
16  States position?
17    A.  Yes.
18    Q.  Did you actually forward an application
19  to Mr. Frye?
20    A.  I didn't forward it to him, I gave it,
21  I hand carried it to him.
22    Q.  When did you meet with Mr. Frye?
23    A.  The fall of 1999.
24    Q.  Is that when you gave him a copy of
25  the application for the...

County Court Reporters, Inc.
CCR

TOLL FREE 800.262.8777          Registered Professional Reporters          FAX 540.667.6562
CCR@COURTREPORTINGSERVICES.COM       Certified Video Technicians          WWW.COURTREPORTINGSERVICES.COM
                               Professional Reporting Since 1975

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

## Page 326

1    A.  Yes.
2    Q.  ...Assistant Director Eastern States?
3    A.  Yes.
4    Q.  Do you have any evidence to support or
5  indicate that the selectee was laterally
6  transferred into the position?
7    A.  Do I have any evidence of it?
8    Q.  Yes.
9    A.  I don't have any evidence of it. I
10  can, I mean, that can be verified. I can
11  verify it.
12    Q.  Who, in fact, was the selectee?  Do
13  you know?
14    A.  Gail, Gail Gordon, I think.
15    Q.  Miss Gail Gordon was the person who
16  made the decision, correct?
17    A.  I think so.  That's what Tom Frye
18  said.
19    Q.  Who actually was the person that Miss
20  Gordon selected?
21    A.  Mike Ned.
22    Q.  Can you state for the record his race
23  and his gender?
24    A.  Yes, he's an African American male.
25    Q.  Are you familiar with Mr. Ned's...

## Page 327

1    A.  Yes.
2    Q.  ...SF171?
3    A.  Yes.
4    Q.  Do you believe that your qualifications
5  are better than
6  Mr. Mike Ned's for that particular position?
7    A.  Yes.
8    Q.  What basis do you have to substantiate
9  that you believe that your position or, excuse
10  me, your criteria or your background experience
11  was better than the actual selectee?
12    A.  Attachment, Attachment L is similar to
13  what you previously asked in terms of my
14  résumé and work production and in this
15  statement, as I told the investigator, this is
16  a false statement, Issue Number 15, that Tom
17  Frye states, when I came back I was asked to
18  see him per the request of the Assistant
19  Secretary, John Barry, and told to give him my
20  application and I was not looking for another
21  detail. I was looking for a challenging
22  position.
23       This is just a fabrication. As I told
24  the investigator, this is a lie here. He told
25  me that I was looking for another detail.

## Page 328

1  That's a lie. I was on a detail and I was
2  trying to get into a specific, a position.
3  That means Field Manager, an Assistant Director
4  position, eventually going up to a State
5  Director or someplace in the Department.
6    Q.  When did you find out that you did not
7  make the Certificate of Eligibles?
8    A.  I found, I don't think, I never found
9  that out. I just found out that they had
10  laterally transferred someone into the job and
11  I think that was some time either that fall or
12  maybe that winter or the spring of 2000,
13  something like that.
14    Q.  Concerning Allegation 15, is there
15  anything else that you would like to state for
16  the record to support your allegation that when
17  management officials refused to submit your
18  application for the Assistant Director of the
19  Eastern States Office that that, in fact, was
20  a discriminatory act?
21    A.  Yes, I felt that when we met with
22  Assistant Secretary Barry, we were trying to go
23  through the, the management process correctly
24  and we went through that. And I'm not saying
25  you have to select me, I'm just saying that I

## Page 329

1  should be competitive along with everyone else
2  and that wasn't done. He, he Tom Frye, made
3  a specific statement that he would submit my
4  application. He did not, he had no plans of
5  doing it. He had no plans of assisting me.
6    Q.  When you refer to management officials,
7  who are all the management officials that
8  you're naming or alleging were involved in
9  this?
10    A.  Tom Frye, Warren Johnson, Robert Doyle,
11  Peter Neibower.
12    Q.  Are any of the people that you just
13  mentioned, Tom Frye, Warren Johnson, Peter
14  Neibower, are you aware of whether any of
15  those particular managers actually participated
16  in the selection process?
17    A.  No, I'm not. I'm not, I can't make
18  that statement, I'm not sure. I'm sure they
19  had, I'm sure they had input.
20    Q.  Do you have any evidence to indicate
21  that management officials, and when you refer
22  to management officials you're referring to all
23  three, Mr. Tom Frye, Mr. Warren Johnson and
24  Mr. Peter Neibower, is that correct?
25    A.  And Robert Doyle, yes.

County Court Reporters, Inc.
CCR

TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM

Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975

FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM

STEPHENSON, VA    •    WASHINGTON, DC    •    LEESBURG, VA    •    HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656

Case 1:06-cv-01233-JDB   Document 15-18   Filed 10/31/2007   Page 11 of 11
Hill, Milton Earl #13265-2 5/15/02; Leslie O. Scavuzzo C

83 (Pages 330 to 333)

## Page 330

1    Q.  Concerning these four people do you
2  have any evidence to demonstrate that they, in
3  fact, refused to submit your application?
4    A.  No.
5    Q.  Was it any of their responsibility,
6  either Mr. Tom Frye, Mr. Warren Johnson, Mr.
7  Neibower or Mr. Doyle, was it any of their
8  responsibilities to submit your application for
9  the Assistant Director Eastern States Office
10 position?
11   A.  Yes.
12   Q.  Whose responsibility are you alleging
13 that it was?
14   A.  The Director, Tom Frye.
15   Q.  Why are you alleging that it was his
16 responsibility?
17   A.  Because he's the one who said he would
18 do it.  He didn't have to say it, he could
19 have said I'm not going to do it.
20   Q.  Do you have any evidence to document
21 that, in fact, Mr. Tom Frye said that he would
22 forward your application?
23   A.  No.  It was in a meeting with Warren
24 Johnson in attendance.
25   Q.  But you also recall, in addition to

## Page 331

1  giving Mr. Tom Frye a copy of the application
2  on the exact same date that you allegedly met
3  with him, you also recall mailing a copy of
4  the application to the Eastern States Office,
5  is that correct?
6    A.  Yes, correct.
7    Q.  Okay.  How were you harmed when you
8  allege that Mr. Tom Frye did not forward or
9  refused to submit your application for this
10 particular position?
11   A.  I was not given an equal opportunity
12 or chance to compete for the job.
13   Q.  Did you mail your application to the
14 Eastern States Office in a timely fashion?
15   A.  Yes.
16   Q.  How were you not given an opportunity
17 to compete for the job?
18   A.  Well, it was as Tom Frye said.  He
19 says that the selecting official was the
20 Eastern States Director, Gail Gordon, and that
21 she was the one who made the selection and
22 insinuating that he had no input in it.  If
23 you are the Bureau Director, you have input
24 into everything that's going on in the Bureau.
25 That's a lie.

## Page 332

1    Q.  Concerning your discussions with Mr.
2  Tom Frye, do you have any document or anything
3  to demonstrate that you talked to him about
4  forwarding your application?
5    A.  We just have the formal letter that
6  we, I'm not sure if I even put that in there,
7  in terms of that was the October of '99
8  letter, I think.  I'm not sure if it put on
9  there about the forwarding of the application.
10   Q.  Concerning this particular allegation,
11 how are you alleging that when Mr. Tom Frye
12 refused to allegedly submit your application
13 for this position that that, in fact, resulted
14 in a discriminatory act against you?
15   A.  Because it didn't give me an
16 opportunity to compete fairly for a position.
17   Q.  Are you alleging that it was based on
18 race?
19   A.  No.  I'm, I'm alleging that it was
20 based on I think bias towards me.
21   Q.  How do you define bias towards you?
22   A.  And bias towards me meaning negative,
23 negative thought patterns, negative approaches
24 toward things that I do.
25   Q.  Have you ever interacted with Mr. Tom

## Page 333

1  Frye outside of this November of 1999 session
2  concerning the Eastern States Assistant Director
3  position where you've had a chance to witness
4  any negative thought patterns from Mr. Tom Frye
5  towards you?
6    A.  Oh, yes, you know, he just avoids you.
7  He avoids you.  When he sees you coming down
8  the hallway he goes the other way, refuses to
9  return...
10   Q.  Well, what dates did Mr. Tom Frye...
11   A.  I don't know the exact dates, but it's
12 19, the same period of time, the fall of 1999
13 on the whole theory, spring of 2000.
14   Q.  Do you have any specific instances?
15   A.  I recall that he refused to return
16 phone calls, he refused, after this meeting
17 refused to meet with me.  He wrote me a
18 letter saying he wasn't going to meet with me
19 and he wasn't going to help me and...
20   Q.  Do you still have a copy of that
21 letter?
22   A.  Yeah, that's included here.  Okay, it
23 would be in Attachment G and, about the, let's
24 see...
25   Q.  G as in God?

County Court Reporters, Inc.
CCR
Registered Professional Reporters
Certified Video Technicians
Professional Reporting Since 1975
TOLL FREE 800.262.8777
CCR@COURTREPORTINGSERVICES.COM
FAX 540.667.6562
WWW.COURTREPORTINGSERVICES.COM
STEPHENSON, VA   •   WASHINGTON, DC   •   LEESBURG, VA   •   HARRISONBURG, VA
Corporate Offices: 1160 Jordan Springs Road, STEPHENSON, VA 22656