**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - - - - - -x
 5   MILTON HILL,               :
 6           Plaintiff,         :
 7   vs.                        : Case No: 06-1233 (JDB)
 8   DIRK KEMPTHORNE,           :
 9           Defendant.         :
10   - - - - - - - - - - - - - -x
11
12
13                     Washington, D.C.
14                     Monday, August 6, 2007
15
16
17
18
19   Deposition of:
20              MILTON E. HILL
21   the Deponent, called for examination by counsel for the
22   Defendants, pursuant to notice and agreement as to time and
23   place, at 501 3rd Street, N.W., Washington, D.C., before
24   Sean Williams, a Notary Public in and for the District of
25   Columbia.
```

**Page 2**

```
 1   APPEARANCES:
 2           On Behalf of the Plaintiff:
 3           STEPHEN DOMENIC SCAVUZZO, ESQUIRE
 4           Suite 207
 5           300 Maple Avenue West
 6           Vienna, Virginia  22180
 7           (703) 319-8770
 8
 9           On Behalf of the Defendant:
10           RHONDA FIELDS, ESQUIRE
11           Assistant United States Attorney
12           501 3rd Street, N.W.
13           Washington, D.C.  20530
14           (202) 514-6970
15
16
17
18
19
20
21
22
23
24
25
```



EXHIBIT
Hill 2007
Depo
Excerpts

**Page 3**

```
 1                    I N D E X
 2   WITNESS:        EXAMINATION:          PAGE:
 3   Milton Hill     Direct - Ms. Fields     4
 4                   Cross - Mr. Scavuzzo   152
 5                   Redirect - Ms. Fields  153
 6
 7             E X H I B I T S
 8   EXHIBIT NO.:    DESCRIPTION:          PAGE:
 9       1          Detail Description      64
10       2          MFR dated 25 February 2000  65
11       3          Interrogatories        114
12       4          Interrogatory 1C       127
13
```

**Page 4**

```
 1              P R O C E E D I N G S
 2                   (10:20 a.m.)
 3   Whereupon,
 4              MILTON E. HILL
 5   was called as a witness and after having been first duly
 6   sworn, was examined and testified as follows:)
 7              DIRECT EXAMINATION
 8   BY MS. FIELDS:
 9      Q.  Mr. Hill, my name is Rhonda Fields.  I am an
10   Assistant U.S. Attorney and I am representing the Agency in
11   this matter in District Court.  You're here for a deposition.
12   I know you've been deposed before, but let's just sort of run
13   over the rules quickly.
14      A.  Okay.
15      Q.  A deposition is simply, as you know, a discovery
16   mechanism for civil cases.  It's not the trial.  Therefore, we
17   don't have judges here.  And I'm going to be asking you
18   questions.  I would ask you to listen to the questions.  If
19   you don't understand a question or if you need me to repeat
20   it, just let me know.
21      A.  Okay.
22      Q.  Of course, you have to say yes or no.  You can't
23   shake your head --
24      A.  Okay.
25      Q.  -- because the court reporter has to get this down
```

Page 17

1  part where you used -- it's not an exact science.
2       You use mathematical models and you do work force
3  analysis, what they was calling it, in terms of what period of
4  time. You say -- all right, you had X number of employees.
5  This is what they did. This is the number of people who were
6  there at the time. This is where you're trying to go. So you
7  have to use your or your staff have to use your judgment in
8  terms of what you did in the past, what you're doing now and
9  where you want to go and put that into a workable model where
10  you have a budget and you can say well, this is the budget
11  that we're going to go with. It either exceeds or it doesn't
12  exceed that, and that's how it works. And so now we went from
13  there to also the Chief of Resource Management.
14       Q. Okay. When did you become Chief of Resource
15  Management?
16       A. That was '85, '86.
17       Q. So you were Chief of Forest Integration from '84 to
18  '85?
19       A. From '84 to '86. From '84 to '86 or something like
20  that.
21       Q. Um-hum.
22       A. And then went into what was called the -- I was the
23  Chief of Resource Management and the Deputy for Personnel, and
24  it was what's called a MW, Morale Welfare and something. I
25  can't remember. I need to -- let me see that. Then I went to

Page 18

1  Assistant Director of Personnel, DPCA, the Deputy for
2  Personnel and Community Activities, and that's where you work
3  under the -- I guess you call it Installation Director,
4  Installation Director, and in this it was -- I think it was a
5  two star, I think, two star general. I'm not sure. I can't
6  remember, either a one or two star. In that case, what you
7  did, you managed the personnel, military, civilian and the
8  contractors, as well as what's called the Morale Welfare and
9  Recreation where that was the child care center, the
10  recreation hall, the child hall -- the meal hall. I should
11  say child hall, and the day care homes and the mess halls.
12       Q. So you were responsible for the contractors who you
13  gave the services for those --
14       A. The services, um-hum. It came through us. We
15  reviewed them. And then it goes to the Director, and then it
16  goes to Installation Management for final decision making.
17       Q. Okay.
18       A. And we reviewed them. Again, we did the same thing.
19  We made sure that the contracts were efficient -- anyway, and
20  effective, and we did the first full-fledged, Congressional
21  mandated installation review. We completed that ahead of
22  time.
23       Q. That was for what years, '86 through --
24       A. Uh-huh, '86 to about '89.
25       Q. Okay.

Page 19

1       A. And then I went to -- after that I went to the
2  Department of Interior, I think February of 1990.
3       Q. Okay.
4       A. And I was a management analyst in the Management
5  Review Shop where, again -- I'm going to be specific here.
6  What they did or we did was reviewed -- we did studies by
7  request at that time whether it was with the Department or
8  whether it was with the Office itself, meaning the Bureau. I
9  should say the Bureau of Land Management.
10       For example, the National Performance Review was
11  kicking in about that time, so they need analysts, so I was
12  selected as one of the chairs for the analysis of what's
13  called Program Redesign, which basically that was looking at
14  the organizations and their software and hardware in the
15  Department and trying to go to -- at that time they were doing
16  a lot of teaching them total quality management, and went
17  through the courses with an instructor on that and also
18  reviewed EEO offices, the Personnel Offices for the Bureau,
19  the National Business Museum. We did -- on the team that did
20  the nationwide Quality Management Initiative going from
21  Personnel -- redoing the Personnel from a hard paper to
22  converting it to -- it's on the computerized version of it.
23  So we did that and I was the chair of the program redesign.
24  We did that. And so --
25       Q. So are you saying that now with your applications

Page 20

1  you can go on line and get the applications on line?
2       A. Right.
3       Q. Is that what you're talking about?
4       A. Exactly right. So now when you go on line -- you go
5  on line and get it. That wasn't like that. So what we did
6  was consolidate work. Of course, we worked with the Personnel
7  folks on what was good and bad, narrowed it down. I guess we
8  called it consolidated it, and put it in a form that was
9  workable and put it on software. And this version is now -- I
10  guess they got their own web site and stuff like that. And so
11  --
12       Q. So you worked with a group of other analysts --
13       A. Other analysts, right.
14       Q. -- to help the Personnel people --
15       A. Right.
16       Q. -- put this all into --
17       A. Altogether.
18       Q. -- the computer network?
19       A. Right. And we also looked at -- and along with that
20  we did oil and gas reviews, and we did what's called quick
21  quality -- upgraded the procurement process in Interior, so we
22  was on their teams, so it was a variety of things. So that's
23  what that team did and that's what I was doing.
24       Q. Now were you a manager?
25       A. No. I was selected as the team leader. I was a

## Page 21

1 management analyst in the group. Then the Department wanted
2 teams, and I was selected as one of the team leader, so I had
3 folks under me. I had -- matter of fact, I was -- I had two
4 SES's working with me.
5     Q. So you were a team leader --
6     A. Right.
7     Q. -- for a group of analysts?
8     A. A group of analysts.
9     Q. Okay.
10     A. We called them analysts.
11     Q. As a team leader, do you do supervisory duties?
12     A. Supervisory duties.
13     Q. So you did their PD --
14     A. We had input to their PDs.
15     Q. Okay.
16     A. So what we had to do was when they finished, we
17 wrote up the info, what they did do and did not do or
18 whatever, and we sent that to their supervisors because they
19 was on detail to us.
20     Q. I understand. Okay.
21     A. And, let's see -- and from there --
22     Q. Bureau of Land Management?
23     A. Bureau of Land Management.
24     Q. Okay.
25     A. Okay. And then from there I was supposed to have

## Page 22

1 been going to -- it was a settlement that was involved here
2 around '93, something like that, where I was the Chief of Work
3 Force -- they were developing or incorporating or starting a
4 Work Force Development Office, and they were sending it up to
5 Denver, Colorado. And so fine, you know, that's my field, so
6 I had about eight people, nine people, under me and so we
7 started -- we completed all the position descriptions. We did
8 the organization chart, the mission statement, the
9 organization statement.
10     Q. For the Office of Work Force Diversity?
11     A. Right.
12     Q. Okay.
13     A. And we ready to go and all of a sudden -- I don't
14 know what happened, and so I'm just sort of floating there.
15 And so I went to the AD, the Director -- the System Director
16 of HRM, and he said well, there's some things going on here,
17 and so I applied to be a staff assistant in the Department,
18 and also at the time I was applying to the Congressional
19 Fellows Program, things like that.
20     And so then I went -- from there I got accepted to
21 -- I applied for the American Political Science Association
22 and I got accepted there and I worked on the hill for a year-
23 and-a-half, and that was in '95, and I worked for Congressman
24 Benny Thomas. That was when the -- first year of the -- I
25 guess for lack of another word, the Republicans' revolution

## Page 23

1 came in at the time, so I was there at that time.
2     Q. Now in your resume you have that down from October
3 of '94 to February of '96, is that right?
4     A. Right. That's about right. That's about right, uh-
5 huh.
6     Q. Now was this -- this fellowship, was this a detail
7 or was this --
8     A. No.
9     Q. -- or was it -- did you --
10     A. Apply. You had to apply, but what happens is
11 American Political Science Association gives out or I should
12 say they have available every year -- every other year a grant
13 or a fellowship where, if qualified, you have to -- they look
14 at your background. You only get -- Interior only gets two
15 slots per year. There's about a hundred folks applying. And
16 so you go there and you have to go through -- I'm sorry,
17 excuse me. We're sitting here. You have about eight folks
18 who are supposed to be experts in the field, and it was --
19 they decide -- they look at your background, your resume, your
20 accomplishments, your awards, information from your
21 supervisors. They go all the way back, I guess, about eight
22 or nine years and they make a decision. And I was accepted
23 and I got it, and I went to -- and it was --
24     Q. So did you like take a leave of absence from your
25 federal job? That's what I'm trying to figure out.

## Page 24

1     A. Well, how it works is that they pay for all of the
2 resources, but the salary is paid for -- you're still on the
3 payroll of your agency.
4     Q. Okay.
5     A. So they pay for everything else, meaning that you go
6 to the Congressional Resource Service. They sent you to
7 Canada for -- I guess they called it international training.
8 You got to -- of course, you work with the Congressman and he
9 decides what -- he or she decides what you're going to work
10 on. And then you go to their district and you get training on
11 how the budget process works, how the appropriation process
12 works. You work on -- they have you working on committees on
13 the hill, assignments with staff, Congressional staff, along
14 with your particular Congressman, but you have to interview.
15 You interview for all these folks and they bring you on, and
16 so it was great, you know.
17     Q. So you were with --
18     A. Thompson, Benny Thompson.
19     Q. -- Congressman Thompson for --
20     A. Right.
21     Q. -- this is almost --
22     A. A year-and-a-half, a year-and-a-half.
23     Q. -- two years? A year-and-a-half.
24     A. Uh-huh.
25     Q. Okay.

Page 33

1    Q. I understand.
2    A. Uh-huh.
3    Q. Okay.
4    A. And while all this is going on on the military side,
5  I decided -- when my time was up for four years, I got an
6  offer to be an instructor, so I was getting out. I was going
7  to get out. And so I was instructed on what -- at the time it
8  was Commissary Support Information in terms of you're looking
9  at how -- you're teaching transportation management issues,
10 rail safety, aircraft, and so that's my field, logistics.
11   Q. This is in the ROTC?
12   A. No, this is in the Army.
13   Q. In the Army, okay.
14   A. Uh-huh. So I went from ROTC to active duty. Now
15 I'm in the reserves, so my four year commitment is up, but
16 they appoint me to work as an instructor in the military
17 school. So fine, I accepted that. And so then after some
18 thought --
19   Q. I'm sorry. When did you do that?
20   A. That was in -- I started that in, I think, the '80s.
21 Then I was selected as an adjunct professor down in Logistics
22 Management College and was an instructor there. And all of a
23 sudden I had 10, 15 years in. I'm thinking well, you know
24 what, although I was ready to get out, now I only got 5 years
25 to go. So then I was assigned to Fort Huachuca, Fort

Page 34

1  Huachuca, Arizona, as the Transportation Management Officer up
2  there. And then during that period from, what, '86 to when I
3  retired, 1986 to 1998, I was Transportation Management
4  Officer. I was the Deputy Director of Logistics and I was
5  Director of Logistics up there. Then also my last assignment
6  was at the Pentagon where I was a Logistics Specialist.
7    Q. Okay. Now explain to me how much time did you spend
8  doing that?
9    A. Well, it depends. Every year, it was two to three
10 weeks that they send you to what they call annual training. It
11 hasn't changed. It's the same now. That's one of the -- to
12 try to answer your question, folks are being rotated in Iraq
13 now.
14       One of the complaints is that well, you're sending
15 them three and four times. Well, you sign up, that's what you
16 sign up for because you don't sign up to go active duty that
17 long, but if something happens, the Department of Defense and,
18 in my case, the Army, has the option to say well, you know
19 what, yeah, we said we're going to train you every year for
20 two weeks, but we need you to do something else. And that's
21 explained to your civilian employees. I mean you just can't
22 go -- there's an order that they send you, and that's how it
23 is.
24       I mean you tell them you're in the military before
25 then. So they sent me to Panama. I went to -- they meaning

Page 35

1  -- again they, Department of Defense, because I was one of the
2  specialists in Transportation -- I was a school-trained
3  logistician.
4    Q. So how long were you in Panama?
5    A. A month.
6    Q. Okay. When was that?
7    A. That was '85, I think, something like that. So --
8    Q. And then each year --
9    Q. Each year you go to --
10   A. -- you go two weeks --
11   Q. Or more if they --
12   A. -- or more.
13   Q. Or more.
14   A. And were there years when you had to spend more than
15 two weeks in addition to Panama?
16   A. Well, sometimes. Sometimes if they decide -- they
17 meaning the Army in this case -- decide that, say, they need
18 your skills some place else, they'll send you there. So I
19 went to -- one year they sent me to Scotland. I went to
20 England.
21   Q. Let's go to -- let's start -- let's say after your
22 fellowship in 1996.
23   A. In 1996 I come back.
24   Q. You came back. Did you go for the reserves more
25 than two weeks --

Page 36

1    A. I think once.
2    Q. -- after 1996?
3    A. I think once or twice, and that was Fort Huachuca
4  when they were doing a -- I think I had to go there for three
5  weeks, you know.
6    Q. What did you do there at Fort Huachuca?
7    A. Fort Huachuca, we did simulations on -- simulations
8  meaning you are -- you have a scenario where you have -- the
9  military active duty is saying there's a conflict somewhere in
10 the world. You're coming on active duty because you're
11 replacing them. They're going to the war. You're replacing
12 them on their jobs, so you have to do what they're doing and
13 the training has to take place, so that's why they have to --
14 that's why the DOD has to send you order to say this is what
15 you're going to do.
16       So in this case I was a Transportation Movement
17 Officer. One year I was the -- a couple years -- the last
18 couple of years I was the Deputy Director and Director of
19 Logistics. And so then my last assignment was at the Pentagon
20 and that was over here, and so that was for two weeks, I
21 think.
22   Q. And when was that?
23   A. I think that was 1998.
24   Q. Okay.
25   A. And so then I retired. So at that time I retired as

## Page 37

1 a lieutenant colonel.

2    Q. You retired from the Reserves?

3    A. The Reserves in 1998.

4    Q. Okay.

5    A. December 1998.

6    Q. Okay.

7    A. And so then I got accepted that year or the year

8 after to the Industrial College of Armed Forces and, again,

9 that --

10    Q. Would that be in July of '98 approximately?

11    A. Let's see -- right, right.

12    Q. Okay.

13    A. And so I got -- I applied, and there's one slot they

14 give to Interior every year and, again, -- people apply for

15 it. In this year I just wanted my application in, you know.

16 They wanted some applications, so -- I don't know why, you

17 know, and I said this -- I went to Assistant Secretary Berry

18 and said look, all I'm saying is that I want an opportunity t

19 compete and -- I mean if I don't get it, then I go back. I

20 mean it's no big deal. If I do get it, they pay for all my

21 training.

22        So I put my application in and it's 200 slots per

23 year, about 200 slots per year, and about a thousand folks

24 applying. It's both -- it's the senior executives. You know,

25 it's the folks from corporations. It's your top military

## Page 38

1 officers, and I was one of those. And so I got a masters in

2 natural resource strategy, you know, and a subordinate in

3 acquisition management.

4        And so when I finished that in 1999 I came back, and

5 when I left, you know, I told them what I was interested in

6 and they said we don't see any problem. They didn't say no,

7 you know. And so -- but there were some things happening at

8 the time, which I was not aware of until later on. And so I

9 came back and had put my application in for a couple

10 positions, and from there they started reassigning me.

11    Q. And so when you came back in -- when did you come

12 back?

13    A. I came back in 1999, I think.

14    Q. August of '99?

15    A. August or September, something like that, 1999.

16    Q. Okay. And what position did you go back into?

17    A. Back to the business management position.

18    Q. That was the position you had before you left?

19    A. Right. But the week I was back they reassigned me

20 to -- they, again I'm saying they. There's no paperwork on

21 it. They just told me that I was being reassigned to the

22 Small Business Office.

23    Q. That's Mr. Faithful's office?

24    A. That's Robert Faithful's office.

25    Q. Okay. And did you go there?

## Page 39

1    A. Yes.

2    Q. So where was his office in relation to where you

3 were?

4    A. His office -- I was on L Street with the Bureau of

5 Land Management. His office was in -- he was in the

6 Headquarters Office. He was the Small Business -- Chief of

7 Small Business for the Department.

8    Q. Okay. And what did you do for Mr. Faithful, what

9 was your assignment there?

10    A. I was the Small Business Adversary, something like

11 that.

12    Q. And what did you do there?

13    A. Well, you pursued at a higher level the -- trying to

14 get small business to the Department, small business to the

15 Department, and small minority veteran-owned and -- I'm trying

16 to think of the word they used. It wasn't gay. It was

17 another term they used. And we did outreach efforts. They

18 were trying to push and they were trying to upgrade their

19 software systems.

20    Q. Gay and lesbian organizations?

21    A. Gay and lesbian. That's right, thank you, gay and

22 lesbian organizations, so there were doing a push for that,

23 and that's what they had me doing. So we did outreach with

24 gay and lesbian groups, women's groups, veterans groups,

25 disabled folks.

## Page 40

1    Q. To contract with the Department?

2    A. With the Department. And, let's see, Asian Pacific,

3 Black Chamber of Commerce, Chamber of Commerce, Urban League,

4 things like that, so we did outreach efforts. So he had me

5 doing presentations, talking to the groups in terms of how you

6 contact the Department, what the Department needed. We did

7 outreach to HB -- Historically Black Colleges and

8 Universities. They wanted to put the emphasis on them getting

9 contracts along with some of the major schools, so that's what

10 they had me doing.

11    Q. So that was similar to what you had been doing prior

12 to your going to the Industrial College?

13    A. Right, and just at a different level, yes.

14    Q. At a higher level?

15    A. Yeah, but it wasn't -- in my mind, this was not -- I

16 mean before I left and when I came back and interviewed with

17 my supervisor, the Chief, the Assistant Secretary, he had the

18 positions I wanted. I said I'm being trained in senior

19 executive positions, both academically and job-wise, so why

20 you putting me in jobs that are non-senior executive?

21    Q. Well, let me ask you. SES has it's own process,

22 doesn't it?

23    A. Yes.

24    Q. Okay. So did make application to SES?

25    A. Yes, I did.

Page 45

1  Q. And Mr. Doyle in 1998 didn't forward it? He didn't
2  forward it?
3  A. No.
4  Q. Okay. Did you have any conversation with him about
5  why he didn't forward it?
6  A. Yes.
7  Q. Okay. When did you gave a conversation with him
8  about that?
9  A. Fall.
10  Q. The fall of '98?
11  A. Um-hum.
12  Q. And what did he tell you?
13  A. He didn't say anything.
14  Q. What do you mean?
15  A. I'm just -- I'm telling you exactly -- I'm sitting
16  in front of him like I'm sitting in front of you.
17  Q. There was total silence --
18  A. I'll get back with you.
19  Q. He said I'll get back with you, okay. And did he
20  get back with you?
21  A. I got a letter.
22  Q. What did the letter say?
23  A. It said that he's not forwarding it.
24  Q. And did it say why he's not forwarding it?
25  A. Thank you.

Page 46

1  Q. Do you have that letter?
2  A. I have that letter. You want a copy of it?
3  MS. FIELDS: Do we have a copy of it?
4  MR. SCAVUZZO: It's in the ROI.
5  WITNESS: I'll get it. I sent -- everything you
6  want from me, I sent it to --
7  MR. SCAVUZZO: Isn't it in the ROI?
8  WITNESS: I'm not sure. It may be.
9  BY MS. FIELDS:
10  Q. Okay.
11  A. Okay.
12  Q. Okay. So in 1998 you were not in the SES program
13  then because it wasn't forwarded?
14  A. Wasn't forwarded.
15  Q. In 1999 you were not in the SES program?
16  A. Right.
17  Q. And in 2000 you were not in --
18  A. Right.
19  Q. You weren't in the SES program at any time?
20  A. I applied every year.
21  Q. No, but you were never accepted into the program?
22  A. It was never forwarded.
23  Q. Okay. So you --
24  A. Right.
25  Q. So for the whole time of your career with the Bureau

Page 47

1  of Land Management you were not in SES, is that correct?
2  A. Right.
3  Q. Okay. Now let's go to the allegations in your
4  complaint, okay, and I got your Supplemental Interrogatories.
5  Thank you.
6  A. Oh, you're very welcome.
7  Q. Very helpful because it was sort of confusing.
8  A. It's very convoluted.
9  MR. SCAVUZZO: You were confused?
10  MS. FIELDS: If I say yes, do I get --
11  BY MS. FIELDS:
12  Q. You have to break it down for me on a fourth grade
13  level so I'll understand it, okay?
14  A. Okay.
15  Q. If I don't have it, let me know.
16  A. Okay.
17  Q. Let's start with the first count of the complaint
18  which I'm going to summarize what I understand from your --
19  A. Right.
20  Q. -- interrogatories and you tell me where I'm right
21  or where I'm wrong.
22  A. That's fair enough.
23  Q. Okay. The basis for the complaint for Count 1 is
24  retaliation, okay?
25  A. Correct.

Page 48

1  Q. Okay. And if I understand it correctly, you're
2  saying two things, that in September of 1999 you did not get
3  an award, and that for Fiscal Year 1998 you did not get a
4  performance appraisal.
5  A. Correct.
6  Q. Okay. Let's start with the first one, Fiscal Year
7  1998, and I always get this confused, Fiscal Year 1998 ends in
8  September of '98 or September --
9  A. That's right.
10  Q. So it runs October 1st --
11  A. Previous year.
12  Q. -- '97 --
13  A. Right.
14  Q. -- to September 30th of '98?
15  A. Correct.
16  Q. So that's the time period we're talking about for FY
17  1998.
18  A. Right.
19  Q. Okay. So October of '97 to September of '98 is the
20  time period covered, and you should have received a
21  performance appraisal when for that period?
22  A. That September of '98.
23  Q. Okay. So you should have received an appraisal
24  September of '98. And you did not?
25  A. Did not.

**Page 49**

1  Q. Okay. Who was your supervisor during that period?

2  A. Peter Niebauer.

3  Q. Peter Niebauer.

4  A. Peter Niebauer. And I'm trying to remember if that

5  was '96 or '97. I have to look at it. But he did one the

6  prior year, and -- I think that year, but I'll verify that to

7  make sure.

8      MR. SCAVUZZO: For the record, the count that I

9  alleged was for -- as you said, was for Fiscal Year '98. I

10  don't know what he just said.

11     WITNESS: '98.

12     MS. FIELDS: Right, '98.

13     MR. SCAVUZZO: That's what you asked about. That's

14  what this count was about.

15     MS. FIELDS: And that's what Count 1 was about.

16  Okay.

17     MR. SCAVUZZO: Right.

18     BY MS. FIELDS:

19  Q. So when you did not get your evaluation in September

20  of 1998 -- let's see -- let me retract that.

21  A. Okay.

22  Q. In September 1998 you were at the National Defense

23  University?

24  A. Right.

25  Q. Okay. When you did not get your evaluation in

**Page 50**

1  September of 1998 --

2  A. Okay.

3  Q. -- what did you do?

4  A. Wrote a letter.

5  Q. To whom?

6  A. To Peter Niebauer.

7  Q. Okay. And when did you send a letter to Peter

8  Niebauer?

9  A. That fall. I know I probably did that. I can get

10  that to you also.

11     MR. SCAVUZZO: For the record, that's in the ROI.

12  It's Exhibit 3.

13     BY MS. FIELDS:

14  Q. Now what did the letter say?

15  A. That I had not received an award. I had done

16  outstanding work in the area, and not only had I not gotten an

17  appraisal, I had not gotten an award, and I would like him to

18  address that issue.

19  Q. And what happened?

20  A. Nothing.

21  Q. Okay.

22  A. And also called him.

23  Q. Okay. And so you got no response to your letter?

24  A. Right, no response to the letter, no response to my

25  phone call.

**Page 51**

1  Q. Okay. And that was in the fall of 1998?

2  A. Yes.

3  Q. Okay. And then what happened in relation to --

4  A. Now do you need a copy of that?

5  Q. -- that evaluation?

6  A. The evaluation? Nothing happened.

7  Q. Okay. So you got no response, and then you come

8  back in July or August 1999.

9  A. And I wrote another letter to Bob Doyle.

10  Q. Okay.

11  A. Uh-huh, Bob Doyle. Same thing, and a listing of --

12  I'm coming back and he sent me off to senior executive

13  training.

14  Q. Okay. So you wrote a letter to Bob Doyle?

15  A. Bob Doyle.

16  Q. When was the letter to Bob Doyle?

17  A. That was in, I think, August of '99, I think,

18  somewhere around that.

19  Q. August of '99.

20  A. Either late summer or fall, uh-huh.

21  Q. Of 1999?

22  A. '999.

23  Q. So that's as you're -- when you came back -- when

24  you're coming back?

25  A. When I'm coming back. I was still at -- I was

**Page 52**

1  winding down on the Industrial College of Armed Forces, ICAF,

2  and I'm telling them hey, I'm on my way back, I've been to

3  Communications, here are my issues, and here are the jobs I'm

4  interested in. I went away to senior executive training, here

5  are the jobs I'm interested in.

6  Q. Okay.

7  A. Can we meet?

8  Q. This is to Bob Doyle now?

9  A. To Bob Doyle.

10  Q. Okay. And in this letter you're also saying you did

11  not receive your performance evaluation in '98?

12  A. Right, my performance evaluation and what I consider

13  awards for outstanding work, exceptional work.

14  Q. Now what is the -- first of all, what award are you

15  saying you should have gotten for FY '98?

16  A. I'm saying I should have gotten a cash award.

17  Q. Okay.

18  A. A cash award.

19  Q. And how much of a cash award?

20  A. I say a minimum of $5,000. I told them that.

21  Q. $5,000?

22  A. Minimum.

23  Q. Okay.

24  A. Yeah.

25  Q. And for what should you have gotten the cash award?

Page 65

1 supposed to do?
2    A. Right.
3    Q. And did you start any of this work for Dr. Taylor?
4    A. We initiated the paperwork on it. Yeah, we
5 initiated the paperwork, but after that we was told to stop.
6 I was told to stop, I should say.
7    Q. So did you do -- how long were you doing work for
8 Dr. Taylor?
9    A. Only about two weeks.
10    Q. Okay. And then what did you do for him for those
11 two weeks?
12    A. We were getting -- I was getting the materials
13 together, the ecosystem management and the environmental
14 justice materials together to initiate the effort.
15    Q. And when did you start doing that?
16    A. I think that was winter of '99 or beginning of 2000,
17 I think.
18    Q. Okay. But you say you only did that for about two
19 weeks?
20    A. Yes.
21    Q. Okay. Let me show you --
22        MS. FIELDS: Mark this Number 2.
23 (Whereupon, the document that was referred to as Exhibit
24 Number 2 was marked for identification.)
25        BY MS. FIELDS:

Page 66

1    Q. Do you recognize Exhibit Number 2?
2    A. Okay, yes.
3    Q. What's this?
4    A. This is -- let's see.
5    Q. Is this in your handwriting?
6    A. This is my handwriting. This is my bad handwriting.
7    Q. Maybe if you could read it for the record for us.
8    A. Okay, yes.
9    Q. It's hard to read.
10    A. It is bad.
11    Q. Start at the first line.
12    A. All right. Received a call from Dr. Willie Taylor.
13 He stated he had spoken with Warren Johnson this morning
14 concerning my detail to him, Dr. Taylor's office -- to his
15 office, Dr. Taylor. Warren would not agree to detail if he,
16 Dr. Taylor, would not pick up my salary, benefits and travel.
17 Therefore, the proposed detail is off. Dr. Taylor stated that
18 he hoped I would keep in contact with him and if any positions
19 come up -- come open in his office, feel free to contact him
20 and apply.
21    Q. And at the very top, is that MFB, what is that?
22    A. Oh, that's bad handwriting, MFR.
23    Q. What does that mean?
24    A. For the record.
25    Q. Okay. And then 10?

Page 67

1    A. That's 10:55 a.m.
2    Q. And the date?
3    A. 25 February.
4    Q. Of 2000?
5    A. Of 2000.
6    Q. Okay. Now when you wrote this note, had you already
7 stopped doing work for Dr. Taylor or was this the termination
8 of the work you were doing?
9    A. This was the termination of it, the termination.
10    Q. So this was February the 25th.
11    A. Right.
12    Q. Would you have started doing work for Dr. Taylor
13 sometime in mid-February of 2000?
14    A. Probably about that time because there was a break
15 there where -- I think so. To answer your question, I think
16 we had started reviewing what we were going to do in that fall
17 -- in the winter, I think, and then we were going to initiate
18 it, to go full -- ahead, in 2000. I think that's what
19 happened.
20    Q. When you say we, who's we?
21    A. We means -- I had to work with Dr. Taylor.
22    Q. Okay.
23    A. I'm sorry. We, Dr. Taylor. I was working with Dr.
24 Taylor when I said -- when I was meaning we.
25    Q. Okay. Now when you were doing the initial work with

Page 68

1 Dr. Taylor, were you also doing the work for Mr. Faithful?
2    A. Yes.
3    Q. Okay. And there came a point in time in mid-
4 February when you were doing work solely for Dr. Taylor?
5    A. Dr. -- yes.
6    Q. Okay. And then on about February the 25th Dr.
7 Taylor said we can't go forward --
8    A. Right.
9    Q. -- because he could not pick up your salary?
10    A. Right, he couldn't pick up -- I guess they -- yes,
11 could not pick up the salary.
12    Q. Okay. Salary, benefits and travel?
13    A. Yes.
14    Q. Okay.
15    A. Yes.
16    Q. So then after February 25th you were still doing --
17 you went back to doing work solely for Mr. Faithful, is that
18 correct?
19    A. Right.
20    Q. Okay. And in March of 2000 you returned back to
21 BLM?
22    A. Right. To L Street, yes.
23    Q. Okay. But the detail with Dr. Taylor was going to
24 be at most around a six month detail?
25    A. Yes. It would have been a six month detail.

Page 97

1  A. Yeah. We're talking about — that, again, I'm
2  saying is retaliation with race being how I felt about it,
3  race and sex, but I think the issue was -- it's retaliation
4  because of my prior activity and because of my meetings with
5  the Director, Tom Fry, and Warren Johnson previously, and a
6  hostility just built up.
7  Q. What was the meetings that generated the hostility?
8  A. Well, you know, it's really amazing. I mean I went
9  in there to interview because the Assistant Secretary asked me
10  to try to resolve it, go through the chain of command.
11  Q. Okay. To resolve what? Back up. You've got to
12  back up.
13  A. Oh, I'm sorry. Oh, excuse me.
14  Q. What was the genesis of it?
15  A. The genesis of it was the Assistant Secretary, John
16  Berry, asked me to resolve this issue, to go to see Tom Fry,
17  the Director.
18  Q. And what issue did he ask you to resolve?
19  A. To resolve me being selected for the jobs after I
20  was qualified for, and that's -- you can be selected. Let Tom
21  Fry help you do that. He's the Director. So he said you can
22  resolve that. You can go back to -- he called Tom -- he, John
23  Berry, called Tom Fry, set up an appointment, said I'm coming
24  there to resolve it.
25  Q. Okay. So let's back up a little bit.

Page 98

1  A. Okay. All right.
2  Q. You said he wanted to resolve your not being
3  selected for certain jobs?
4  A. Yes.
5  Q. What were the jobs you were complaining about not
6  being selected for?
7  A. Assistant Director, Eastern States Office.
8  Q. Okay.
9  A. A Special Assistant to -- they were doing a special
10  project in Detroit, the job with Dr. Taylor. There were two
11  District Managers, 15s, Business Managers available.
12  Q. So --
13  A. He said you -- I'm sorry.
14  Q. He said go talk to Mr. Fry?
15  A. Mr. Fry. You can work this out. You're qualified,
16  dah, dah, dah. He said, you know, we can work this out. I
17  will call him. He called him, he. John Berry called Tom Fry
18  and set up the meeting with Tom Fry and myself.
19  Q. Okay. And you met with Tom Fry?
20  A. Met with Tom Fry.
21  Q. Met with Tom Fry?
22  A. Met with Tom Fry. He called Warren Johnson.
23  Q. About when did you meet with Mr. Fry?
24  A. This was the winter of '99, I think so, around
25  there.

Page 99

1  Q. Okay. Okay. Was this after you had returned?
2  A. This was after I had returned --
3  Q. Okay.
4  A. -- from ICAF.
5  Q. Okay. Then what happened?
6  A. Well, we met and I gave him a copy of my resume,
7  said I was selected by John Berry. He says well, one of the
8  jobs on here, we've already made a selection. Well, it hasn't
9  been advertised. He said but the Director wanted this person
10  for the job. I said well, what I would like to do is whenever
11  it comes out, because I'm on a different assignment -- I said
12  Berry asked me to give you my resume. I'd like for you to
13  submit that. He said fine. He took my resume. We'll submit
14  it.
15  Then he said well, you know, I'm -- he said what
16  we'll do is if you can't contact me, let me call in Warren
17  Johnson. He called -- he, Tom Fry, called Warren Johnson in.
18  I didn't call Warren Johnson in. He's the HRM person. He
19  comes into the meeting and he says to him -- he said well, you
20  know, his issues, the jobs I'm interested in and that he
21  should be assisting me on that because he's busy, dah, dah,
22  dah, you take care of it. You got any problem with that,
23  Milton? No.
24  Q. He should be assisting you on what?
25  A. On what? Specifically on how to, first of all, get

Page 100

1  office space and supplies, get the jobs I'm interested in,
2  applying for those jobs, what I need to do, submitting the
3  applications and giving him my resume just in case I'm away,
4  I'm on travel, it comes up. Sometimes just two weeks is open.
5  I give him my resume. He would be submitting that for me.
6  He's the HR -- that's what he said. I said fine. I have no
7  problem with any of that.
8  Q. So you're saying that Mr. Fry --
9  A. Tom Fry, the Director.
10  Q. -- told Warren Johnson —
11  A. Warren Johnson.
12  Q. Okay.
13  A. Yes.
14  Q. -- to submit applications for you.
15  A. Okay, for these particular jobs.
16  Q. For what particular jobs?
17  A. The Assistant Director of Eastern States Office, the
18  District Manager in the field, 15.
19  Q. Which District Manager?
20  A. One was in New Mexico, which I have a place there.
21  I used to work there. The other ones were in Eastern States
22  Office and there were others open which I wasn't aware of that
23  he would know. Now the reason he said that was that I'm
24  traveling. I'm away from them now. I'm over in a detail, and
25  sometime I'm in the field and sometime those openings are only

Page 101

1  for two weeks. I'm gone for three weeks. So what he's doing
2  is asking him to assist me. That's all he's doing. That's
3  all I -- I said fine. That's all I wanted.
4      Q. Now just so I understand --
5      A. Sure, I understand.
6      Q. -- Mr. Fry told Mr. Johnson to take your resume and
7  that whenever any positions opened, that any vacancy
8  announcements opened for --
9      A. See, there were four specific -- these four specific
10  --
11     Q. What were the four specific ones?
12     A. The Eastern States Office --
13     Q. Yeah.
14     A. -- District Manager in the field and the State
15  Director in the field.
16     Q. Uh-huh. And he was supposed to submit what?
17     A. My resume.
18     Q. Your resume.
19     A. Right, because, see, he's going to assist me,
20  whatever that meant.
21     Q. So how was that supposed to work?
22     A. Well, you tell me. That's what I said. I said
23  okay, well, I'll work with him. What am I supposed to say? I
24  said fine, I'll do that. In my mind it was just to get me out
25  of the office.

Page 102

1      Q. So in your mind he just said that?
2      A. Thank you.
3      Q. At the time when he said that in your mind he was
4  just talking?
5      A. Right.
6      Q. And at the time when he said that when you were in
7  the meeting, it was your belief that --
8      A. My belief. I didn't say he --
9      Q. Wait. My question is when he said it in the office
10  --
11     A. Right, right.
12     Q. -- it was your belief that he had no intention of
13  having Mr. Johnson do that? Is that your testimony?
14     A. I'm saying he wasn't sincere, right.
15     Q. So it was your belief at that time when you were
16  having that meeting with him that he wasn't sincere?
17     A. Yes.
18     Q. And are you saying that it was your belief at that
19  time that he was not sincerely --
20     A. He was dishonest.
21     Q. -- telling Mr. Johnson to send out your resume?
22     A. I'm saying he was dishonest and he was lying.
23     Q. That he was lying to you when he said --
24     A. Deliberately.
25     Q. -- to Mr. Johnson --

Page 103

1      A. Right.
2      Q. -- to send out the resume?
3      A. Right.
4      Q. So at that meeting you came away not believing that
5  Mr. Johnson was going to be sending out your resume?
6      A. Right.
7      Q. Is that what you're testifying?
8      A. Right.
9      Q. Okay.
10     A. That this was all a charade.
11     Q. Okay. So you really didn't anticipate that Mr.
12  Johnson would send out your resume? Is that your testimony?
13     A. I'm saying I felt that they were not sincere, but
14  I'm -- this is the chain of command. This is what the
15  Assistant Secretary asked me to do. I'm doing it.
16     Q. Okay. But because you didn't think they were
17  sincere, you went on and applied for Eastern States yourself,
18  isn't that right?
19     A. I applied. I applied for the State Director. I
20  applied for the District Manager, and nothing.
21     Q. And you applied for the Assistant Director for the
22  Eastern States position?
23     A. Yes. I put my application in.
24     Q. Okay. Independent of Warren Johnson?
25     A. No, through Warren Johnson.

Page 104

1      Q. What do you mean through Warren Johnson?
2      A. He had my application. I didn't know -- it was
3  advertised. I didn't know it was advertised, so Warren
4  Johnson assured me -- now I'm saying that he wasn't sincere,
5  my feeling was, but he's telling me that when this comes up,
6  he'll put my application in.
7      Q. Warren Johnson said that when the position opened he
8  would mail your application in?
9      A. Mail it in.
10     Q. And you gave him a 171?
11     A. Gave him two 171s.
12     Q. Gave him two 171s.
13     A. Right.
14     Q. Okay. And that's all you did?
15     A. Well, that's all he asked me for.
16     Q. Okay.
17     A. Now keep in mind now that this is what the -- we're
18  saying that when I'm talking to the Assistant Secretary --
19     Q. Who's that?
20     A. John Berry.
21     Q. When you're talking to Mr. Berry.
22     A. Right. He's telling me that these things are
23  resolved all the time and I'm saying sure, they're resolved
24  because we don't have to go through all this.
25     Q. He's saying this can be resolved because, what, we

Page 109

1 you submitted the application, where did you submit the
2 application? To the Eastern States Office, Human Resources
3 Office in the Eastern States. Did you mail it or did you
4 hand-carry it? I mailed it and I gave copies to Tom Fry, the
5 Director at the time.
6   A. Yeah, but he was asking -- right, right, but you
7 know for what I was --
8   Q. You mailed it?
9   A. I mailed it, but that wasn't for the position. The
10 position hadn't been advertised. I sent the application in
11 saying that I was interested in applying for the job and it
12 had not been advertised yet. So he was supposed to have been
13 -- he meaning Tom Fry and Warren Johnson were supposed to have
14 been sending mine in when it was advertised. I didn't know
15 when it was going to be advertised. I never saw it
16 advertised.
17   Q. You never saw it advertised?
18   A. No.
19   Q. So when I'm mailing it in, I'm not mailing it in
20 because it's advertised. I'm mailing it in to tell HRM that
21 I'm interested in the position if it becomes advertised
22 because that's what he's asking me to do. I thought you meant
23 was I sending in an application for a particular
24 advertisement. No, I did not do that.
25   Q. Now when you mailed it in, when did you mail in what

Page 110

1 you mailed in?
2   A. I mailed it in that winter --
3   Q. What winter?
4   A. -- of '99.
5   Q. Of '99?
6   A. Of '99.
7   Q. Before or after your conversation with Mr. Fry?
8   A. Or after -- it was after.
9   Q. How long after?
10   A. I think it was a couple weeks, couple weeks because
11 I also sent a cc copy to -- at the time my interim supervisor
12 was a guy named Roger Hiltabidle (phonetic sp.).
13   Q. So you mailed it in to Eastern States and you sent a
14 cc to Roger Hiltabidle?
15   A. Roger Hiltabidle, the reason being that Fry was
16 saying -- Tom Fry was saying keep folks abreast. He was
17 saying well -- he was insinuating that folks weren't abreast
18 -- since I away from them, they weren't abreast of what I was
19 interested in or what I was doing, so he said make sure that
20 you send it -- if you're going to send it in, make sure your
21 supervisor and the HRM person was aware of that.
22   Q. Now in -- just so I'm understanding now -- July or
23 August -- no, August or September of 1999 you came back to --
24   A. Yes. I came back from ICAF.
25   Q. Okay. And you came back to BLM?

Page 111

1   A. Came back to BLM, yes.
2   Q. Okay. And then you were told you were going to be
3 going to work with Mr. Faithful?
4   A. Right, told, no paperwork.
5   Q. Okay. And then about when did you go to Mr.
6 Faithful's office?
7   A. September, October.
8   Q. Did you do any traveling between the time you came
9 back and the time you went to Mr. Faithful's office?
10   A. I don't think so. I think my first travel was with
11 Mr. Faithful's office with the Hispanic Conference.
12   Q. Okay. And how long was the Hispanic Conference?
13   A. I think it was a week or two. Two weeks? One week
14 or two weeks, I think.
15   Q. And when was that?
16   A. That was in the fall of '99. When specifically I'm
17 not sure. I don't remember.
18   Q. Okay.
19   A. Fall of '99.
20   Q. Fall of '99 for about two weeks?
21   A. One or two weeks.
22   Q. One or two weeks. And when you came back, you were
23 still in Mr. Faithful's office?
24   A. Yes.
25   Q. Okay. What was the next job you did?

Page 112

1   A. We didn't do any because we didn't have -- we were
2 supposed to be going to the Black Chamber of Commerce and one
3 other conference we had.
4   Q. So you didn't do any further travel while you were
5 in Dr. Faithful's [sic] office?
6   A. I don't think so.
7   Q. Okay. Then you went back to BLM?
8   A. Went back to BLM.
9   Q. When was that? Was that March?
10   A. That was in February, March.
11   A. February.
12   A. Around February or March 2000, I think.
13   Q. Okay. February or March 2000. So other than the
14 Hispanic Conference before you went back to BLM in March of
15 2000 you hadn't done any travel?
16   A. No travel, just local.
17   Q. Okay.
18   A. Just local, no outside the D.C. area.
19   Q. Okay. And then once you went back to BLM, did you
20 travel?
21   A. Yes, I think we did.
22   Q. Okay.
23   A. Yes.
24   Q. What travel did you do? What was the first travel
25 you did?

Page 113

1    A. I don't remember. First travel I did when I went
2 back? I think it was the Black Enterprise Conference, I
3 think. It was either that one or Urban League, something --
4 one of those.
5    Q. Where was the Black Enterprise Conference?
6    A. I think that was in Tennessee.
7    Q. And where was the Urban League Conference?
8    A. I'm not sure.
9    Q. How long were you away for the Urban League
10 Conference?
11    A. I think that was about three, four days, something
12 like that.
13    Q. And how long were you away for the other one, the
14 Black Enterprise Conference?
15    A. I think that was about a week.
16    Q. Okay. And about when would those have been?
17    A. 2000, 2001, something like that. It was -- what I'm
18 trying -- it was -- let's see. I think I started getting sick
19 -- I'm trying to think. I started getting sick in summer of
20 2000, I think. I'm sorry. I think it was sometime -- I'm
21 trying to correlate it with when I began getting sick and it
22 was in May of 2000, I think, something around there, I think
23 somewhere around there.
24    Q. Is when the travel was?
25    A. Yes.

Page 114

1    Q. About May of 2000?
2    A. Yeah, something around there.
3    Q. Okay.
4    A. I'm trying to give you a more specific time.
5    Q. That's okay.
6    A. Okay. Man -- well, you know --
7    MR. SCAVUZZO: Did you answer that to what you
8 remember? If you did, then wait for another question and
9 answer the next one.
10    WITNESS: All right.
11    BY MS. FIELDS:
12    Q. Okay. Now I'd like to talk about Count 4, Paragraph
13 10 which relates to a rewriting of your position description.
14    A. I'd like to --
15    Q. Okay. Take a short break.
16        (OFF THE RECORD)
17        (ON THE RECORD)
18    MS. FIELDS: We're back on the record. Now could
19 you mark this? This is -- it starts -- to interrogatories
20 that you gave to the Agency, and that's our Exhibit 3.
21 (Whereupon, the document that was referred to as Exhibit
22 Number 3 was marked for identification.)
23    BY MS. FIELDS:
24    Q. And it was unclear from that record exactly what was
25 what. I'm going to ask you to start with the document and

Page 115

1 take --
2    A. Okay.
3    Q. Do you have a pen?
4    A. I have a pen.
5    Q. I want you to just look at the two position
6 descriptions. Number the pages 1 running and then I want you
7 to identify what is what for me.
8    A. All right.
9    MR. SCAVUZZO: No, that's all right.
10    WITNESS: Want me to --
11    BY MS. FIELDS:
12    Q. Yeah, just number the pages.
13    A. Okay. I have marked on here 1 through 7.
14    Q. Okay.
15    A. That's the Senior Business Management position, the
16 original position.
17    Q. The original position.
18    A. The position and they start on page 8, and remember
19 all those also?
20    Q. Yes.
21    A. Okay. That is the rewriting of the position.
22    MR. SCAVUZZO: For the record, in the supplemental
23 responses to Interrogatory Number 8, they're marked as pages 1
24 through 12, those two descriptions.
25    WITNESS: okay.

Page 116

1    MR. SCAVUZZO: They're both --
2    BY MS. FIELDS:
3    Q. Now were you told why the position description was
4 being rewritten?
5    A. No.
6    Q. Okay.
7    A. It was supposed to have been we're requesting -- we
8 meaning me, the EEO officer and the Personnel had agreed to do
9 a desk audit for the position because I was saying it should
10 not be a 14. It should be a 15 position.
11    Q. Okay.
12    A. Okay. Then that was set, I thought.
13    Q. There was going to be a desk audit?
14    A. Yes. Then all of a sudden the EEO officer and front
15 line said that they were rewriting my job description. The
16 next thing I know that was it. That's how it was rewritten
17 and I didn't -- I said no.
18    Q. So you had told them that you thought your position
19 should be a 15?
20    A. Sure.
21    Q. Okay. And that you wanted a desk audit in order to
22 see if it would be a 15?
23    A. Exactly right.
24    Q. And then the next thing you were told was that they
25 were going to be rewriting your position description?

Page 117

1    A. Correct.
2    Q. Okay. And had you done any paperwork in relation to
3 the desk audit prior to this time?
4    A. Yes, um-hum. A lady named Dana McGee had sent this
5 list of questions and listing and I sent all that back to her
6 --
7    Q. Okay.
8    A. -- in terms of what the job entailed and what I was
9 doing, who I reported to, that kind of thing. And I was
10 telling her that a lot of the jobs were being farmed out to
11 other folks, Special Assistants, the Deputy Director and all
12 that kind of stuff, and I put all that in there.
13    Q. When you were writing up for the reclassification?
14    A. Right, yeah. She was supposed to be coming in to do
15 the desk audit, I put those in. She didn't put any notes
16 down. I put all that down.
17    Q. You put what down?
18    A. That many of the jobs were being slowly taken from
19 me and given to other people.
20    Q. And they were jobs that you felt were at the 15
21 level?
22    A. Well, they were taskings, I should say, taskings
23 that I was doing. For example, the reviews of -- they were
24 saying they're doing the reviews of national programs or doing
25 instruction for -- instruction and reviews for offices that

Page 118

1 were interested in improving the efficiency and effectiveness.
2 They were attempting to rewrite or reassign those taskings to
3 other folks.
4    Q. Wait. Was this -- this is before you asked for the
5 desk audit?
6    A. It was during the time I was doing the desk audit.
7 It was during the time I requested a desk audit.
8    Q. Okay. So during the time you requested the desk
9 audit, they were giving taskings to other people --
10    A. That I had previously done.
11    Q. -- that you had previously done?
12    A. Yeah, uh-huh. So she said put everything down. She
13 was saying just put everything down you're concerned about and
14 I had miscellaneous.
15    Q. Okay.
16    A. So along with who I reported to, what I was doing,
17 how long I been doing it, cost savings, cost avoidances, I
18 added that. That was a note. Then I was -- so then all of a
19 sudden this thing was being rewritten.
20    Q. So let me ask you a question.
21    A. Sure.
22    Q. What were the duties that you were saying made your
23 job a 15 versus a 14?
24    A. The level of responsibility, the level that you were
25 dealing with, meaning that you were not just dealing with

Page 119

1 bureaus and -- your bureau. You were dealing with Congress.
2 You were dealing with large and small businesses. You were
3 dealing with the entire Department. You were dealing with,
4 you know, other natural resource agencies like Forest Service
5 or Fish and Wildlife. So when you were -- when you start
6 reducing that, that's going to reduce the grade level.
7    Q. Okay. So the things that they -- so the things that
8 you -- you say they started tasking things to other people?
9    A. Yes. I was telling her -- I made sure she wrote
10 this down because I wanted them to look into that.
11    Q. Right.
12    A. Now -- go ahead.
13    Q. Now the things that they were tasking to other
14 people, did those include the duties that you were saying
15 these are the things that make my job a 15?
16    A. Yes.
17    Q. Okay.
18    A. And also that I was telling them when I got -- when
19 Federline and Gloria, the EEO officer, they're going to
20 rewrite my position description, I was upset, of course, and
21 we had a meeting. I said this is unacceptable. I said well,
22 you know, this is a foul up. I say well, I felt this had
23 started when I came back from -- it was retaliation. That's
24 what I felt. I told them just like I'm talking to you. I
25 said this is not fair. I said this is just overt, it's just

Page 120

1 overt. You're trying to denigrate me as a person and as a
2 man, as a human being. And I told her specifically I had a
3 supervisor. I said this is almost as worse -- I said the
4 worst thing -- I mean using my exact words, I said the worst
5 thing, had a supervisor who was going to accuse me of being a
6 traitor. Now this is -- he's given this testimony.
7    Q. Okay. Let's do that separately because we're going
8 to get to that topic. Okay? Let's stick with this topic.
9    A. Oh, I thought you wanted me to tell you what was
10 happening. Okay.
11    REPORTER: You said Federline and who?
12    WITNESS: Excuse me?
13    REPORTER: Federline and --
14    WITNESS: Oh, and Gloria Ennis.
15    REPORTER: Thank you.
16    WITNESS: I'm sorry. Oh, I thought you wanted me to
17 tell you what we were talking about. Okay. Let me cut that
18 out then. I'm not going to -- okay.
19    BY MS. FIELDS:
20    Q. Yeah. I want to hone in --
21    A. Okay.
22    Q. I want to hone in on the duties.
23    A. Oh, I'm sorry. I thought you wanted me to tell you
24 what transpired. Okay, the duties. Okay. The duties when
25 they rewrote that, to me they became more technical. It's

Page 121

1  small things. See, when you -- now you're not dealing with
2  departments, Congress, large businesses. When I say large,
3  over $50 million. Now you're trying to narrow it to do
4  technical stuff.
5      Q. Did they take away the duties that made the job a
6  15?
7      A. I felt they did.
8      Q. Okay.
9      A. Yes. Of course, now -- you said me?
10     Q. Of course.
11     A. Right, okay.
12     Q. But that's what you thought they did?
13     A. Yes.
14     Q. They took away the duties that made the job a 15
15  versus a 14?
16     A. Yes. And, plus -- that's what I'm saying.
17     Q. Okay.
18     A. And here's what -- just focus on this. Here's why I
19  was upset, more upset than usual, because it seemed to me more
20  than a coincidence that just when they were going to do a desk
21  audit you then rewrite my job description, position
22  description.
23     Q. To take away the 15 duties?
24     A. Why?
25     Q. But that's --

Page 122

1          MR. SCAVUZZO: Answer the question.
2          BY MS. FIELDS:
3      Q. Is that what you're telling me --
4      A. Yes.
5      Q. -- they took away the duties that made it a 15 --
6      A. Yes.
7      Q. -- versus being a 14?
8      A. Yes.
9      Q. Okay. Now we're going to jump to Mr. --
10     A. I'm sorry. I thought -- yeah, I thought you wanted
11  me to explain what the conversation was.
12     Q. We have to --
13     A. I'm sorry.
14     Q. We have to try to focus it a little bit more.
15     A. Okay.
16     Q. Then we'll jump to --
17     A. Okay, okay.
18     Q. -- what you talked about, okay?
19         MR. SCAVUZZO: Remember I told you put it in these
20  boxes?
21         WITNESS: Yes.
22         MS. FIELDS: Two or three boxes.
23         WITNESS: I apologize.
24         BY MS. FIELDS:
25     Q. Let me find the box. I can't find the box.

Page 123

1      A. Okay. All right. Don't feel bad. I have trouble
2  myself.
3          MR. SCAVUZZO: We attempted to include that in the
4  Supplemental Responses. It's the first -- this is
5  Interrogatory Number 1Z, pages 1 through 5. We're trying to
6  stay with that. It's the very first -- it would be after
7  that. It would be this one.
8          MS. FIELD: Interrogatory --
9          MR. SCAVUZZO: You were asking about Interrogatory
10 Number 1Z, but what I mean to say is that's the document that
11 he gave the OPM investigators. It's right after all those.
12         MS. FIELDS: Yeah, which -- I'm trying to find that
13 count that it's in now?
14         MR. SCAVUZZO: It would be -- I answered it in
15 response to your question concerning about the -- well, first
16 of all, there was more than -- okay. Page -- okay, I'm sorry,
17 page 2 of the Supplemental Responses.
18         MS. FIELDS: Okay.
19         MR. SCAVUZZO: Now there were additional questions
20 that you had asked. One of them is Interrogatory 1C.
21         MS. FIELDS: And you said that that is --
22         MR. SCAVUZZO: That's -- false testimony --
23         MS. FIELDS: Right.
24         MR. SCAVUZZO: -- is what I thought you were just
25 getting at.

Page 124

1          MS. FIELDS: Right. So that's a part of Count --
2          MR. SCAVUZZO: Well, it's part of the retaliation
3  claim, you know.
4          MS. FIELDS: Okay. It's part of the retaliation
5  claim.
6          MR. SCAVUZZO: Yes. You wanted the documentation of
7  the retaliation claim which you've asked --
8          MS. FIELDS: Okay.
9          MR. SCAVUZZO: It's also -- generally it's in
10 response to Interrogatory Number 17 which is on page 11.
11         MS. FIELDS: Okay, okay.
12         MR. SCAVUZZO: All right?
13         MS. FIELDS: Okay.
14         MR. SCAVUZZO: You're asking about the prior
15 reprisal for a protected activity and alleged discriminating
16 official.
17         MS. FIELDS: Okay.
18         MR. SCAVUZZO: Right?
19         MS. FIELDS: Okay, okay. So -- I guess that's why
20 I'm getting confused. It's not Count 1.
21         MR. SCAVUZZO: Oh, I see. You're asking for -- all
22 of these counts, every count has a retaliation to it.
23         MS. FIELDS: But is this a stand-alone
24 retaliation claim?
25         MR. SCAVUZZO: It's a documentation of retaliation.

Page 125

1    MS. FIELDS: Okay.

2    MR. SCAVUZZO: Whatever happened --

3    MS. FIELDS: Okay.

4    MR. SCAVUZZO: -- in Ju'y of '98 was supposed to be

5    as --

6    MS. FIELDS: Evidence of retaliation.

7    MR. SCAVUZZO: -- evidence of what you asked for, of

8    retaliation, retaliatory animus.

9    MS. FIELDS: Okay, got you. Thank you. Okay. Now

10    I understand where we are.

11    MR. SCAVUZZO: And just by the way, what I was

12    trying to do was this, was the only race and sex really are

13    that big one, Thompson. Everything else is supposed to be in

14    retaliation.

15    WITNESS: Right, retaliation.

16    MR. SCAVUZZO: I mean --

17    MS. FIELDS: Okay, okay.

18    WITNESS: I was trying to --

19    MR. SCAVUZZO: Okay. Hold on.

20    WITNESS: Okay.

21    MR. SCAVUZZO: I got what your lawyer said and you

22    said whatever you said.

23    WITNESS: Right, right.

24    BY MS. FIELDS:

25    Q. Are you in agreement with what he just said?

Page 126

1    A. Yes, I do.

2    Q. Okay. So the Thompson claim is race and sex --

3    MR. SCAVUZZO: And retaliation.

4    MS. FIELDS: -- and retaliation, and everything else

5    is retaliation in terms of your claim, the complaint?

6    WITNESS: Yes.

7    MR. SCAVUZZO: Yes.

8    BY MS. FIELDS:

9    Q. Okay. Thank you for the clarification, Mr. Hill.

10    A. Okay.

11    Q. Okay. Now let's go to Mr. -- how do you pronounce

12    his name again?

13    A. Niebauer.

14    Q. Mr. Niebauer and the security clearance statement.

15    This was a security investigation, correct?

16    A. Yes.

17    Q. And it was a security investigation for you to go to

18    ICAF?

19    A. Yes.

20    Q. Okay. And he made this to the investigator.

21    A. Investigator.

22    Q. Okay. And I just want to hone in on -- and I've

23    lost my stuff -- hone in on what portions of it you

24    particularly claim are false statements.

25    A. Yes.

Page 127

1    Q. I had it here.

2    MR. SCAVUZZO: Well, that's page 2 of the

3    Supplemental Responses, but --

4    MS. FIELDS: Here we go.

5    BY MS. FIELDS:

6    Q. And you got this through a FOIA, F-O-I-A-, request,

7    is that correct?

8    A. Yes.

9    Q. Okay. And when did you get the response back, the

10    FOIA response back?

11    A. When did I get that response back?

12    MS. FIELDS: If you could mark this.

13    (Whereupon, the document that was referred to as Exhibit

14    Number 4 was marked for identification.)

15    WITNESS: I think I got the response back around --

16    I want to say fall/winter of '99, I think.

17    BY MS. FIELDS:

18    Q. Okay. Let's take a look at this document. This is

19    marked as our Exhibit 4, Interrogatory 16, 1 of 5.

20    MR. SCAVUZZO: 1C.

21    MS. FIELDS: Oh, 1C.

22    MR. SCAVUZZO: That's what I was trying to say, yes.

23    BY MS. FIELDS:

24    Q. 1C, 1 of 5. You have a copy of this document in

25    front of you?

Page 128

1    A. Yes.

2    Q. Okay. Now it looks like it says this references

3    your letter dated 10/24/98.

4    A. Right.

5    Q. Is that your handwriting above that? See, there are

6    two dates there?

7    A. Um-hum. No, that there -- mine is on -- yeah,

8    10/24/98.

9    Q. And that's the same as is in theirs, correct?

10    A. Yeah.

11    Q. You just put that on top --

12    A. Yeah, because I couldn't see it.

13    Q. And then you have here written December 1, '98, and

14    I can't read what you have written next?

15    A. Yeah, 5211. Matter of fact, I was -- I think that

16    was something they had stamped on it and I couldn't see it.

17    Q. Okay. So you were writing basically what this stamp

18    right above it --

19    A. Right, uh-huh.

20    Q. -- looked like it say?

21    A. Yes.

22    Q. So it looks like it was dated December the 1st,

23    1998.

24    A. '98, right.

25    Q. And you believe you got this approximately when?

## OFFICE OF ENVIRONMENTAL POLICY AND COMPLIANCE

**PROGRAM ANALYST, GS-345-14 (Estimate 6-month detail):**

The detail's ***principal purpose*** will be to work with the Environmental Justice (EJ) bureau representatives within the Department of the Interior (DOI) in an effort to continue, increase, and integrate environmental justice considerations into the DOI and other federally conducted and supported programs. The ***goal*** is to develop ways the Department can integrate EJ principles in its mission.

### TASKINGS TO BE ACCOMPLISHED:

1. Chair the DOI EJ Working Group

2. Represent the DOI on the National Interagency Group

3. Update the DOI EJ Strategic Plan

4. Prepare the DOI EJ Contacts Directory

5. Complete the development of the DOI EJ Web Page

6. Coordinate and publish the accomplishments, pilot projects, and "success stories" of the EJ efforts amongst the bureaus in the DOI on the DOI EJ Web Page

7. Develop performance measures that correlate EJ accomplishments with budgetary resources, the Government Performance Results Act (GPRA), and the Strategic Plan

8. Review other Federal agencies' guidance to implement EJ principles in environmental analyses and develop model guidance for DOI



EXHIBIT SW BWO

4/6/08

MFB                 10.55 am

Received a call from Dr. Willie Taylor
He states that he had spoken with Leann Johnson
this morning concerning my deposit to
him (Dr. Taylor's) office.

Leann would not agree to defend if
he (Dr. Taylor) would not pay if the
my salary, benefits and travel. They pay
the proposed defend in the

Dr. Taylor stated that he hoped I would
stay in contact with him. And if
any positions come open in his office, feel
free to contact him, and apply.

                              Metta [illegible]

EXHIBIT  Sub
   2     Repo
  8/6/0
PENGAD 800-631-6989



Interrogatories # 13, # 17, 16



EXHIBIT

3

4/6/07

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

| | | | | | 1. Agency Position No. | |
|---|---|---|---|---|---|---|

**2. Reason for Submission**
[X] Redescription  [ ] New
[ ] Reestablishment  [ ] Other

Explanation *(Show any positions replaced)*

**3. Service**
[X] Hdqtrs.  [ ] Field

**4. Employing Office Location**
Washington

**5. Duty Station**
WO-850

**6. OPM Certification No.**

**7. Fair Labor Standards Act**
[X] Exempt  [ ] Nonexempt

**8. Financial Statements Required**
[ ] Executive Personnel Financial Disclosure  [ ] Employment and Financial Interests

**9. Subject to IA Action**
[ ] Yes  [ ] No

**10. Position Status**
[X] Competitive
[ ] Excepted *(Specify in Remarks)*
[ ] SES (Gen.)  [ ] SES (CR)

**11. Position is:**
[ ] Supervisory
[ ] Managerial
[X] Neither

**12. Sensitivity**
[ ] 1—Non-Sensitive  [X]
[ ] 2—Noncritical Sensitive
[ ] 3—Critical Sensitive
[ ] 4—Special Sensitive

**13. Competitive Level Code**

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | Senior Business Management Specialist | GS | 1101 | 14 | RD | 10/15/99 |

**16. Organizational Title of Position** *(if different from official title)*

**17. Name of Employee** *(if vacant, specify)*

**18. Department, Agency, or Establishment**
Department of Interior
a. First Subdivision
Bureau of Land Management
b. Second Subdivision
Business and Fiscal Resources Directorate

c. Third Subdivision
Property and Acquisition Group
d. Fourth Subdivision
e. Fifth Subdivision

Signature of Employee *(optional)*

**19. Employee Review**—This is an accurate description of the major duties and responsibilities of my position.

**20. Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor
Robert Donelson
Group Manager, Property and Acquisition
Signature                                    Date 11/15/99

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*
Signature                                    Date

**21. Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action

Signature                                    Date

**22. Position Classification Standards Used in Classifying/Grading Position**

Information for Employees. The standards, and information on their application are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**

**25. Description of Major Duties and Responsibilities** *(See Attached)*

NSN 7540-00-634-4265      Previous Edition Usable      5008-106
OF 8 (Rev 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

public interest groups and Congress. Identifies major program evaluation needs and evaluates model programs to be used as prototypes. Provides senior management advice regarding management techniques, programs, organizational models, and general management developments. Where necessary, reviews financial operations and field activities to ensure compliance with budgetary guidance.

Serves as a liaison between working groups, teams, councils, and management teams. Provides a central point of contact to the bureau. Serves as a facilitator at a variety of meetings and coordinates, as necessary, re-engineering and organizational development on bureauwide and Departmentwide basis.

Initiates, plans, coordinates and provides technical assistance and support to program managers in the preparation of operating plans. Assesses the operation of inter/intradisciplinary planning teams in terms of bureau planning regulations standards and quality standards; and, in his/her judgement, recommends actions to strengthen team organization.

## MAJOR DUTIES

The following major duties are accomplished either directly or under supervision of the Group Manager and/or AD:

1.  Advises on, administers, supervises and/or performs work pertaining to and requiring a knowledge of business and trade practices, production and efficiency methods and processes; the collection, analysis and dissemination of information; establishing and maintaining contacts with industry, academia and governmental entities.

2.  Reviews the bureau's Advanced Procurement Plan reports, ensuring that program managers are familiar with and carry out their responsibilities in this area.

3.  Exercises originality and sound judgement to analyze problems and develop solutions. Performs managerial work concerned with long and short range planning in connection with prospective changes in functions and programs; determine measures for improving coordination among activities and measures needed to provide data to management to plan and implement changes in existing or new organizational structures.

4.  Prepares and issues responses to Congressional, Freedom of Information Act (FOIA), and other special interest correspondence regarding bureau business related programs; provides assistance and guidance to bureau field offices and WO in their preparation of similar correspondence to ensure accuracy and consistency among these entities.

5.   Performs, or assists in reviewing, efficiency reviews and productivity studies.  Examines and makes recommendations on data gathered, seeking to identify the most efficient organization. Establishes quality and quantity of staffing requirements.

6.   Assists in the formulation of acquisition management policies and guidelines.  Provides technical guidance in the development of the Statement of Work, Performance Work Statement, or data requirements.

7.   Provides briefings, seminars, and workshops on acquisition and financial assistance programs.

8.   Represents the Group Manager in meetings, conferences, and negotiations with other agencies and groups.  Works as one of the Groups' leads for re-engineering and organizational management projects and issues.  Provides advice and assistance to Washington Office and field personnel on the interpretation of legislation, regulations, standards, operating orders, and procedures pertaining to acquisition management and re-engineering.

9.   Aids in the preparation of manuals, reports, handbooks, and other procedural guidance needed to help implement the Group's programs.  Reviews and revises existing issuances and reference materials to ensure conformance with new and existing policies.

10.  Serves as bureau and/or DOI representative on intra and interagency committees, task forces, work groups, and other entities responsible for Federal acquisition and financial assistance programs, improvement of business practices, etc.

11.  Provides staff support to the AD and assists in developing, implementing, administering and reviewing bureau policies, systems and procedures for a diverse group of activities.

12.  Responsible for the evaluation of the effectiveness and efficiency of program operations throughout the bureau. Evaluations take into consideration factors such as cost effectiveness, attainment of program goals, and compliance with pertinent legal and regulatory guidelines.

13. Evaluates specific acquisition programs and develops procedures for program improvement.

14. Provides a convenient way for small businesses to access the BLM, facilitates communications between the small business community and the BLM, and works with the BLM personnel to increase their understanding of small businesses.

(4)

1.  <u>FACTORS</u>

-   Knowledge of acquisition management, strategic planning, and continuous improvement philosophies, concepts, practices, techniques, and skills to utilize.

-   Indepth knowledge of human resource management, organizational management, management analyses and theorems, public administration, organizational management, behavioral sciences, and skills to utilize in strategic planning and continuous improvement efforts.

-   Working knowledge of natural resource management and related disciplines, indepth knowledge of the DOI and the BLM(there cultures, histories, organization, etc.), and ability to provide realistic consultation that provides positive results to individuals, groups, and organizations.

-   Knowledge of the budgetary and legislative processes as they relate to the bureau organization and operations of the various programs.

-   The incumbent must possess exceptional verbal and written communication skills; and, knowledge of automation principles and technology and the use of automation in accomplishing the program goals and objectives.

-   Mastery of acquisition principles applicable to Federal socioeconomic development programs and extensive knowledge of statutes, Executive Orders, and Federal, DOI, and bureau regulations, policies, and programs which impact socioeconomic development programs.

-   Knowledge of the Federal Acquisition Regulation, and supplementing regulations, higher level policies, and procedures sufficient to develop and issue implementing guidance and procedures.

-   Mastery of leadership skills including motivation, role modeling, leveraging resources, and team building.

5

2.  SUPERVISORY CONTROLS

The incumbent reports to the AD or Group Manager, who provide administrative direction in terms of objectives.  The incumbent is responsible for planning and completing the assignments with minimum supervision.  This includes the approach to be taken and the methodology to be used.  The incumbent will keep supervisor informed of progress and identify problems and areas of controversy which impact on the timeliness of completing assignments.  The incumbent is expected to work independently with other program area experts and identifies and resolves problems before they become crises.  The incumbent executes complex assignments which requires a large measure of creativity and originality in work performance. Work is reviewed primarily in relation to broad policy requirements and conformance with overall Departmental and BLM policy.

3.  GUIDELINES

Incumbent is guided by professional practices in the areas and use of Office of Management and Budget (OMB), General Accounting Office (GAO), BLM and Departmental manuals, laws, regulations, policy statements/decisions, and written directives as well as indepth understanding of the Director's and AD's policies, and preference which requires careful interpretation by the incumbent.   Sound judgement must be used and analysis is necessary to interpret these guidelines as well as developing guidelines where none exist.

4.  COMPLEXITY

Typical tasks involve development of bureauwide planning strategies, analytical studies, development of planning concepts and procedures, review, analysis and recommendations of completed planning documents.  A wide variety of factors and conditions may exist, some where clear standards are available and others that must be developed, thus requiring imagination, creativity, and innovation.  Assigned tasks often involve complex planning issues with high levels of interest elsewhere in the Department, state, local government, and private interest groups.

5.  SCOPE AND EFFECT

The incumbent performs or serves as team leader, or works independently, for broad studies which are of significant interest to the Department, Assistant Secretary, bureau, and the public. The services performed will involve planning for resource management and administrative programs.  The incumbent will insure that the program(s) is/are effectively and efficiently managed.

The BEDP work encourages expansion of the national industrial base by small businesses  to assure increased opportunities to contract and subcontract with the bureau, other Federal, state, and local entities and with prime contractors.

(6)

6.  <u>PERSONAL CONTACTS AND PURPOSE OF CONTACTS</u>

Contacts are with peers, subordinates, BLM and Departmental managers, Congressional officials, state and local governments, and special interest groups. These contacts require the incumbent to be conversant with current and future knowledge pertaining to bureau objectives and goals. Contacts are to keep the Director and AD apprised of complex decisions/issues impacting the bureau, facilitating the flow of critical paperwork and to exchange information, to provide and/or receive professional assistance, to coordinate differing views or technical approaches and adequacy, and provide program direction.

As BEDP manager, the purpose of contacts with potential contractors is to ensure that BEDP requirements are met through providing small and socially and  economically disadvantaged businesses with opportunities to compete for  contracts and subcontracts.

7.  <u>PHYSICAL DEMANDS</u>

The work is largely sedentary. Travel is required. Walking and standing is required during visits to contractor facilities, participation in trade fairs, conferences, and seminars. Physical lifting required in the transport and setup of display materials. Travel by automobile and airplane is necessary in fulfilling the requirements of this position.

8.  <u>WORK ENVIRONMENT</u>

Work is typically performed in an office environment with travel to attend meetings, review field operations, visit contractors, participate in trade fairs, seminars, and conferences.



## Evaluation Statement

Requested Classification: Senior Business Management Specialist, GS-1101-14

Location:    Department of the Interior
            Bureau of Land Management
            Property and Acquisition Management and
            Headquarters Services Group (WO-850)
            Assistant Director, Business and Fiscal Resources Directorate

Background:    The Group is responsible for the policies and oversight of Bureau-wide
            Acquisition, Grant, and Property Management business systems.  The Group is
            also responsible for training development and coordination of all business
            programs within the Business and Fiscal Resources Directorate which includes
            budget, acquisition and property management, financial management, and
            management systems.

Reference:    (a) OPM  Handbook of Occupational Groups and Families Series, GS-1101,
                dated 1/99.
            (b) OPM PCS Administrative Analysis Grade-Evaluation Guide, August
                1990 (TS-98)

Title and Series Determination:  Consideration was given to placement of the position in the GS-1102, Contracting Series .  However, placement to this series was determined inappropriate in that the incumbent of this position will not only be performing duties of this series but also administrative analytical, planning, and evaluative work.  Based on reference (a), the 1101 series (General Business and Industry Series) includes all classes of positions were the duties are to administer, supervise, or perform (1) any combination of work characteristic of two or more series in this group where no one type of work is series controlling and where the combination is not specifically included in another series; or (2) other work properly classified in this group for which no other series has been provided. The GS-1101 series is the most appropriate to be used in this position.  There are no prescribed titles for positions allocated to the GS-1101 series.  In accordance with the instructions in the Introduction to the Position Classification Standards, duties, responsibilities, and qualifications should be recognized in a title.  Additionally, words such as Officer, Administrator, or Manager may be substituted to denote a level of responsibility which inherently includes supervision.  Therefore, the appropriate title for this position is Senior Business Management Specialist.

Grade Determination:  The GS-1101 series does not contain grade level criteria; therefore, the Administrative Analysis Grade-Evaluation Guide was used to determine the grade level of the position.  This guide provides grade level criteria for nonsupervisory staff administrative analytical, planning, and evaluative work, at grade GS-9 and above.

**Factor 1 - Knowledge Required by the Position**
**Points**                                                    **Level 1-8 - 1550**

At this level, a comprehensive knowledge of a range of administrative laws, policies, regulations, and precedents applicable to the administration of one or more important public programs is required. Typically, this includes knowledge of agency program goals and objectives, the sequence and timing of key program events and milestones, and methods of evaluating the worth of program accomplishments. Work requires knowledge of relationships with other programs and key administrative support functions within the agency or in other agencies. Knowledge characteristic of this level are applied to a variety of ways. For example, knowledge is applied to the design and conduct of comprehensive management studies where the boundaries of the studies are extremely broad and difficult to determine in advance. Study objectives are to identify and propose solutions to management problems which are characterized by their breadth, importance, and severity, and for which previous studies and established management techniques are frequently inadequate. Also included at this level is skill to plan, organize, and direct team study work and to negotiate effectively with management to accept and implement recommendations, where the proposals involve substantial agency resources, require extensive changes in established procedures, or may be in conflict with the desires of the activity studied.

The knowledge required by the position described in the PD meets Factor Level 1-8.

**Factor 2 - Supervisory Controls**
**Points**                                                    **Level 2-5 - 650**

At level 2-5, the employee is a recognized authority in the analysis and evaluation of programs and issues. The employee is subject only to administrative and policy direction concerning overall project priorities and objectives. Analyses, evaluations, and recommendations developed by the employee are normally reviewed by management officials only for potential influence on broad agency policy objectives and program goals. Findings and recommendations are normally accepted without significant change. At this level, the employee is typically delegated complete responsibility and authority to plan, schedule, and carry out major projects concerned with the analysis and evaluation of programs or organizational effectiveness. The employee typically exercises discretion and judgment in determining whether to broaden or narrow the scope of projects or studies. In this position, work is assigned on a continuing basis, with the employee independently responsible and accountable for planning, managing and coordinating work necessary to meet program or functional objectives. Within broad administrative and policy guidance the employee defines and revises program approaches as judged necessary, and establishes external work relationships with public and private sector organizations to best serve assignment objectives. Technically, work is accepted as authoritative and unreviewed; completed assignments are considered in terms of resource utilization and fulfillment of goals. The employee refers issues of external conflict or political sensitivity for discussion and consults the supervisor for availability of additional personnel and/or funding. Level 2-5 is assigned.

**Factor 3 - Guidelines**
**Points**                                                    **Level 3-5 - 650**



At Level 3-5, guidelines consist of basic administrative policy statements concerning the issue or problem being studied, and may include reference to pertinent legislative history, related court decisions, state and local laws, or policy initiatives of agency management. The employee uses judgment and discretion in determining intent, and in interpreting and revising existing policy and regulatory guidance for use by others within or outside the employing organization (e.g., other analysts, line managers, or contractors).

In this position, guidelines include socioeconomic laws; Federal, Departmental, and BLM Federal Acquisition Regulations and Manuals; Executive Orders (EO), including EO 13101 on the Federal *"Greening"* program; OMB circulars; Comptroller General Decisions; and other legal precedents applicable to the BEDP and *"Greening"* programs; as well as unofficial "Best Practice" guides; such as, handbooks, circulars, and publications of private firms and small business advocacy organizations. The employee exercises judgment and considerable creativity to ensure uniform application of guidelines among closely related or seemingly conflicting directives. The employee develops supplemental guidance only when existing guidance limits ability to efficiently and effectively perform BEDP and *"Greening"* program requirements and achieve BEDP and *"Greening"* goals. This meets level 3-5 described above.

**Factor 4 - Complexity**                                                         **Level 4-5 - 325 Points**

At Level 4-5, the work consists of projects and studies which require analysis of interrelated issues of effectiveness, efficiency, and productivity of substantive mission-oriented programs. Typical assignments require developing detailed plans, goals, and objectives for the long-range implementation and administration of the program, and/or developing criteria for evaluating the effectiveness of the program. Options, recommendations, and conclusions developed by the employee take into account and give appropriate weight to uncertainties about the data and other variables which affect long-range program performance. For example, the employee may need to consider and assess the relative advantages and disadvantages of centralizing or decentralizing work operations in organizations with several echelons of geographically separated components. In some instances, work is complicated by the need to develop data about workload and program accomplishments which is currently unavailable. Current measurements of program effectiveness may be ambiguous and susceptible to widely varying interpretations. Under these circumstances the employee develops new information about the subject studied and establishes criteria to identify and measure program accomplishments, develops methods to improve the effectiveness with which programs are administered, or develops new approaches to program evaluation which serve as precedents for others. The incumbent's work involves complex projects of BLM-wide and Department -wide scop. It also consists of an extensive array of duties involving a broad range of activities and depth of analysis for the highly specialized fields of the BEDP and the Greening program. The work is subject to continuing changes to ensure increased effectiveness, efficiencies and improved quality in response to the needs of the public, the BLM, and DOI, other Federal agencies, and Congress. Program needs of the BLM are varied, encompassing the entire spectrum of land and ecosystem management. A general knowledge of the BLM's mission, organization, projects, and programs is required. This meets level 4-5 described above.

(10)

**Factor 5 - Scope and Effect**                                    **Level 5-5 - 325 Points**

At level 5-5, the purpose of the work is to analyze and evaluate major administrative aspects of substantive, mission-oriented programs. This may involve, for example, the development of long-range program plans, goals, objectives, and milestones, or to evaluating the effectiveness of programs conducted throughout a bureau, a regional structure of equivalent scope, or a large complex multi-mission field activity. The work involves identifying and developing ways to resolve problems or cope with issues which directly affect the accomplishment of principal program goals and objectives (e.g., the delivery of program benefits or services). Some employees develop new ways to resolve major administrative problems or plan the most significant administrative management aspects of professional or scientific programs, while some employees at this level develop administrative regulations or guidelines for the conduct of program operations, while others develop new criteria for measuring program accomplishments (e.g., the level, costs, or intrinsic value of benefits and services provided) and the extent to which program goals and objectives are attained. Study reports typically contain findings and recommendations of major significance to top management of the agency, and often serve as the basis for new administrative systems, legislation, regulations, or programs. Typical of work products prepared by employees at this level are complete decision packages, staff studies, and recommendations which upon implementation would significantly change major administrative aspects of missions and  programs, or substantially affect the quality and quantity of benefits and services provided to the agency's clients.  In the incumbent's position, the purpose of the work is to perform program administration and analysis activities and to resolve problems relating to those programs using accepted procedures and precedents and innovative approaches. The work is to provide expertise and leadership by furnishing advisory, planning, or reviewing services on specific problems, projects, or programs or, facilitating solutions to a wide range of recommendations.   This meets level 5-5 as described.

**Factor 6 - Personal Contacts and**
**Factor 7 - Purpose of Contacts**                                **Level 3D - 280 Points**

The incumbent's contacts include high-level DOI and BLM decision makers in Washington D.C.; State/Center and field offices; BLM and DOI Business Utilization Development Specialists (BUDS), BLM contracting officers, property managers, National Business Center managers, program managers, and technical personnel; representatives of other Federal agencies;  State and local government officials, local and national chambers of commerce, industrial and trade associations, and small business advocacy entities; Government contractors and representatives from small and small socially and economically disadvantaged business concerns.   Level 3 involves persons outside the agency which may include consultants, contractors, or business executives in a moderately unstructured setting. This level may also include contacts with the head of the employing agency or program officials several managerial levels removed from the employee when such contacts occur on an ad- hoc basis.  The purpose of contacts at level D (the highest level) are to justify or settle matters involving significant or controversial issues; e.g., recommendations affecting major programs, dealing with substantial expenditures, or significantly



changing the nature and scope of organizations. The incumbent's position meets level 3, D as described above.

**Factor 8 - Physical Demands**                                    **Level 8-1 - 5 Points**

At Level 8-1 the work is primarily sedentary, although some slight physical effort may be required. The incumbent's work is mostly sedentary, requiring no special physical demands.

**Factor 9 - Work Environment**                                    **Level 9-1 - 5 Points**

At Level 9-1 work is typically performed in an adequately lighted and climate controlled office and may require occasional travel.

**Summary and Grade Conversion:**

| Factor 1 | Level 1-8 | 1550 | Points |
|----------|-----------|------|--------|
| Factor 2 | Level 2-5 | 650 | |
| Factor 3 | Level 3-5 | 650 | |
| Factor 4 | Level 4-5 | 325 | |
| Factor 5 | Level 5-5 | 325 | |
| Factor 6 and | | | |
| Factor 7 | Level 3D | 280 | |
| Factor 8 | Level 8-1 | 5 | |
| Factor 9 | Level 9-1 | 5 | |
| Total | | **3790** | Points |

Using the point to grade conversion chart, 3790 points converts to GS-14.

**FINAL CLASSIFICATION DETERMINATION:**

The position is correctly classified as Senior Business Management Specialist, GS-1101-14

Arthur F. Rivera
Personnel Management & Classification
Specialist

**POSITION DESCRIPTION**

**SENIOR BUSINESS MANAGEMENT SPECIALIST
GS-1101-14**

**INTRODUCTION**

This position is located in the Property and Acquisition Management and Headquarters Services Group (WO-850) within the Directorate of the Assistant Director, Business and Fiscal Resources. The Group is responsible for the policies and oversight of Bureau-wide Acquisition, Grant, and Property Management business systems.  The Group is also responsible for training development and coordination of all business programs within the Business and Fiscal Resources Directorate which includes budget, acquisition and property management, financial management, and management systems.

**I.    SUMMARY OF RESPONSIBILITIES AND MAJOR DUTIES**

**A.  RESPONSIBILITIES**

1.      The Business and Economic Development Program (BEDP)  The employee is responsible for leading the Bureau of Land Management's BEDP .  The BEDP was established by the acquisition-related sections of the Small Business Act (15 U.S.C. 631, *et seq.*) and other acquisition legislation.  The Headquarters BUDS is the BLM advocate for the Government-wide policy to provide maximum contract and sub-contract opportunities to small business, HUBZone small business, small disadvantaged business, and women-owned small business concerns. The BLM acquires goods and services worth about $250 million each year.

The Headquarters Business Utilization Development Specialist (BUDS) is the manager who is responsible to implement small business programs within the BLM.  The employee negotiates Bureau-wide monetary goals with the Department of the Interior for contracts awarded to these business concerns.  The Headquarters BUDS is also responsible for monitoring performance by BLM States and Center against the Business and Economic Development Program (BEDP) goals, and facilitates the achievement of the goals by identifying those offices falling short and offering ideas for improving performance.

The Headquarters BUDS leads the effort with the State and Center BUDS  to set-aside acquisitions for these business concerns in order to achieve the goals.  The effort includes reviewing the BLM advanced acquisition plan and solicitations that are not unilaterally set aside by the Contracting Officer and recommending a set aside if two or more capable small business concerns can be found.   The Headquarters BUDS coordinates with the Small Business Administration (SBA), the Department of the Interior (DOI) Office of Small and Disadvantaged Business Utilization (OSDBU), and  BLM acquisition operations offices positive steps to achieve the goals and SBA appeals.  The Headquarters BUDS establishes or facilitates partnerships Chambers of Commerce and Trade Associations that represent small, disadvantaged and women-owned business; such as the National Black Chamber of Commerce, the National

Hispanic Chamber of Commerce, and the Pan-Asian Chamber of Commerce to increase business opportunities for these firms and facilitate the achievement of BLM goals. The employee collects information on outreach endeavors and submits the BLM annual report for the DOI awards program. The employee also leads the BLM BEDP awards program for outstanding achievers.

2.    "Greening the Government Through Waste Prevention, Recycling and Federal Acquisition"
The employee is also responsible for co-managing with the Protection and Response Group the implementation of Executive Order 13101 and the Department of the Interior Strategic Plan and Action Plan for *"Greening the Government Through Waste Prevention, Recycling and Federal Acquisition"*. The employee is responsible for managing for the BLM Property and Acquisition functions of the *Greening* program to achieve goals in the DOI Strategic Plan through the Action Plan. The employee is also responsible for the annual *Greening* report on Bureauwide performance and recommending improvements to overall performance.

The acquisition goals are to (1) purchase products that have the highest percentage of recovered materials practicable, considering price, availability and performance, focusing on products designated in the Comprehensive Procurement Guideline (CPG). The acquisition goals are also to (2) purchase environmentally preferable products (EPPs), and (3) bio-based content products (BCPs).

The property goals are to (1) operate Government fleet vehicles using re-refined oil, retread tires (when replacing tires), reclaimed engine coolant, and on a pilot basis, biodegradable lubricating oil in small engines; (2) use recycled-content bathroom tissue, paper towels and plastic bags in the operation of all leased and owned facilities (3) use copy paper with at least 30% postconsumer material, (4) use bathroom tissue, and paper towels that have been manufactured without the use of diking and bleaching at all BLM facilities, and (5) use either recycled content carpet or factory refurbished carpet for all new installations in BLM facilities.

The manager in the Protection and Response Group is responsible for environmental management of the *Greening* program and reporting to the DOI and Federal Environmental Executives.

B.    MAJOR DUTIES

The responsibilities described above are achieved by performance of the following major duties:

1.    Business and Economic Development Program (BEDP)    Provides leadership and management of BLM BEDP as follows:

By January 31 of each fiscal year, negotiates annual fiscal year BEDP goals for the Bureau of Land Management (BLM) with the Department of the Interior (DOI) Office of Small and Disadvantaged Business Utilization (OSDBU). The goals are to reflect improvement or continuing effort to maintain the same level of prior accomplishments. The goals are separate dollar goals for contracts to the following businesses:

14

(i)     Small business,
        Within minority business entities, there are separate goals for:
(ii)    Section 8(a) disadvantaged firms,
(iii)   Small disadvantaged firms receiving contracts resulting from direct, open
        competition, and
(iv)    Non-profit, educational and large minority firms
(v)     Women-owned business,
(vi)    Subcontracts to small business
(vii)   Subcontracts to minority business and
(viii)  Subcontracts to women-owned business.

~~Within 30 days~~ after receiving final Bureau-wide BEDP goals from the DOI, negotiates annual fiscal year BEDP goals within the BLM for the Washington Office, the National Business Center, State Offices, and the National Interagency Fire Center. The goals are based on past accomplishments and planned acquisitions.

Developing team dynamics among BLM acquisition operations office and Business Utilization and Development Specialists (BUDS), assists as requested, in identifying projects suitable for acquisition in support of socioeconomic development programs. Facilitates activities to ensure effective, efficient accomplishment of tasks, providing instruction, guidance, and clarification when required.

Performs an ongoing program to review new or revised higher-level acquisition regulations and directives issued by DOI related to the BEDP, and develops, issues, reviews, and updates BLM acquisition policies and procedures related to the BEDP. Comments on proposed laws and regulations affecting BLM BEDP programs.

Reviews the BLM's advance acquisition planning reports, ensuring that program managers are familiar with and carry out their responsibilities in this area.

Provides advice and guidance to BLM State, Center and Field Offices on BEDP matters.

Provides liaison between BLM and the DOI on BEDP statutes, policies and initiatives.

Participates in acquisition management reviews of BLM States, Centers and Field Offices to ensure that (1) the BLM conforms with existing socioeconomic statutes and regulations, (2) Contracting Officers and BUDS are coordinating effectively with the SBA Procurement Center Representative, and (3) the Contracting Officers are using SBA tools, such as PRONET at http://www.sba.gov to provide maximum practicable opportunities in acquisitions and subcontracts to small business, HUBZone small business, small disadvantaged business, and women-owned small business. Develops procedures for BEDP improvement.

Reviews and analyzes BLM BEDP accomplishments quarterly, and recommends improvements. Conducts recognition of BEDP accomplishments program.

Represents the BLM and the DOI at Federal, State, and local small business programs, trade fairs, and other socioeconomic development advocacy events; providing marketing assistance and counseling to small and socially and economically disadvantaged business enterprises. Counsels and assists small business concerns and provides information about doing business with the BLM. This includes (1) referring these concerns to the BLM procurement Web site at site at (2) informing them how to search for opportunities in the BLM Advanced Procurement Plan that is on the Internet, (3) informing them how to register centrally for electronic acquisition opportunities in the Interior Department Electronic Acquisition System.

Develops partnerships with the SBA, the DOI, and other Government agencies and socioeconomic development advocacy groups. Provides assistance to solve disagreements between the Small Business Administration (SBA) and the cognizant Contracting Office. Advises the Bureau Procurement Chief, the AD, B&FR, and the DOI OSDBU in appeals by the SBA of the Contracting Officer's decision not to set aside an acquisition.

Advises BLM contracting officers and BUDS at the National Business Center and Oregon State Office on the acceptability of prime contractor subcontracting plans, recommending improvements.

Represents the BLM in meetings with BLM contractors with complaints or questions about the BLM's socioeconomic programs, informing BLM managers of systematic practices which impair or impede access to acquisition opportunities, and proposes remedial measures.

Prepares and issues responses to Congressional, FOIA, and other special interest correspondence regarding the BLM BEDP program; provides assistance and guidance to the BLM State, Center and Field Offices, and the Office of the Assistant Director and the Director in their preparation of similar correspondence to ensure accuracy and consistency among these entities.

Provides briefings, seminars, and workshops on the BEDP program. Sponsors and participates in conferences and training designed to increase small business participation.

Serves as the BLM or DOI representative on intra and interagency committees, task forces, work groups, and other entities responsible for Federal BEDP programs.

"Greening the Government Through Waste Prevention, Recycling and Federal Acquisition"
Provides leadership and management of Property and Acquisition functions of the *"Greening"* Program as follows:

To promote achievement of the vision and goals established in the *Strategic Plan for Greening the Department of the Interior Through Waste Prevention, Recycling, and Federal Acquisition*, the employees lead the implementation of the DOI Action Plan in the BLM.

Participates as a member of the DOI *Greening* Group responsible for implementing the acquisition and property management and environmental strategies to achieve the items listed in the action plan.



Coordinates with the BLM Procurement Chief and Property Manager in the WO-850 Group and the National Business Center leads for various items in the Action Plan.

Coordinates and submits acquisition and property management information for *"Greening"* programs reports.

Serves as the BLM or DOI representative on interagency committees, task forces, work groups, and other entities responsible for Federal *"Greening"* programs.

## II. FACTORS

### Factor 1. Knowledge Required by the Position

-- Mastery of acquisition and other business management principles applicable to Federal socioeconomic development programs and extensive knowledge of statutes, Executive Orders, and Federal, DOI policies and regulations, which impact socioeconomic development programs and the *"Greening"* program..

-- Extensive knowledge of acquisition and socioeconomic statutes, Executive Orders, Office of Management and Budget circulars, Comptroller General decisions, and administrative board and court decisions to interpret regulations and higher-level policies for the BLM, and identify and analyze acquisition issues and their impact on BLM-wide socioeconomic programs that affect small, minority and women-owned business concerns and to lead and manage the implementation of the *"Greening"* Program action items.

-- Extensive knowledge of socioeconomic laws; such as, the Small Business Act, and Executive Order 13101, *"Greening the Government Through Prevention, Recycling and Federal Acquisition"*, Government-wide policies, and the Federal and Interior Acquisition Regulations sufficient to develop, coordinate and issue BLM policies and procedures.

-- Broad knowledge of the BLM's mission and acquisition and property management programs to develop BLM-wide Business and Economic Development Program (BEDP) and *"Greening"* policies and procedures, and lead the achievement of BEDP and *"Greening"* goals.

-- Mastery of leadership skills including motivation, role modeling, leveraging resources, and team building.

-- Mastery of management skills including planning, organizing, analyzing, and evaluating, and clear and concise written and oral communication skills.

-- Extensive knowledge to effectively present, clarify, and defend, when necessary, the BLM's or the DOI's position on BEDP and *"Greening"* matters before peers in the acquisition community within and outside the DOI, higher-level management, and the public sector groups.



-- Knowledge necessary to effectively evaluate and provide constructive recommendations to improve BEDP and *"Greening"* policies and guidance.

-- Knowledge of functions and capabilities of the BLM acquisition and property management offices.

-- Knowledge of FOIA and Congressional inquiries policies and procedures.

Factor 2. Supervisory Controls

The ~~Bureau Procurement Chief~~ Group manager (WO-850) gives broad general direction and guidance and generally makes assignments only when they are initiated by higher management or for special projects. [~~The Bureau Property Manager also give broad direction with respect to the property management action items on the DOI "Greening" Action Plan.~~] Work assignments usually are self-generated. The employee is primarily responsible for leading and managing the BLM BEDP mandated by public law and the *"Greening"* program. The employee works independently, leading the coordination with the BLM State/Center Procurement Analysts and the NBC leads to plan, organize, and complete assignments and manage the BEDP workload and the DOI *"Greening"* Action Plan items to achieve each program's goals and objectives. The completed work is accepted as being technically authoritative, and is reviewed from an overall standpoint in terms of appropriateness, attainment of program goals and objectives, and accuracy.

Factor 3. Guidelines

Guidelines include socioeconomic laws; Federal, Departmental, and BLM Federal Acquisition Regulations and Manuals; Executive Orders (EO), including EO 13101 on the Federal *"Greening"* program; OMB circulars; Comptroller General Decisions; and other legal precedents applicable to the BEDP and *"Greening"* programs; as well as unofficial "Best Practice" guides; such as, handbooks, circulars, and publications of private firms and small business advocacy organizations. The employee exercises judgment and considerable creativity to ensure uniform application of guidelines among closely related or seemingly conflicting directives. The employee develops supplemental guidance only when existing guidance limits ability to efficiently and effectively perform BEDP and *"Greening"* program requirements and achieve BEDP and *"Greening"* goals.

Factor 4. Complexity

The work consists of an extensive array of duties involving a broad range of activities and depth of analysis for the highly specialized fields of the BEDP and the *"Greening"* program. Work involves complex projects of BLM-wide and Department-wide scope. The work is subject to continuing changes to ensure increased effectiveness, efficiencies and improved quality in response to the needs of the public, the BLM, the DOI, other Federal agencies, and Congress. The employee, independently and with State Procurement Analysts', Bureau Procurement Chief's



and Bureau Property Manager's contributions, develops new information, considers data from a wide variety of sources, and modifies and originates approaches, methods, and procedures to plan and carry out successful program goals and objectives. The employee must rely on acquired knowledge, experience, and expertise in the areas of organizational, leadership, and management skills in addition to formal and informal guidelines and regulations. Program needs of the BLM are varied, encompassing the entire spectrum of land and ecosystem management. A general knowledge of the BLM's mission, organization, projects, and programs is required.

Factor 5. - Scope and Effect

The purpose of the work is to perform program administration and analysis activities for the BEDP and *"Greening"* programs, and to resolve problems relating to those programs using accepted procedures and precedents and innovative approaches. The purpose of the work is to provide expertise and leadership by furnishing advisory, planning, or reviewing services on specific problems, projects, or programs within the BEDP and *"Greening"* programs; or, facilitating solutions to a wide range of recommendations. Examples include formulating approaches to BEDP and *"Greening"* problems or issues when the problems require extensive analysis of a variety of unusual conditions, questions, or concerns or establishing procedures for implementing policies or guidelines. The BEDP work is crucial in encouraging expansion of the national industrial base by developing new or improved small, minority or women-owned firms to assure increased opportunities to contract and subcontract with the BLM, other Federal, State, and local entities and with prime contractors. This work primarily affects the economic well-being of small and socially and economically disadvantaged businesses located principally in the Western United States. The *"Greening"* program work is crucial because it provides an active, systematic way to protect the natural processes that sustain life on our planet. The BEDP and *"Greening"* work affects a wide range of acquisition and property management activities, such as the operation of acquisition and property management programs in various locations, and the accomplishment of significant goals. The BEDP affects the timely support of other Federal departments or agencies; has a significant economic effect on those working in various industries, since it establishes rules and guidelines under which the BLM's major acquisition programs are accomplished and which members of those industries must follow in doing business with the BLM. The *"Greening"* program has far reaching effect to protect the natural processes that sustain life on our planet.

Factor 6. - Personal Contacts

Frequent and extensive contacts with high-level DOI and BLM decision makers in Washington D.C.; State/Center and field offices; BLM and DOI Business Utilization Development Specialists (BUDS), BLM contracting officers, property managers, National Business Center managers, program managers, and technical personnel; representatives of other Federal agencies; State and local government officials, local and national chambers of commerce, industrial and trade associations, and small business advocacy entities; Government contractors and representatives from small and small socially and economically disadvantaged business concerns.

**Joe Federline**

03/27/01 07:47 AM

To: Milton Hill/WO/BLM/DOI@BLM
cc:
Subject: Re: just a reminder

Milton:

1. I can only recall discussing two trips with you.

● California Black Chamber of Commerce meeting. I understand from BLM California that they are worried that the ball may have been dropped in that effort because no one has heard from you.

● Your participation in the Procurement Analysts' Conference last week. You also asked for the BLM to pay for trips by Bob Faithful and Gary Wade. I approved Bob Faithful's trip, but not Gary Wade. You and Bob Faithful were on the agenda for one hour on Tuesday, March 20 from 11:00 am to noon. Bob Faithful and the lady from GSA discussed the BLM Business and Economic Development Program and GSA's outreach during that time.

If you discussed any other trips with me in which I approved, please let me know.

2. I wrote your PD for the work in the WO-850 group for which you were assigned by management. We discussed and made one change to the PD in our meeting last August stating that you would coordinate your work with Group Manager as you requested. The PD was classified at your current grade, GS-14. Personnel and EEO agreed that it was a good PD. Personnel, EEO and I thought that after we made the change that you requested, and you didn't have any other problems with the remainder of the PD, the PD was ok with you. However, the PD does not require agreement by the employee.

I do not ever recall discussing setting up a meeting with HRM to discuss your transfer. I recall that I would provide you with every vacancy announcement that was brought to my attention to help you with your career. And I'd work with you on your IDP. But you would need to apply for vacancies as they occur.

Your EPPRR is based on your PD. Although I consider agreement preferable, you do not have to agree with your EPPRR. Part IV of the EPPRR states: *(Employee's signature certifies review and discussion with the rating official. It does not necessarily mean that the employee concurs with the information on this form.)* I'm sorry that you feel that the BLM Business and Economic Development Program and Greening Program are dead end jobs with clerical duties. The classification statement indicates otherwise. Achieving diversity in contracting goals and greening goals are very important BLM and Department programs. Achievements in those programs need strong leadership.

3. We need to discuss your health, the need for a doctor's slip if you are out for 3 days or more, and who will lead the programs if you are unable to work for extended periods of time.

Let's talk. I need you to do the work in these programs until you are able to find and are selected for a vacancy that you feel is in line with your career goals. We need leadership in these very important programs.

Milton Hill

**Milton Hill**

03/26/2001 09:01 PM

To: Joe Federline/WO/BLM/DOI@BLM
cc:
Subject: Re: just a reminder

1. Let me remind you that all my travel and conferece participations were discussed with you. Matter of

Exhibit O - 2 pages

fact, you insisted that I do more outreach and participation with the Chambers, particularly the Black and Hispanic Chambers and the "greening initiative." These efforts are particularly draining and keep me away from my family. I can curtail the activities whenever you wish. I will be finishing up the pre-plannned meetings with Annisten and the CA Black and Hispanic Chambers' members by apr 4. Let's re-discuss then.

2. I never agreed to you re-writing of my PD and my EPPRS. We can discuss this also. When we last talked with the personnel and eeo personnel, you were going to set up a meeting with the HRM personnel to discuss my transfer. The reason this is a sensitive issue with me is because I did not asked to be, nor did I wanted to be, transferred to WO-800. Before agreeing to the move, I met with the Dep Dir(Mat Millenbach) and the Grp Mgr(P. Niebaurer) who agreed that I would "help out the small business pgm for a couple of years" but I would I would continue as a GS-343 and be involved with organizational planning, public and strategic planning, and other assignments that were commensurate with my skills and training; and, that would enhance my career. I never agreed to be an "eternal" BEDP person and have you (and) others to attempt to confine me to a dead end job and clerical duties.

3. We can also discuss the status of my telecommuting request, my laptop request, my future medical dates, and other items.

**E-Government Program Manager**
**GS-301/14**
**Draft, 10/03/01**

## INTRODUCTION

The incumbent serves as the focal point and leader for the Bureau's offices and programs in the meeting of (1) mission objectives and (2) improving service delivery or efficiency in one or more of the following four major segments: government to individuals; government to business; government to government (Federal-State-Local-Tribal); and, internal efficiency and effectiveness. The E-Government Program Manager is responsible for the development and successful achievement of short-range and long-range objectives for the use of this technology in BLM. This includes the planning, leading and coordinating Bureau-wide strategic efforts with respect to E-government activities and E-Commerce applications to Government activities for all offices of the Bureau. The incumbent will lead cross-directorate projects to meet Bureau, Departmental and Government-wide goals through efficient and cost-effective use of E-Government and E-Commerce technology and solutions in the four major segments. The E-Government Program Manager plays a key role to set the overall direction for conducting business electronically within BLM. Finally, this position recommends standards for E-Government-related hardware and software to ensure that the best-in-class infrastructure is in place and continual improvement is made to support the Bureau's business. This includes bringing commercial best practices to Government.

This position is the senior, national level advisor to the BLM's Executive Leadership Team (ELT) while organizationally assigned to the Assistant Director, Business and Fiscal Resources, on all aspects of the application of E-Government and E-Commerce technology and solutions to achieve a citizen-centered BLM.

The BLM, as a result of recently enacted legislation, will be implementing a new effort, known as E-Government which is expected to include substantial organizational, cultural, and functional changes. Once completed, the manner in which BLM provides goods and services to the public, how it acquires commercial resources to support its mission, and how employees perform their work will be significantly different. It is possible that solutions developed and used in the Bureau's E-Government effort will be available for adaptation to other agency requirements and other external agencies. As the senior technical expert in E-Government and E-Commerce, the incumbent is to identify significant future trends and the best commercial practices, in technology, and apply these trends and practices to implementing the enterprise architecture.

## MAJOR DUTIES

As the Bureau of Land Management's (BLM's) E-Government Program Manager, the incumbent must be highly skilled in formulating and recommending national policies and procedures concerning the development and implementation of the E-Government vision within the context of the business vision and action plans that clearly define projects, objectives, goals, schedules and assignments. This manager must also be able to work effectively with members of the

BLM's national senior leadership team (the ELT) and the Information Resource Management Advisors to the Assistant Directors to achieve our E-Government and E-Commerce goals. The E-Government manager leads all BLM offices and programs toward achieving mission objectives and improving service delivery or efficiency in the four major segments.

## General

a. Serves as the senior staff expert to the: Bureau's ELT made up of the Director, Deputy Director, Assistant Directors, and State/Center Directors, on all matters related to E-Government and E-Commerce design and development. As an example, this work is expected to range from e-procurement and e-grants through the government-wide point of entry website (www.FedBizOpps.gov). to on-line mineral leasing application or recreation site permitting. Participates in decision meetings involving any aspect of this technology as well as E-Government system design and development.

b. Serves as the senior staff expert to all Assistant Directors and State Offices on implementation of E-government within BLM and the use of Web-enabled technology to further BLM mission requirements.

c. Leads Enterprise-wide Project Teams on policy development and implementation of E-Government within the BLM. Leads the alignment of business practices with available funding and personnel to get the most efficiency from the technology.

d. Instigates change by advancing an E-Government strategy that includes specific outcomes to be achieved, establishing an integrated approach to E-Government planning and management, leveraging the technology, and motivating action up and down the organization.

e. Provides feedback and briefings for the BLM on activities involving all aspects of E-Government technology as well as design and development, e-procurement and e-grants.

f. Provides input to all stages of the budget process to ensure that E-Government technology, and system design and development functions are integrated into program activities in support of established priorities.

g. Participates in interagency E-Government work groups or on special assignments, independently representing the BLM.

h. Coordinates with other agencies to achieve integrated E-Government design and development while maintaining close coordination with the Bureau's senior technical staff, including the NIRMC Director, the Configuration Manager, and Systems Engineers.

## Factor 2 - Supervisory Controls

- The Group Manager, Property and Acquisition Management provides only administrative direction while the BLM's ELT, through the Assistant Director, Business and Fiscal Resources, provides assignments and policy direction in the context of overall project priorities and objectives of supporting BLM's mission and improving service delivery or efficiency. The incumbent has complete authority to plan, schedule and execute major e-government projects and necessary evaluations to support these projects.

- As the BLM's recognized authority in E-Government development and implementation in BLM, this position requires the incumbent to exercise discretion and judgement in determining the scope of E-Government projects or associated studies and to work independently without direct supervision and produce products that are considered authoritative and conclusive.

- Work is reviewed by the Assistant Director, B&FR in terms of the potential influence on the BLM's Strategic Plan as expressed in the BLM's policy objectives and programmatic goals. The work is normally accepted without significant change in that the incumbent's work is heavily relied upon for technical accuracy, completeness and soundness of data analysis for decision-making.

## Factor 3 - Guidelines

- The incumbent relies on relevant statutory authorities, basic legislation, private industry best practices, and where existing, other Governmental objectives and directives. The incumbent exercises judgement and ingenuity in interpreting the intent of legislation and broad program objectives to develop E-Government and related business management policies for use throughout the Bureau. As business interactions with all sectors of the public, other Governmental units, and internal BLM offices change from paper-based to electronic, the incumbent's work is expected to have major impacts on these interactions and will cause a fundamental change in character as to how BLM conducts business across its work spectrum and at all levels of the organization.

- Few broad Government-wide guidelines concerning E-Government exist at the present time. The incumbent is expected to contribute to the formulation of these broad guidelines as well as to formulate BLM E-Government policies and guidelines. However, the incumbent must often adapt and deviate from other established standards and guidelines in order to meet unique needs of the BLM and its publics and to ensure compatibility with other agency guidelines. Adaptations and deviations must be considered within the limitations of available technology.

Factor 5 - Scope and Effect

- The incumbent's actions and decisions will be highly visible and impact all programs throughout the BLM. The purpose of the work is to perform very broad and extensive assignments related to the development and integration of e-government technology and systems to support all aspects of the Bureau's management of land and resources. The work is of significant interest and impact to the Bureau, the Department, and external customers and stakeholders. The incumbent must identify and develop ways to resolve both technical and operational issues and develop criteria to measure the success of the work.

- The incumbent directs development and integration of the Bureau's E-Government systems. This work affects the operations, policies, and procedures of the Bureau and State and Field Offices on a continuing basis and fulfills the E-Government responsibilities of the Bureau as an integral part of the agency.

Factor 6 - Personal Contacts

- The incumbent will be responsible for establishing and maintaining appropriate personal contacts at all internal levels, as well as with other agencies personnel, including agency heads, national development teams, interdisciplinary resource personnel, executives representing both vendors and contractors as well as with the general public.

  Incumbent will regularly:

  - Communicate with both internal and external top level managers (including BLM, DOI, OMB, private industry executives, etc.) to represent the Bureau.

  - Serve as a point of contact for other federal agencies, contractors, state and local governments seeking services, help, or guidance in the design and development of E-Government information systems.

  - Negotiate with federal agencies and/or private industry sources to establish data sharing and data exchanges and provide for cooperative use of resource data.

  - Represent the BLM to ensure close cooperation, coordination and sharing of data and systems to support DOI's mission.

Factor 7 - Purpose of Contacts

- The incumbent will defend and negotiate agreements on significant and/or controversial matters directly with top level mangers, officials and/or leaders of public interest groups recognizing that the incumbent's recommendations will affect major Bureau programs,

and/or include significant expenditures of funds, and/or significantly change the nature and scope of the Bureau. The incumbent must be able to influence or persuade other experts to adopt particular approaches, concepts, or compromises when serious conflicts arise.

- Extensive contacts are developed and maintained within the BLM and DOI, with other government agencies, and with representatives of vendors, contractors, public interest groups and other stakeholders.. Contacts and coordination are made through direct communication and through attendance and participation at meetings related to E-Government actions to be or that are being implemented by the Bureau.

- Interagency contacts are made to share information, develop general policy and provide expert technical capability to solve problems and conflicts involving interagency programs having common problems in policy and programs. Commitments made in these contacts will be honored by the Bureau.

Factor 8 - Physical Demands

- The incumbent's work is mostly sedentary, with periods of occasional stress related to intensive concentration, conflict resolution and meeting tight deadlines. The job requires a great deal of travel, mostly by air but driving long distances is also involved.

Factor 9 - Work Environment

- The work is performed in an office setting. Incumbent will adhere to all safety rules and regulations as prescribed in manuals/supplements or by the designated Safety Officer.



# United States Department of the Interior

## Bureau of Land Management
### Washington, D.C. 20240



April 23, 2001

Memorandum

To:        Milton Hill

From:      Joe Federline    *Joe Federline*

Subject:   Letter of Reprimand

This is an official reprimand for your failure to perform assigned duties as directed.   This action warrants disciplinary action.  I required you to lead a presentation at the BLM Procurement Analysts' conference in Phoenix, Arizona on March 20, 2001 at 11:00 am.  Even though the Bureau is responsible to pay for your expenses to travel to participate in the conference during the week of March 19, 2001, where you were to make a presentation about the BLM Business and Economic Development Program on March 20, 2001 from 11:00 am to noon, you made no presentation and you did not participate in the conference.

On February 25, I sent you an e-mail message from Denver saying that we needed to discuss your involvement in the BLM Procurement Analysts' conference during the week of March 19 at the National Training Center in Phoenix when I returned.  I said in the message that one hour was reserved on the agenda to present the BLM Business and Economic Development Program. You never discussed your involvement or the details of your presentation with me.  Instead, through an e-mail message, you asked that I pay for travel for Bob Faithful, Director of the Department of the Interior Office of Small and Disadvantaged Business Utilization, and Gary Wade, Mr. Faithful's data manager to the meeting.  I said that I would pay for Bob Faithful's travel, but not Gary Wade's travel.  Since you had not been in the office, I left you a voice mail message and an e-mail message on March 6 requiring you to discuss with me what you were going to present prior to this trip.  I provided you with the draft conference agenda in the e-mail message.  Linda Johnson, the conference coordinator, sent the attached final conference agenda to all participants on March 14, 2001.  The agenda clearly showed your assigned participation as a presenter at the Business and Economic Development Program session.

At the conference, Mr. Faithful presented the FY 2000 Business and Economic Development Program accomplishments for the BLM State Offices, but not the BLM District Offices. Accomplishments for the BLM District Offices could not be ascertained because the FY 2000 acquisitions to small, minority and women-owned businesses less than $25,000 had not been included in the statistics.  Mr. Faithful also presented his views on the emphasis needed for FY 2001 in two areas.  Also, an employee from the General Services Administration in Phoenix presented the GSA outreach initiatives to small, disadvantaged and women-owned businesses.

One aspect of your position is for you to lead the effort to achieve Bureau-wide Business and Economic Development Program (BEDP) goals by:
- negotiating and monitoring goals for each BLM State and Center,
- coordinating and overseeing the State and Center BEDP activities, and
- identify offices falling short of the goals and offer ideas for improving performance.

In carrying out your responsibilities, your position description requires that you provide briefings on the BEDP program, which is precisely what you were assigned to do at the conference. Your failure to participate in the presentations at the conference constitutes a clear failure on your part to perform an assignment and warrants discipline. Your failure to carry out your job responsibility in this case is made worse by the facts that your are the lead official for the BEDP for the Bureau, you attended the meeting and made no contribution as part of the panel on the BEDP, and the Bureau incurred expenses for your travel to Phoenix where you did not make the contribution to the meeting.

The Bureau is entitled to expect employees to carry out their assigned duties as directed. Your failure to do so cannot be tolerated.

The Department of the Interior Table of Penalties provides for penalties ranging from a written reprimand to a suspension or removal for a first offense for failing to do assigned work. Although a more severe penalty can be imposed, this is to notify you that I am imposing only the lowest level of discipline by placing this letter of reprimand in your Official Personnel Folder (OPF). I hope this reprimand will impress upon you the need to conduct yourself in a manner consistent with agency rules and expectations as to employee behavior so that further disciplinary action will not be necessary. You are cautioned, however, that any future misconduct of this nature or other misconduct, particularly any that might occur while this reprimand remains in your OPF, may result in severe disciplinary action up to and including removal.

A copy of this reprimand, along with any explanation made by you, will be placed in your OPF. This reprimand will be removed from your OPF after two years or whenever you leave the Department (whichever occurs first). If your conduct so warrants, the reprimand may be removed earlier than the expiration of the two year period. If the reprimand is withdrawn earlier and destroyed, you will be so informed in writing.

You may file a formal grievance concerning this reprimand in accordance with the procedures described in 370 DM 771. The formal grievance should be filed with the Karen Ryan, Chief, Branch of Human Resources Management, Eastern States, 7450 Boston Boulevard, Springfield, Virginia 22153 within fifteen (15) days of the issuance of this reprimand. To be considered, the grievance must:

      (1) be in writing and signed by you or your authorized representative;
      (2) contain sufficient detail to identify and clarify the basis of the grievance;
      (3) specify the relief sought by you which must be directly personal to you; and
      (4) include copies of any documents related to the grievance.

If you believe that this reprimand discriminates against you on the basis of your race, color, religion, sex, national origin, handicap or age, you may file a complaint of discrimination in accordance with the Equal Employment Opportunity Commission (EEOC) discrimination complaint procedures. Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with EEOC regulations found at 29 CFR Part 1614. You should contact Lynda Nix, EEO Manager, on 703-440-1593, if you choose to initiate a complaint of discrimination. Correspondence should be addressed for Eastern States, Lynda Nix, EEO Manager, Department of the Interior, Bureau of Land Management, Eastern States Office, (ES-953), 7450 Boston Boulevard, Springfield, Virginia 22153. You must request consultation with an EEO Counselor within 45 days of the date of issuance of this reprimand in order for a complaint of discrimination to be accepted for processing.

Questions about the procedures applicable to this action may be discussed with Sheila Johnson Curry, 703-440-1555. If you believe that personal, medical, or other problems are affecting you're your conduct, you may provide documentation of such conditions. You may also contact the Employee Assistance Program (EAP) by calling Federal Occupational Health at 1-800-222-0364. Any discussions with the EAP are entirely confidential. Neither the fact that you consulted the EAP nor the context of your discussions can be released to anyone, including me, without your prior written consent.

To acknowledge receipt of this memorandum, please sign and date the attached copy in the space provided and return it to me.

Attachment

cc: Sheila Johnson Curry, Branch of States Human Resources Management

Receipt Acknowledged:

_____          _____
Signature                                   Date

**Joe Federline**          To: Milton Hill/WO/BLM/DOI@BLM
                           cc:
01/09/01 07:11 AM          Subject: Re: FY 2001 Conference Update- FYI

Milton - Have you committed to participate in these?  If so, which ones?  If you are unable to participate, who do you recommend should participate?
Milton Hill



**Milton Hill**           To: Joe Federline/WO/BLM/DOI@BLM
01/09/2001 05:54 AM       cc:
                          Subject: FY 2001 Conference Update- FYI

In conjunction with the DOI OSDBU efforts and initiatives, we (the BLM) have tentatively agreed to particapate in and/or attend the following conferences and seminars:

- The DOI Environmental Conference
- Native American Business Initiative
- Blacks in Government
- Black Enterprise Procurement Conference
- U. S. Hispanic Chamber of Commerce
- National Black Chamber of Commerc
- CA Black Chamber of Commerce
- CA Hispanic Chamber of Commerce
- Women's Business Network
- The Urban League
- National Association for Equal Opportunity
- Congressmen Al Wynn and Elijah Cummings Procurment Fairs
- Congressional Black Caucus
-National Black Business Council Trade Fair
- Black Chamber of Commerce Trade Fair
- U. S. Chamber of Commerce

Exhibit A

**Joe Federline**

02/25/01 10:34 PM

To: Milton Hill/WO/BLM/DOI@BLM

cc:

Subject: We need to meet

Milton - I'm in Denver this working on a team to reorganize the NBC. Can we meet when I return next week? Items for the meeting are:

- Your FY 2000 EPPRR. OSDBU has not yet provided FY 2000 achievements to the Bureaus. They promised to provide the achievements during the first week of March. I'm not sure why it takes 5 months to know FY 2000 achievements compared to the goals.

- Your FY 2001 EPPRR and priorities. There is government-wide strategic plan for the BEDP. Priorities could come from the strategic plan. Partnerships with the various Chambers of Commerce are being established through MOUs. OSDBU wants Bureaus to take a leadership roles in establishing and making the partnerships work. We also need an EPPRR item for your part in the Greening the Interior efforts.

- We need to call Annasteen about the your part in the CA Black Chamber of Commerce. If you have time before I return, could you please call her at (916) 978-4492?

- Your involvement in the Procurement Analyst Work Shop during the week of March 19 at the NTC in Phoenix. We've set aside an hour for the BEDP. If needed, we could have a BEDP breakout session. Some of the group wanted to know what was happening to the DOI BEDP Project Action Team that Bob Faithful was going to establish. They also wanted to know more about the women-owned business program, and the disabled vet program.

- How is your health? What is your doctor's recommendation for the long term? Do I need to ask Lee Allen or help on a detail?

Exhibit B - 2 pages

From:    Joe Federline on 03/06/2001 08:30 AM

To:      Milton Hill/WO/BLM/DOI@BLM

cc:

Subject:  Re: BLM Acquisition Conference

Milton - We need to talk about the BEDP session of the conference today.  Here's the draft agenda.  Invited guests; such as, the National Chairperson from the National Industries for the Blind, are paying their own way.  If we look hard,we may be able to find funds for Bob Faithful, but not for two people.

The BEDP session is tentatively scheduled for 11:00 am to noon on Tuesday, March 20.  But we can adjust the schedule if necessary.  Would it be better at the end of the day?  Does Bob plan to present an overview of recent changes in law, policy and initiatives, and the latest update on the DIAR Part 19 changes, and DOI BEDP priorities for FY 2001?  Will the FY 2000 accomplishments be available?



AgendaProposed2001.wpc
Milton Hill

**Milton Hill**                          To: Joe Federline/WO/BLM/DOI@BLM
03/05/2001 09:21 AM                   cc:
                                      Subject: BLM Acquisition Conference

I had previously invited Bob Faithful and Gary Wade of the OSDBU to give presentations at this year's BLM acquisition Conference in Phoenix. I thought it would be appropriate and timely with the new administration, issues, etc

They agreed to attend and be presenters, if BLM could pay their travel.  The cost should be minimum with them having to stay for only one night and I think there flight costs will be partially paid for by the Native American Conference they are attending the same week in CA.

When is the BEDP segment scheduled for? I need to coordinate the times and travel with Bob and Gary.

Exhibit C - 4 pages
page 1

*received March 6, 2001*

2/24/01

# PROCUREMENT ANALYSTS WORKSHOP AGENDA
## March 19 - 23, 2001

## NATIONAL TRAINING CENTER
### PHOENIX, ARIZONA

| DAY/TIME | TOPIC | PRESENTER | LOCATION |
|---|---|---|---|
| **MONDAY** | | | |
| 8:00 - 8:30 | Opening Remarks<br>Review Agenda | Joe | Idaho Room B201 |
| 8:30 - 9:00 | FY2000 Accomplishments, FY2001 Priorities and Challenges | Joe Federline | |
| 9:00 - 9:15 | Break | | |
| 9:15 - 10:30 | Workplace of the Future (Linda) | Bob Donelson | |
| 10:30 - 10:45 | Break | | |
| 10:45 - 11:30 | Property Issues (Linda)<br>Overview of Property Conference | | |
| 11:30 - 12:00 | Greening the Government–Procurement & Property (Linda) | | |
| 12:00 - 1:00 | Lunch | | |
| 1:00 - 2:00 | JWOD Program (Marc) | Dan Bailey | |
| 2:00 - 2:15 | Break | | |
| 2:15 - 3:30 | Best Practices/Acquisition Strategies (MaryAnn) | All States/Centers | |
| 3:30 - 3:45 | Break | | |
| 3:45 - 4:30 | Assistance Update | Marc Gress | |
| **TUESDAY** | | | |
| 8:00 - 9:30 | Procurement Reviews  (Dave W)<br> –2001 National schedule & DOI Focused review<br> –Oregon's In-state Review Process<br> –Results of FY2000 Reviews<br> –Changes to Evaluation Format for 2001<br><br>In-state Review Process - States' approach to reviews | Joe Federline<br>Roger Sharp<br>Panel<br>Dave W | |
| 9:30 - 9:45 | Break | | |
| 9:45 - 10:45 | Charge Card Program Accountability – Results of IG Review (Julie–content w/Larry; Linda–set up videoconf) | Larry Keller | via video-conference |
| 10:45 - 11:00 | Break | | |
| 11:00 - 12:00 | Business and Economic Development Program (Joe) Reporting–Goals–how will current problems be resolved? Women-Owned set asides FedBizOps–status? | | |
| 12:00 - 1:00 | Lunch | | |

| | | | |
|---|---|---|---|
| 1:00 - 3:00 | Advance Procurement Plan–How Can We Make This Process Useful? (Break into small groups to: 1. Analyze plan of one state 2. Brainstorm problems/good things about plan/improvements 3. Identify uses of plan End Products: Guidelines for Using the APP           Improvements to Automated System (Linda to look for good state to analyze) | Who will lead? | |
| 3:00 - 3:15 | Break | | |
| 3:00 - 5:00 | Strategies for Building the Workforce of the Future (Need guidance on what this should be, how to run this exercise–discussion session on issues of classification, aging workforce, intern programs, training, etc) | Joe | |
| **WEDNESDAY** | | | |
| 8:00 - 9:00 | National Fire Plan Implementation (Marc) (Go through website; models for contracts and assistance, lead COs in Geographic Areas, outreach, etc) | Joe Julie Marc Bob Heaton | |
| 9:00 - 9:15 | Break | | |
| 9:15 - 10:30 | Update on National Fire Plan Contract and Agreement Implementation Action Plan (Marc) | All States | |
| 10:30 - 10:45 | Break | | |
| 10:45 - 11:30 | Review of Progress on Development of Simplified Acquisitions Guide (H-1510-1) | Linda Johnson | |
| 11:30 - 12:30 | Lunch | | |
| 12:30 - 1:00 | Plan for future development/revision of manuals & handbooks; review results from survey Workgroup assignments:      H-1510-3 through 1510-7      1511 Manual and H1511-1 | | |
| 1:00 - 4:00 | Workgroups – Acquisition Handbooks – Assistance Manual & Handbook | | |
| **THURSDAY** | | | |
| 8:00 - 9:30 | Payments | Candace Thatcher | |
| 9:30 - 9:45 | Break | | |
| 9:45 - 10:45 | Fire Procurement | Marc Gress | |
| 10:45 - 11:30 | IDEAS Update | Dave Wunder | |
| 11:30 - 12:30 | Lunch | | |
| 12:30 - 1:30 | Demonstration of Electronic Resources (Mary Ann) | All States | |
| 1:30 - 1:45 | Break | | |
| 1:45 - 4:00 | Workgroups for Handbooks | | |
| **FRIDAY** | | | |
| 8:00 - 8:30 | Acquisition Manager's Partnership Update | Joe Federline | |
| 8:30 - 9:00 | Workgroups Report Out | | |
| 9:00 - 9:15 | Break | | |
| 9:15 - 10:00 | Round Robin | | |
| 10:00 - 10:30 | Plans for Next Year's Meeting(s) Closeout | | |
| | | | |
| | | | |

**Milton Hill**
03/08/01 09:40 PM

To: Robert Faithful/PSD/OS/DOI@DOI
cc:
Subject: Re: BLM Acquisition Conference

---------------------- Forwarded by Milton Hill/WO/BLM/DOI on 03/08/2001 09:37 PM ----------------------------

From:    Joe Federline on 03/06/2001 08:30 AM

To:      Milton Hill/WO/BLM/DOI@BLM
cc:

Subject:  Re: BLM Acquisition Conference 🗒

Milton - We need to talk about the BEDP session of the conference today. Here's the draft agenda. Invited guests; such as, the National Chairperson from the National Industries for the Blind, are paying their own way. If we look hard, we may be able to find funds for Bob Faithful, but not for two people.

The BEDP session is tentatively scheduled for 11:00 am to noon on Tuesday, March 20. But we can adjust the schedule if necessary. Would it be better at the end of the day? Does Bob plan to present an overview of recent changes in law, policy and initiatives, and the latest update on the DIAR Part 19 changes, and DOI BEDP priorities for FY 2001? Will the FY 2000 accomplishments be available?



AgendaProposed2001.wpc
Milton Hill

**Milton Hill**
03/05/2001 09:21 AM

To: Joe Federline/WO/BLM/DOI@BLM
cc:
Subject: BLM Acquisition Conference

I had previously invited Bob Faithful and Gary Wade of the OSDBU to give presentations at this year's BLM acquisition Conference in Phoenix. I thought it would be appropriate and timely with the new administration, issues, etc

They agreed to attend and be presenters, if BLM could pay their travel. The cost should be minimum with them having to stay for only one night and I think there flight costs will be partially paid for by the Native American Conference they are attending the same week in CA.

When is the BEDP segment scheduled for? I need to coordinate the times and travel with Bob and Gary.

Page 4



**Milton Hill**

03/11/01 08:40 AM

To: Betty Monroe/PSD/OS/DOI@DOI
cc: Robert Faithful/PSD/OS/DOI@DOI
Subject: Re: BLM Acquisition Conference  [Virus checked]

Please call the staff assistant, Angela Davis @202-452-5170 to coordinate the details. If she is out, joe federline's number is 202-452-5177 and the procurement analyst name/no is tina bush 202-452-5175. the blm's acquisition fax number is 202-452-5141.

---------------------- Forwarded by Milton Hill/WO/BLM/DOI on 03/11/2001 08:34 AM ----------------------

## ROBERT FAITHFUL @ DOI

03/09/2001 08:53 AM

To:      Milton Hill/WO/BLM/DOI@BLM
cc:      Joe Federline/WO/BLM/DOI@BLM

Subject:   Re: BLM Acquisition Conference  [Virus checked] 📄

Milton, I spoke with Joe and have committed to come for a presentation on the 20th at 11am.  I hope to join the group for larger discussion.  Where are people staying?  Joe indicated BLM would pay for my travel; what are the things I need to do?  Please have the administrative staff contact Betty Monroe to work on the arrangements.  Can I also get a copy of the agenda and location of the program?  Thanks!  I have asked Gary Wade to work with you on stats from BLM.

Your neighbor in business,

Robert W. Faithful IV
Director, OSDBU  Interior Dept.
202-208-3493



Exhibit D

**Linda Johnson**

03/14/01 01:07 PM

To: BLM_Procurement_Contacts, Bob Donelson/WO/BLM/DOI@BLM, Gery Behr/NTC/BLM/DOI@BLM, Candace Thatcher/NCS/BLM/DOI@BLM, Mary Skole/COSO/CO/BLM/DOI@BLM, Barbara Bellio/NCS/BLM/DOI@BLM, Gary Meade/NCS/BLM/DOI@BLM, Milton Hill/WO/BLM/DOI@BLM, Robert Faithful/PSD/OS/DOI@DOI

cc:

Subject: Procurement Analysts Workshop

The agenda for the workshop next week is attached. Some of the sessions require information sharing from all of you; we had requested that you provide the information you would be covering to Mary Ann Crafton prior to the workshop. If you have not already done so, please give Mary Ann a call or e-mail her with:

-- Best practices, acquisition strategies, success stories you have from the last year in your state
-- An electronic resource or two that you have found useful in your work

Also, please plan to talk about what you have been doing with green procurement--purchases made, proactive efforts, etc.

Thanks,  see you next week!  Linda



draftagenda2001.wpd

Exhibit E - 4 pages

3/14/01

# PROCUREMENT ANALYSTS WORKSHOP AGENDA
## March 19 - 23, 2001

## NATIONAL TRAINING CENTER
## PHOENIX, ARIZONA

| DAY/TIME | TOPIC | PRESENTER | LOCATION |
|---|---|---|---|
| **MONDAY** <br><br> 8:00 - 8:30 | Opening Remarks <br> Review Agenda | Joe Federline | Idaho Room B201 |
| 8:30 - 9:00 | FY2000 Accomplishments, FY2001 Priorities and Challenges <br> Discuss options for Express Package Contracts | Joe Federline | |
| 9:00 - 9:15 | Break | | |
| 9:15 - 10:30 | Workplace of the Future | Bob Donelson | |
| 10:30 - 10:45 | Break | | |
| 10:45 - 11:30 | Property Issues <br> Overview of Property Conference | Bob Donelson <br> Gery Behr | |
| 11:30 - 12:30 | Lunch | | |
| 12:30 - 1:00 | Greening the DOI–Procurement & Property | Joe Federline <br> Bob Donelson <br> Gery Behr | |
| 1:00 - 2:00 | JWOD Program | Dan Bailey | |
| 2:00 - 2:15 | Break | | |
| 2:15 - 3:30 | Best Practices/Acquisition Strategies | All States/Centers | |
| 3:30 - 3:45 | Break | | |
| 3:45 - 4:30 | Assistance Update | Marc Gress | |
| **TUESDAY** | | | |
| 8:00 - 9:30 | Procurement Reviews <br> –2001 National schedule & DOI Focused review <br> –In-state Review Processes <br> –Results of FY2000 Reviews <br> –Changes to Evaluation Format for 2001 | Joe Federline <br> Roger Sharp <br> Panel <br> Dave Wunder | Idaho Room-B201 |
| 9:30 - 9:45 | Break | | |
| 9:45 - 10:45 | Charge Card Program <br> –Accountability – Results of IG Review <br> –Fire Template | Julie Lewis | |

| 10:45 - 11:00 | Break | | |
| 11:00 - 12:00 | Business and Economic Development Program | Milton Hill<br>Bob Faithful<br>Gwen Burton | |
| 12:00 - 1:00 | Lunch | | |
| 1:00 - 3:00 | **Advance Procurement Plan–How Can We Make This Process Useful?** | Linda Johnson | |
| 3:00 - 3:15 | Break | | |
| 3:00 - 5:00 | **Strategies for Building the Workforce of the Future** | Joe Federline | |
| **WEDNESDAY** | | | |
| 8:00 - 9:00 | National Fire Plan Implementation | Joe Federline<br>Julie Lewis<br>Marc Gress<br>Roger Sharp | Idaho Room |
| 9:00 - 9:15 | Break | | |
| 9:15 - 10:30 | Update on National Fire Plan Contract and Agreement Implementation Action Plan | All States | |
| 10:30 - 10:45 | Break | | |
| 10:45 - 11:30 | Review of Progress on Development of Simplified Acquisitions Guide (H-1510-1) | Linda Johnson | |
| 11:30 - 12:30 | Lunch | | |
| 12:30 - 1:00 | Plan for future development/revision of manuals & handbooks; review results from survey<br>Workgroup assignments:<br>   H-1510-3 through 1510-7<br>   1511 Manual and H1511-1 | Linda Johnson<br>Marc Gress | |
| 1:00 - 4:00 | Workgroups<br> – Acquisition Handbooks<br> – Assistance Manual & Handbook | | Idaho-B201<br>B203,B204<br>B205<br>Nevada-C204 |
| **THURSDAY** | | | |
| 8:00 - 9:30 | Payments | Candace Thatcher | Idaho Room |
| 9:30 - 9:45 | Break | | |
| 9:45 - 10:45 | Fire Procurement | Marc Gress | |
| 10:45 - 11:30 | IDEAS Update | Dave Wunder | |
| 11:30 - 12:30 | Lunch | | |
| 12:30 - 1:30 | Demonstration of Electronic Resources | All States | |
| 1:30 - 1:45 | Break | | |

From:    Joe Federline on 02/25/2001 10:34 PM

To:    Milton Hill/WO/BLM/DOI@BLM
cc:

Subject:  We need to meet

Milton – I'm in Denver this working on a team to reorganize the NBC.  Can we meet when I return next week?  Items for the meeting are:

- Your FY 2000 EPPRR.  OSDBU has not yet provided FY 2000 achievements to the Bureaus.  They promised to provide the achievements during the first week of March.  I'm not sure why it takes 5 months to know FY 2000 achievements compared to the goals.

- Your FY 2001 EPPRR and priorities.  There is government-wide strategic plan for the BEDP.  Priorities could come from the strategic plan.  Partnerships with the various Chambers of Commerce are being established through MOUs.  OSDBU wants Bureaus to take a leadership roles in establishing and making the partnerships work.  We also need an EPPRR item for your part in the Greening the Interior efforts.

- We need to call Annasteen about the your part in the CA Black Chamber of Commerce.  If you have time before I return, could you please call her at (916) 978-4492?

- Your involvement in the Procurement Analyst Work Shop during the week of March 19 at the NTC in Phoenix.  We've set aside an hour for the BEDP.  If needed, we could have a  BEDP breakout session. Some of the group wanted to know what was happening to the DOI BEDP Project Action Team that Bob Faithful was going to establish.  They also wanted to know more about the women-owned business program, and the disabled vet program.

- How is your health?  What is your doctor's recommendation for the long term?  Do I need to ask Lee Allen or help on a detail?

Milt:

I need to talk to you ASAP about the PA Conference in Phoenix concerning ~~the need~~ Gwen and Lee's role, the awards presentation and whether there is time for the SBA Rep. in AZ to brief us on Hubzones.

Joe
2/1/00

**United States
Office of
Personnel Management**

**Investigations Service
Federal Investigations Processing Center
Boyers, Pennsylvania 16018-0618**

In Reply Refer To                    Your Reference

Dear

This is in reference to your letter dated _____. Enclosed is an exact copy of the material requested by you pursuant to the Privacy Act of 1974, as amended, or the Freedom of Information Act.

[ ]    Your request/the attached data was referred to this office by _____ for our direct response to you.

[ ]    We are sending you the document(s) that _____ returned to our office for    release to you.

[X]    This data is being furnished to you in its entirety with no deletions.

[ ]    The data withheld from these documents is limited to the following:

    [ ]    that which is exempt from disclosure under section 552a(k)(5) of the Privacy Act. This subsection exempts from disclosure personnel investigations material that would reveal the identity of a source who furnished the information under an express promise (or prior to September 27, 1975, an implied promise) of confidentiality.

    [ ]    names of Office of Federal Investigations personnel

    [ ]    names of other individuals and identifying information pertaining to them

    [ ]    information (document(s)_____) or another agency's report, which concern(s)_____. Before we can consider release of this information to you, you must provide a notarized authorization from this/these individual(s). Otherwise, the information will be withheld pursuant to USC 552(b)(7)(c) of the Freedom of Information Act.

    [ ]    that which is exempt from disclosure under section _____ of the Freedom of Information Act.

[ ]    The file contained document(s) _____ with information furnished by _____.
This office is in the process of consulting with the originating agency regarding the releasability of these documents. You will be notified of the results of that consultation.

[X]    The investigative file contained information which is the property of _____. That information and a copy of your request have been referred for a decision as to access and they will respond directly to you.

EXHIBIT 4

FIPC-89A (front)
August 1995

CON 132-48-9
July 1995

*Interrogatory #1c.    1/5*

[ ]     Our records indicate a portion of the requested/referred material was furnished to you on _____. Therefore we are furnishing only the subsequent material.

[ ]     Our records indicate the requested/referred material was furnished to you on _____. Your file contains no subsequent information. Therefore we consider your request satisfied.

[ ]     The investigative file contains medical information which cannot be released directly to you. This information (document(s) _____) can be furnished only to a licensed physician designated by you in writing. Such a procedure is provided for in Title 5, Code of Federal Regulations, Section 297.205.

[ ]     The file contains document(s) _____ furnished by _____. This source states the information cannot be released to you by this office. You need to contact the above source if you wish to obtain a copy of this data.

[ ]     Each Federal agency is responsible for granting security clearances to its own employees. The Office of Personnel Management does not grant clearances to employees of agencies other than OPM unless he or she will be doing some work for OPM which requires an OPM clearance. Therefore, we suggest that you contact those agencies that have considered you for employment for answers to any questions you have concerning a clearance.

[ ]     A search of our records indicates we currently do not have any record indexed or maintained on _____.

[ ]     Our records also indicate a _____ investigation was _____ on _____ for _____ _____. All data was favorable and has not been maintained.

[ ]     The information you requested was previously sent to you on _____. The Post Office returned it to this office as "Unclaimed" or "Moved." We therefore, at this time, are again forwarding the requested information to you.

[ ]     Best available copy enclosed.

[ ]     Other:

Sincerely,

Kathy D. Baker
FOI/PA Officer

Enclosures: Copies of letters
to DISE Army
Documents: 1-45

FIPC-89A (Back)

ITEM: 005                                                        SOURCE: 005
NAME PETER W. NIEBAUER, ACTING ASST DIRECTOR, HR, U.S. DEPARTMENT OF
     INTERIOR (DOI), BLM, 1849 C STREET, N.W., ROOM 5628, WASHINGTON, DC
     20240

ISSUE(S) 05B 07A
PRIMARY ASSOCIATION SUPERVISOR
AVERAGE EXTENT OF CONTACT REGULAR
SPAN OF CONTACT APPROXIMATELY 1993 – PRESENT

DOES NOT RECOMMEND BECAUSE OF NIEBAUER'S BASIC SENSE OF DISTRUST, HE
WILL DO ANYTHING FOR HIS PERSONAL GAIN, HE TAKES ADVANTAGE OF THE
SYSTEM, AND HIS INTEGRITY IS
QUESTIONED.

THEY MET WHILE WORKING AT THE DOI, BLM.  THEY SPOKE IN PASSING ONCE
PER MONTH WHILE WORKING IN DIFFERENT OFFICES.  IN APPROXIMATELY 1994,

                    REPORT OF INVESTIGATION
               PROPERTY OF U.S. OFFICE OF PERSONNEL MANAGEMENT
                    P.O. BOX 886, WASHINGTON, D.C.  20044

3/5

---

NAME HILL, MILTON EARL | CASE # 98007540 | PAGE 5

DATES OF INVESTIGATION 06/17/98 - 07/01/98 | SID 0546 | ORG ID P80 | REPORT # 1

---

HE WAS SELECTED FOR THE CONGRESSIONAL FELLOWSHIP PROGRAM. HE WORKED ON CAPITOL HILL AND THEY SPOKE IN PASSING ONCE PER MONTH TO ONCE EVERY 2 MONTHS UNTIL APPROXIMATELY 1995. IN 1995, HIS FELLOWSHIP TERMINATED AND HE CAME TO WORK IN THE BUSINESS AND PHYSICAL RESEARCH OFFICE, WHICH COMES UNDER NIEBAUER. TO DATE, THEY HAVE TELEPHONE CONTACT ONCE PER WEEK AND SEE EACH OTHER ONCE PER WEEK WHEN NIEBAUER STOPS BY HIS OFFICE. THEY WORK IN DIFFERENT BUILDINGS. THEY HAVE HAD CASUAL CONVERSATIONS IN THEIR OFFICES, BUT THERE HAS BEEN NO SOCIAL INTERACTION.

IN EARLY 1990, HIS FORMER SUPERVISOR, PATRICIA HARVEY (NOW RETIRED) TOLD NIEBAUER THAT HE HAD BEEN TERMINATED FROM HIS POSITION WITH THE DOD FOR FALSIFYING TRAVEL VOUCHERS. HARVEY MENTIONED THIS TO NIEBAUER DURING A CONVERSATION. NIEBAUER DOES NOT HAVE DOCUMENTATION NOR DOES NIEBAUER KNOW THE DETAILS OF THE TERMINATION.
HE RECEIVED A PERFORMANCE EVALUATION FROM HARVEY THAT HE APPEALED THROUGH THE BLM. HARVEY GAVE HIM AN EVALUATION RATING OF 4 WITH THE HIGHEST BEING A 5. HE APPEALED THE RATING THROUGH THE BLM GRIEVANCE SYSTEM. THE OUTCOME OF THE GRIEVANCE WAS THAT HE RECEIVED A PROMOTION TO GS-14 AND WAS REASSIGNED TO ANOTHER OFFICE. HE WILL FILE AN EEO COMPLAINT OR GRIEVANCE AT THE DROP OF A HAT.

HE CURRENTLY HAS 2 EEO GRIEVANCE AND COMPLAINTS AGAINST THE DOI, BLM. ONE IS FOR NOT HAVING HIS NAME FORWARDED FOR SELECTION TO THE CONGRESSIONAL FELLOWSHIP PROGRAM. HE WANTS TO BE A FELLOW ON THE U.S. SENATE SIDE. HIS PAPERWORK WAS NOT FORWARDED BECAUSE HE HAS ALREADY SERVED IN THE FELLOWSHIP PROGRAM ON THE U.S. HOUSE OF REPRESENTATIVES SIDE. IN 1996, HE FILED AN EEO COMPLAINT AGAINST SOPHIA BACA, DEPUTY ASSISTANT SECRETARY FOR LAND AND MINERALS, FOR NOT SELECTING HIM FOR A STAFF ASSISTANT JOB IN BACA'S OFFICE.

IN 1995, AND SOON AFTER HIS RETURN FROM HIS ASSIGNMENT AS A COGRESSIONAL FELLOW, HE SUBMITTED PAPERWORK FOR A 1 YEAR COURSE AT THE NATIONAL WAR COLLEGE IN CARLISLE, PA. HE WAS TURNED DOWN BECAUSE THE COURSE WAS NOT RELATED TO HIS JOB. NIEBAUER DOES NOT RECALL THE DATE, BUT HE BY-PASSED NIEBAUER AND THE BLM CHAIN OF COMMAND. HE SUBMITTED PAPERWORK TO ATTEND THE NATIONAL WAR COLLEGE AT FORT MCNAIR, WASHINGTON, D.C. HE SUBMITTED THE PACKET TO ASSISTANT SECRETARY OF DOI FOR POLICY AND PLANNING. IN 4/98, HIS PAPERWORK WAS SIGNED-OFF ON BY BOB ARMSTRONG. HE HAS CREATED ANIMOSITY WITHIN THE BLM FOR BY-PASSING THE BLM SUPERVISORY CHAIN. HE HAS ON SEVERAL DIFFERENT OCCASIONS SUBMITTED PAPERWORK FOR DIFFERENT MANAGEMENT COURSES. SOME WERE APPROVED AND SOME WERE NOT SUCH AS A COURSE HE WANTED TO ATTEND THAT COST $10,000 OR COURSES TOTALING $10,000. HE CONTINUALLY TRIES TO GET AWAY FROM THE BLM ON TRAINING ASSIGNMENTS. HE ALWAYS FEELS THAT HE IS BEING DISCRIMINATED AGAINST.

JOSEPH FEDERLINE IS HIS TEAM LEADER ON THE PROPERTY AND ACQUISITION MANAGEMENT TEAM. FEDERLINE OVERSEES AND APPROVES HIS WORK. FEDERLINE GIVES INPUT INTO HIS PERFORMANCE EVALUATIONS. FEDERLINE AND OTHER

REPORT OF INVESTIGATION
PROPERTY OF U.S. OFFICE OF PERSONNEL MANAGEMENT
P.O. BOX 886, WASHINGTON, D.C. 20044

4/5

---

**NAME HILL, MILTON EARL**

| CASE # 98007540 | PAGE    6

---

**DATES OF INVESTIGATION 06/17/98 - 07/01/98 | SID 0546 | ORG ID P80 | REPORT #  1**

---

MEMBERS OF THE TEAM HAS COMPLAINED ABOUT HIM NOT COMING TO MEETINGS OR
BEING AWAY FROM THE OFFICE FREQUENTLY. NIEBAUER HAS NEVER WRITTEN HIM
UP FOR ANYTHING. THERE ARE CURRENTLY NO DISCIPLINARY ACTIONS AGAINST
HIM.

HE IS EITHER SEPARATED OR DIVORCED, BUT NIEBAUER DOES NOT KNOW ANY
DETAILS SURROUNDING HIS SEPARATION OR DIVORCE. HE IS A LIEUTENANT
COLONEL IN THE U.S. ARMY RESERVES. HE IS AWAY ON MILITARY DUTY
SEVERAL TIMES PER YEAR.

**ITEM: 005**
  NAME JOSEPH J. FEDERLINE, PROCUREMENT CHIEF, BLM, DOI, BLM, 1620 L STREET,
    N.W., ROOM 1075, WASHINGTON, DC 20240        **SOURCE: 006**

  **ACCEPTABLE**
  **PRIMARY ASSOCIATION** WORK COLLEAGUE/TEAM LDR
  **AVERAGE EXTENT OF CONTACT** REGULAR
  **SPAN OF CONTACT** SPRING 1995 - PRESENT

  **RECOMMENDS**

  THEY MET WHEN HE CAME TO WORK ON THE PROPERTY ACQUISITION AND
  MANAGEMENT TEAM. FEDERLINE IS THE BLM PROCUREMENT CHIEF AND THE TEAM
  LEADER. TO DATE, THEY HAVE DAILY, PROFESSIONAL INTERACTION WHEN HE IS
  NOT ON TRAVEL. THEY HAVE LUNCH TOGETHER ONCE PER MONTH AND SOCIALIZE
  THROUGH OFFICE RELATED FUNCTIONS 4-5 TIMES PER YEAR. HE IS AN OFFICER
  IN THE U.S. ARMY RESERVES.

**ITEM: 005**
  NAME PATRICIA J. HARVEY, RETIRED, 11555 SPRINGRIDGE ROAD, POTOMAC, MD   **SOURCE: 007**
    20854

  **ISSUE(S)** 05A 07A
  **PRIMARY ASSOCIATION** FORMER SUPERVISOR
  **AVERAGE EXTENT OF CONTACT** REGULAR
  **SPAN OF CONTACT** FALL 1989 - 1/95

  **RECOMMENDS**

  THEY MET WHEN HARVEY AND HARVEY'S DEPUTY DIRECTOR INTERVIEWED HIM FOR
  A MANAGEMENT ANALYST POSITION. IN APPROXIMATELY 1990, HE WAS HIRED
  AND CAME TO WORK IN HARVEY'S DIVISION. HARVEY WAS THE DIVISION CHIEF
  AND SUPERVISED HIM DAILY UNTIL APPROXIMATELY 1993 OR 1994. IN 1993 OR
  1994, HE WAS REASSIGNED TO ANOTHER OFFICE AND LATER BECAME A
  CONGRESSIONAL FELLOW. THEY SPOKE IN PASSING TWICE UNTIL 1/95, AT
  WHICH TIME, HARVEY RETIRED FROM THE FEDERAL GOVERNMENT. THEY HAVE
  SPOKEN ONCE IN PASSING SINCE. THEY SOCIALIZED ONCE PER YEAR THROUGH
  OFFICE RELATED FUNCTIONS.

30

5/5