1                          I-N-D-E-X

2

3     WITNESS:                                    PAGE

4

5     MILTON E. HILL

6         Examination by Mr. King ..............    3

7

8

9

10    EXHIBITS:                                   PAGE

11        (No exhibits were marked.)

12

13

14

15

16

17

18

19

20                         000163

21

22

EXHIBIT

tabbies

R O I pp. 189-190,
194-195

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2              MR. KING:  Mr. Hill, my name is Lonnie
 3    King.  I have been hired by the Bureau of Land
 4    Management to conduct an EEO investigation of a
 5    complaint that you filed against the Agency,
 6    wherein you allege about 16 different issues.
 7    I'm not going to get into those issues right
 8    now.  I'm going to ask you some boilerplate
 9    questions, then I'm going to ask you to give me
10    your support for your assertions that the
11    Agency has discriminated against you based upon
12    your race, sex, and reprisal.
13              Would you raise your right hand.
14    Whereupon,
15              MILTON E. HILL,
16    Claimant, was called for examination and, after
17    having been sworn, was examined and testified
18    as follows:
19                   EXAMINATION
20              BY MR. KING:
21         Q.   Would you give me your full name,
22    grade, and position.          000204
```

1         A.    Milton Earl Hill, Senior Business

2    Management Officer, GS-14, African American

3    male.

4         Q.    Have you filed a prior EEO complaint?

5         A.    Yes.

6         Q.    In what division do you work?

7         A.    I work in the Office of Acquisition

8    and Property.

9         Q.    Where is that located?

10        A.    That is located at 1620 L Street,

11   Washington, D.C.

12        Q.    The first issue that has been accepted

13   by the Agency for investigation is the one

14   wherein it states, "In March of 1999, your name

15   was not referred to the selecting official for

16   the Group Manager position, Vacancy

17   Announcement No. WO-99-12."  It says you were

18   "not referred," which means that the review

19   panel, obviously, did not feel that you should

20   go on the Best Qualified List, when they say

21   "not referred."  Can you tell me, how do you

22   feel that that was discriminatory, in that you

000195

1    were not referred for selection?

2        A.    I felt that I had all of the necessary

3    qualifications, plus additional ones, meaning

4    working in the budget -- actually, in

5    management analysis, being an assistant

6    director of personnel, I worked in management

7    review shops.  I was a human resource

8    management officer.  Then when I brought this

9    to the attention of the director at that --

10       Q.    What is his name?

11       A.    Mr. Tom Fry.  He asked for another

12   review.  Then my name came up.

13       Q.    What does "came up" mean?

14       A.    It means I made the cert.

15       Q.    You made the cert but you were not

16   referred?

17       A.    I did not make the cert, initially.

18   Then --

19       Q.    But prior to there being a selection,

20   Tom Fry had them go back and review, and you

21   did make the cert once that was done?

22       A.    Yes.        000508

1    Q.    When you made the cert, then, they

2    selected someone else?

3    A.    Yes, sir.

4    Q.    Okay.  Do you know who the selecting

5    official was for that particular one?

6    A.    I believe the selecting official was

7    Robert Doyle, D-O-Y-L-E.

8    Q.    Is he still around?

9    A.    Yes, sir, he is.

10    Q.    Do you know the race and sex of the

11    person who was selected for that position?

12    A.    Yes, sir.

13    Q.    And the name?

14    A.    I cannot recall the -- just a minute.

15    Just a minute.  I have that as -- on my

16    personal --

17    MR. KING:  Off the record.

18    (Discussion held off the record.)

19    MR. KING:  Back on the record.

20    BY MR. KING:

21    Q.    Mr. Hill, what is your belief as to

22    the name of the person who was selected for

000207

1    that position?

2       A.    I believe her name was Jeanine

3    Valesco.  I have that as an Exhibit 13.

4       Q.    Do you know this lady at all?

5       A.    No, sir, I do not.

6       Q.    You've never met her?

7       A.    No, sir.

8       Q.    There is no way that you can say

9    whether or not you are better qualified than

10   she is?

11      A.    I can only say that, from what was

12   given out on an e-mail by Tom Walker --

13      Q.    Who is Tom Walker?

14      A.    Tom Walker is the deputy assistant

15   director under Robert Doyle, who sent out an

16   e-mail after the person was selected and gave

17   her qualifications.

18      Q.    Okay.  So you have that e-mail showing

19   her qualifications or you're giving us your

20   best recollection of what you saw in her

21   qualifications?

22      A.    The best recollection was less

SG1000

1    qualifications.

2        Q.    Than you had, as you saw it?

3        A.    Yes, as I saw it.

4        Q.    We will have a copy of her 171,

5    whatever she turned in, as part of this

6    investigative file.  I'll ask you to identify

7    what her real name is and we will go forward

8    from there.  How did you find out that you were

9    not referred for selection consideration?

10        A.    I asked -- I sent a letter to

11    Mr. Niebauer and --

12        Q.    What is Niebauer's first name?

13        A.    Peter Niebauer.  His last name is

14    spelled N-I-E-B-A-U-E-R.  He informed me that

15    he would follow up on it and later informed me

16    that I wasn't selected -- he did not think I

17    was selected.

18        Q.    Anything else you want to say about

19    Issue Number 1?

20        A.    No, sir.  Well, yes, sir.  Along with

21    Exhibit 13 there is also Exhibit 5, that is

22    the --                    000109

1      Q.    Well, you mentioned these exhibits.  I

2   think what we need to do -- some of this stuff

3   may not be relevant that you have.  What I

4   think you ought to say is that you will include

5   a document in the investigative file.  Let's

6   not put any exhibit numbers on them.  Your

7   things are going to be in one package as one

8   exhibit, all of the things that you will submit

9   to me.

10      A.    Okay.  Then I have the rating summary

11   sheet for the Washington Office 99-12 position.

12      Q.    I will get to that, too.  Let me see

13   it a minute, please.  What were you going to

14   tell me about the rating summary sheet that you

15   have?

16      A.    That the rating summary sheet was the

17   initial -- you were asking how I know I did not

18   make the initial cert.  After Mr. Niebauer

19   contacted me, then I called the personnel

20   officer, at that time, who was Dana Magee.

21   About eight months later she forwarded me that

22   summary sheet showing -- blacked out everyone's

000410

1   name, except for mine, of course, and showed

2   where I fell in the categories that were rated.

3   Then, subsequently, that's when I went to Tom

4   Fry and said that I had a problem with that,

5   that I didn't think it was true and I had some

6   problems with it.

7       Q.    You are saying that this rating

8   summary sheet was the one from which the Best

9   Qualified List was drawn?

10      A.    Yes, sir, initially.

11      Q.    Have you seen a rating summary sheet

12  that was done after you complained to Tom Fry?

13      A.    I asked -- the answer to that, sir, is

14  no. But I did ask Dana Magee to submit that to

15  me and I never received it.

16      Q.    Is Dana Magee still around?

17      A.    I am not sure.  She used to work at

18  Eastern State's Office of Personnel in

19  Springfield, Virginia.

20      Q.    From what I heard you say earlier, Tom

21  Fry caused them to go back and re-rate these

22  applications, and upon there being a re-ranking

00011

 1    or re-rating, you then became a member of the

 2    Best Qualified List?

 3        A.    Yes.

 4        Q.    The only thing that is missing now is

 5    we don't know what that particular rating sheet

 6    looked like?

 7        A.    Correct.

 8        Q.    On this one they have you listed as

 9    Number 11.

10        A.    Right.

11        Q.    You are ranked Number 11?

12        A.    Yes, 11.  I think they used the top

13    ten.  I think the criterion was the top ten

14    qualified.

15        Q.    Who told you that?

16        A.    Dana Magee.  That was the other reason

17    I had apprehensions concerning myself.

18        Q.    Anything else you want to tell me

19    about Issue Number 1?

20        A.    No, sir.

21        Q.    Issue Number 2:  "In April 1999, your

22    name was not referred to the selecting official

1    for the vacant position of Associate State

2    Director, Utah GS-15." Tell me your position

3    with regard to your not being referred on Issue

4    Number 2.

5        A.    On Issue Number 2, I submitted my

6    application and did not make the certification

7    list, and felt that I should have, at least,

8    made the certification list based on my

9    background. By "background," meaning my work

10   as personnel in natural resource management as

11   an assistant director and human resource

12   management, et cetera. I received not a copy

13   of the certification list, of course, but not

14   even a response in terms of why I did not make

15   the list or what the list consisted of.

16       Q.    Do you know the vacancy announcement

17   number?

18       A.    Yes. Vacancy Announcement Number

19   UT-97-17.

20       Q.    I would like to get a copy of this if

21   you don't mind.

22       A.    All of this is yours, sir. That is

000113

1      yours.

2          Q.     I will give you this back after I

3      Xerox the front part of it.  Do you know who

4      the selecting official was in this case?

5          A.     No, sir, I do not.

6          Q.     Do you know who was selected?

7          A.     No, sir, I do not.

8          Q.     Well, then, why do you feel that your

9      not being referred for -- well, really, for

10     both of these positions was discriminatory?

11         A.     I feel that they were discriminatory

12     because, one, that the listing of -- the list

13     of what the qualifications were, I felt like I

14     had all of the basic and more qualifications.

15     So even if not subsequently selected, at least

16     I felt I should have made the certification

17     list.  If you are one of the top ten, then you

18     feel that you are at least in the ballgame, and

19     with your background, both actual work,

20     academic experience, and Hill experience that

21     you should at least have made the list for

22     being considered.            000114

1      Q.      But there is another thing that you

2      have to add to that -- there is another step

3      that I'm trying to get you to deal with.  That

4      step is, you are saying "I feel that I was

5      qualified enough to make the cert."  The next

6      step is "but for discrimination."  So, what you

7      have to tell me now is the nexus between your

8      not making the cert and your assertion that it

9      was discrimination based on your race and your

10     sex and previous EEO activity.

11     A.      Okay.  The connection with that is

12     persons on the panel are selected by management

13     officials, meaning management officials

14     including Mr. Robert Doyle; the assistant

15     directors; the deputy assistant directors, such

16     as Tom Walker; the deputy director of BLM, Nina

17     Hatfield.  Those folks make selections or

18     suggest folks who are on the panel -- the panel

19     members.  Thereby, those persons, I feel, are

20     biased against me.

21     Q.      Why are they biased against you?

22     A.      I think they are biased against me

000115

1   because of me being an African American male,

2   me having been involved in EEO activity in the

3   past, including class actions taken against the

4   Bureau of Land Management actions; not

5   individuals but the actions.  I think they use

6   these actions that I have taken against me and

7   to subsequently hold that against me through

8   them selecting folks to carry out their

9   biddings for them who are on the panel.

10      Q.    Your assertion is that these

11  management officials, Hatfield and company,

12  have an animus against you because of your

13  prior EEO activity and they are going out

14  selecting people for these panels, whose job is

15  to make sure that you don't make the cert.

16  That is what you are saying?

17      A.    I'm saying whose job it is that they

18  suggest that I do not make the cert -- not only

19  do not make the cert, but even when you, me,

20  particularly, going out to get details and

21  career-enhancing training, they are making sure

22  that these individuals put what I call stop

1      gates in the way of that -- of my progression.

2          Q.    Well, name me some specific actions

3      that you know these management officials took

4      with these panelists.  Name the panelists that

5      you think they talked to.  Or is this just your

6      general feeling as to what they must have done?

7          A.    Well, since I'm not in the panel, I'm

8      not privy to it.  I guess I would say, yes,

9      that on the panels -- when the panel members

10     are selected, the panel members are selected to

11     make selections for certain grades.  These

12     grades are mostly senior level positions, 14's

13     and above.  It's not written down, but it's

14     through actions, through verbiage, that it is

15     done to make sure certain persons, in this case

16     myself, are not selected for the job.

17              Let's use one as an example.  The

18     group manager position that we were just

19     alluding to where, when I came back from the

20     Industrial College, I was reassigned to the

21     Office of the Secretary, unbeknownst to me.

22     The person who was assigned as the acting group

00017

1    manager was the individual who was subsequently

2    selected for the position.  I was never

3    considered and never offered the position to

4    act.

5         Then, subsequently, when they had the

6    panel, the panel members consisted of Tom

7    Walker, a deputy assistant director.  The other

8    panel members were two white females who were

9    long-time friends -- "long-time friends,"

10   meaning over ten years -- of the person who was

11   finally selected, Joe Federline.  Thirdly, this

12   same panel was selected by Robert Doyle and Tom

13   Walker, the panel members.  So what you have

14   is, persons who are selected are pre-selecting

15   someone for a job, allowing the person to have

16   unfair advantage to be detailed in a job, and

17   not even allowing the person who has had

18   previous training in it or expertise in it to

19   even act in the job.  So, in this case, myself,

20   I'm taken completely out of the loop.

21       Q.    Okay.  Anything else that you want to

22   tell me about Issue Number 2?

000318

1    A.    Issue Number 2, the Associate State

2    Director job, no, sir.

3    Q.    Let me go to Issue Number 3.  In July

4    1999, you were not selected for the Las Cruces,

5    New Mexico district manager position.  By the

6    way, what is that vacancy announcement number?

7    A.    There was never a vacancy announcement

8    number.  The person was directed -- it is

9    called a directed reassignment, where if you

10    had the same grade you do not have to advertise

11    for the position.  The individual, in this

12    case, was directly assigned to the job without

13    competition.

14    Q.    So how was that discriminatory against

15    you?

16    A.    Well, because I had made it known that

17    I was interested in the job for the past eight

18    years.  I was never even conferred or even

19    considered for it, although Nina Hatfield had

20    previously stated that I was well qualified and

21    she was interested in diversing the work force

22    and diversing the field manager position.  To

000319

1    the best of my knowledge, there is only one

2    African American field manager; not state

3    director, but field manager in the Bureau.   If

4    that's the case, I was just as qualified and

5    more qualified than the individual.   So, I was

6    not even consulted.

7             Even if someone is calling you and

8    saying, "Hey, Milton, there is a position

9    coming up and I know you have shown an interest

10   in it, but we are not going to consider you for

11   that position now but there are other things

12   coming up," or, "You are not qualified for 1,

13   2, 3, 4."   None of that was done.

14        Q.   Who was the person that was directly

15   assigned?

16        A.   Amy Lueders.   The last name is

17   spelled, I think, L-U-E-D-E-R-S.

18        Q.   Was she in the Washington office?

19        A.   Yes, she was in the Washington office.

20        Q.   Now, this district manager is a GM-15

21   position?

22        A.   It is a GM-14 position.

1    Q.    So, you were looking for a lateral

2    transfer?

3    A.    A lateral transfer.

4    Q.    Did you discuss this position with --

5    with whom did you discuss this position?

6    A.    I had previously discussed this

7    position with Peter Niebauer, with Robert

8    Doyle, and with Nina Hatfield, including

9    telling them that I have a home there, still.

10   I have not sold my home in Las Cruces.  So, it

11   is not a matter of my even incurring cost to

12   having to purchase a home and all that kind of

13   thing.  It was advantageous to me, of course,

14   to do a lateral transfer.  I have a home there

15   and I have friends there.  I worked there for

16   eight years, and I have expertise in the area.

17   Q.    I guess your position as to why this

18   was discriminatory is consistent with what you

19   said about Issue Numbers 1 and 2?

20   A.    Yes.  The other part which was

21   disheartening about all this is that, even if

22   one is not selected, it seems to me that one

000441

1    should be given the respect of telling you why

2    you are not selected, treating you like an

3    individual.  I think this is being treated like

4    a third-class citizen.  I think that's another

5    one of my pet peeves on this is that folks are

6    just disrespecting you as a human being and a

7    man.

8        Q.    Who made the director reassignment?

9        A.    I believe it was Nina Hatfield, at

10    that time, the deputy director.  She is not

11    acting director of BLM.

12        Q.    How long is she going to be here?

13        A.    Ms. Hatfield --

14        Q.    Has there been any kind of

15    announcement saying how long she is going to be

16    here?

17        A.    No, sir, there is not.

18        Q.    You were about to say something.

19        A.    I was going to say that I didn't know

20    how long she was going to be here.  I think --

21    I'm not sure if she is what is called a

22    Schedule C.  I think she is a civil servant.

1    So, she will be here, I think, for at least six

2    months.

3        Q.    Let me take you to Issue Number 4.    In

4    January 2000, you were not selected for the

5    supervisory personnel specialist position as

6    advertised under Vacancy Announcement Number

7    WO-99-15.  Tell me, why do you feel that that

8    was discriminatory in your not being selected

9    for that position?  I assume you made the cert?

10       A.    Yes, sir, I made the cert.   The

11   position was originally -- was readvertised

12   after it was advertised initially.   I had

13   spoken with the AD for HRM concerning my

14   interest in the job.

15       Q.    Which one?  What's the person's name?

16       A.    The person's name is Warren Johnson.

17   Although he did not guarantee me a selection --

18   and I did not ask for a guarantee.  All I asked

19   for was to be considered, and he agreed that I

20   would.  We talked about what we wanted to do

21   and -- what he wanted to do, I should say --

22   and what direction he wanted to go.  When my

0001223

1    name came up, I felt that I had a good

2    opportunity for the position.  Plus, with my

3    background -- the background being as an

4    ex-assistant director of personnel, as a

5    director of human resource management.  I had

6    just returned from the Industrial College of

7    Armed Forces where I had emphasis in executive

8    level management; again, a background in

9    budget, had worked on the Hill.

10            All these things, Warren Johnson said

11   he wanted and desired in the job, plus persons

12   with management experience, which I have, both

13   in the military, as well as civilian.

14        Q.    Warren Johnson was the selecting

15   official?

16        A.    Yes, sir, I believe he was the

17   selecting official.

18        Q.    How is it that his not selecting you

19   was discriminatory?

20        A.    I believe that the person who was

21   selected for the job was, in my opinion, less

22   qualified than myself.

1      Q.    Who was that person?

2      A.    That person was Concetta Stewart,

3   C-O-N-C-E-T-T-A, S-T-E-W-A-R-T.

4          MR. KING:  Do you need a break?

5          THE WITNESS:  Yes, I do.

6          (A brief recess was taken.)

7          BY MR. KING:

8      Q.    Mr. Johnson is an African American

9   male, and Ms. Stewart, I believe, is an African

10  American female.

11     A.    Yes.

12     Q.    What I'm trying to figure out is, how

13  is it that the African American selecting

14  official discriminated against you when he

15  hired or selected an African American female?

16  How did that work?

17     A.    Let me be very blunt about it.  I

18  guess, again, as I see it, just as Clarence

19  Thomas is an African American male, whether you

20  are Republican or Democratic, either way -- my

21  concern is, one is discriminatory based on how

22  they make decisions and how they deal with

000125

1    individuals.   In this case, a person is making

2    a decision, in my opinion, to ingratiate

3    himself to the powers to be and in that case,

4    not selecting the most qualified person, but

5    selecting a person -- anybody -- what I call

6    anybody but Milton Hill will get the job.   In

7    this case, where we talked at length concerning

8    what his desires were --

9              (Knock at the door.)

10             MR. KING:   Off the record.

11             (Off the record.)

12             BY MR. KING:

13        Q.   Mr. Hill, another question:   Have you

14   ever named Mr. Warren Johnson as the

15   responsible managing official in the EEO

16   complaint?

17        A.   No, I have not.

18        Q.   But you have reason to believe that

19   Mr. Johnson is aware that you filed earlier

20   complaints?

21        A.   Yes, I do.

22        Q.   It is your assertion that because you

000036

1    filed these earlier complaints, you have become

2    like a pariah to management, and Mr. Johnson

3    knows that and he had to select somebody other

4    than you for that position?

5        A.    Yes, that's exactly what I'm saying.

6            I realize also, to be specific about

7    this -- I understand that when one raises

8    issues, especially concerns about race and

9    employment, that one -- and management becomes

10   the pariah, but my work has never been in

11   question.  The object is who is the best

12   qualified person for the job, who can get the

13   job done, and who is qualified for the job.

14   That has always been the issue.

15           Although it is always that it appears

16   that you are harping on race, the records show

17   it, themselves, in terms of a myriad of studies

18   done on BLM management.  We have a zillion

19   reports on how bad racism, white supremacy is

20   in the Bureau of Land Management, and nothing

21   is being done about it.  That is the issue.

22           Although Mr. Johnson is an African

                        000137

1   American and he selected an African American

2   female, again, you have folks who are in

3   positions; not to effectuate change, but to

4   perpetuate the status quo.  If you really --

5   what was imparted to me is to think out of the

6   box, which I definitely think out of the box,

7   and have the backbone to make good decisions

8   about personnel matters, executive level

9   matters.  Then, unless someone -- I think the

10  record will show, when you look at the

11  backgrounds and experience of those individuals

12  I'm comparing myself with, some of it is not

13  even close.

14      Q.    Issue Number 5:  In March 2000, you

15  were not allowed to apply for the SES

16  Development Program.  That is the Senior

17  Executive Service Development Program.  Tell me

18  your position on that and why you feel you're

19  not being allowed -- who denied you the

20  opportunity to apply and why was that

21  discriminatory?

22      A.    That one was done by Robert Doyle

000128

1    again.  And I feel it was discriminatory

2    because not only didn't he even submit my

3    application, my packet, he was so anxious to

4    send it back to me that he didn't even send me

5    the copy, but he sent me a handscribed updated

6    list, which I will show you, with my packet

7    back, saying he did not know me and all those

8    kind of things, which was not true.

9             Plus, other folks -- the criterion is

10   not who you know or if you know somebody.  The

11   criterion for the SES program is folks who are

12   interested in going into the senior executive

13   level who have the qualifications for it and

14   who have shown the interest in it, which I have

15   had all of that.  At that time, I was in the

16   Industrial College of the Armed Forces, which

17   is senior executive training.  It was a matter

18   of him putting my packet in.  I didn't ask him

19   to approve me because I have to go before a

20   board.  I wanted to compete fairly and that was

21   denied.

22             So when you say what is the criterion

000529

1    for the SES candidate program, for someone to

2    tell you that he is not submitting your packet

3    because he didn't know you or --

4        Q.    That's not quite all he said.

5        A.    Well, I talked to him on the phone.

6        Q.    I'm looking at his memo.  He is

7    saying, "As acting assistant director for less

8    than one month, I have little knowledge of your

9    work performance or potential to make a

10   recommendation at this time regarding your

11   candidacy for the SES."  That's a little

12   different from what you are saying.  Do you

13   follow me?  He is saying he was only AD less

14   than a month.  Is that true?

15       A.    Yes.

16       Q.    Then did you have a chance to let him

17   examine any of your work during that month?

18       A.    Yes, I did.

19       Q.    Was he your immediate supervisor?

20       A.    He was my second supervisor, second

21   level.

22       Q.    Second level supervisor does not

Word-for-Word Reporters & Transcribers
(301)431-3900   (202)775-1842

1    normally see what you do on a day-to-day basis.

2    It is the first level.

3       A.    But the person who sees it is Peter

4    Niebauer.

5       Q.    But who had the responsibility for

6    making the recommendation?

7       A.    Peter Niebauer.  He sends it to Robert

8    Doyle, who approves it.

9       Q.    So, it is Niebauer who didn't

10    recommend you?

11       A.    The bottom line is your packet goes

12    up.  Robert Doyle is the one who signs it.

13       Q.    Did Peter Niebauer recommend you?

14       A.    No.

15       Q.    You know that to be true?

16       A.    He did not recommend me, but I sent

17    the packet to him.

18       Q.    Wait, now.  Let's walk through this.

19    Niebauer did not recommend you, right?

20       A.    I don't know.  Here's why I don't

21    know.  The packet was -- I was at Industrial

22    College of the Armed Forces.  It was then sent

000131

1    to Niebauer and on to Robert Doyle.  I'm making

2    the assumption that in order for it to get to

3    Robert Doyle's desk, it had to go to Peter

4    Niebauer first.  Peter Niebauer then says,

5    "Here, Mr. Doyle," and Doyle says, "Well, I

6    don't know you."

7        Q.    Well, that's not quite what he said.

8    He didn't say he didn't know you.

9        A.    He said he didn't know my work.

10        Q.    He said, "I have little knowledge of

11    your work performance."  That's not the same as

12    saying "I don't know you."

13        A.    Here is why I have a problem with

14    that.  Let's turn the hat around.  When I first

15    went to New Mexico as the chief of forces

16    development down there, there were three folks

17    on my staff, I didn't know their work.  I

18    didn't know if they were good or bad.  They

19    were up for what, at that time, was called the

20    mid-level management course.  Well, just

21    because I had been there for months, I'm not

22    going to say I'm not going to forward it.  I

000132

1    will take the advice of the persons who worked

2    there, before, who supervised them.

3        Q.    Let me ask you some questions that are

4    going to come up in this whole investigation

5    here.  From what this memo is saying, you were

6    already in a training program at the Industrial

7    College of the Armed Forces; is that correct?

8        A.    Correct.

9        Q.    Is it true that that program was not

10   going to complete for six months after the SES

11   Development Program was to begin?

12       A.    Yes.

13       Q.    So what were you going to do?  You

14   were going to quit in midstream, the training

15   program at the Industrial College, in order to

16   go into the SES?  What he is saying is these

17   things overlapped by six months.

18       A.    Yes.

19       Q.    You were still in a program that was

20   going to go on for six months after the SES

21   program began.  So, how do you reconcile that?

22       A.    The reconciliation is that the packet

Word-for-Word Reporters & Transcribers
(301)431-3900   (202)775-1842

1    goes before a board, but the actual program did

2    not stop until a year later.

3        Q.    So, you are saying here that he is

4    incorrect in saying that the program was to

5    begin six months before your training ended

6    with Industrial College of the Armed Forces?

7        A.    Right.   The one I was interested in

8    started in that fall the following year.

9        Q.    Hold on a second.   When was the

10    Industrial College of the Armed Forces to end?

11        A.    That was to end in July 1999.

12        Q.    July of 1999?

13        A.    The other program, if you were

14    accepted, would start in that fall of 1999.

15        Q.    The vacancy announcement for that

16    program was --

17        A.    Number 10.

18        Q.    Number 10?

19        A.    Yes.

20        Q.    What you wanted to do was complete the

21    Industrial College, then, within about 90 days,

22    you wanted to go into the other training

1    program, basically, right?

2         A.    Right.

3         Q.    Okay.

4         A.    Here is the reason why.  The

5    Industrial College, although as senior

6    executives, one of the top colleges in the

7    country, the situation was that in the history

8    of the Bureau of Land Management, there have

9    been only two African American SES's.  That's

10   in the 80-year history.  One is still on board

11   and the other was transferred.  So you have one

12   SES now currently in the Bureau of Land

13   Management.

14        Q.    How many SES slots does the Bureau

15   have?

16        A.    The Bureau has about, I think, 25

17   slots.  It's 25 or 30 SES slots.  Now, that's a

18   very good question, how many slots there are.

19   The question is:  How do you get selected?

20   That has always been a mystery.  But as history

21   shows us, as an African American male, you have

22   to be twice as good as anybody else.  I'm just

000135

1    saying that I'm not asking you to give me

2    anything.  I'm saying I'm willing to compete.

3    All I want to do is compete.  What I'm

4    competing for is the SES slot.  And knowing the

5    history of the Bureau of Land Management, then

6    I know I have to have more credentials than

7    everybody else, and more productivity.

8          So my thought, whether right or wrong,

9    I am submitting that.  When I come back -- the

10   course is not like you are there every day.

11   The SES development is that you are

12   intermittently going into programs.  You are in

13   a program -- you are in training maybe for a

14   month.  You go back to your regular job.

15   You're then in a program for another three

16   months, as opposed to the Industrial College

17   where you are away for a year or ten months.

18       Q.    Mr. Hill, how long was the Industrial

19   College of the Armed Forces training?

20       A.    The training was ten months.  For me

21   it was 15 months because I was on a research

22   project.                    0001036

1      Q.     So you were gone full time 15 months?

2      A.     I was gone full time.

3      Q.     Where were you?

4      A.     I was in Fort McNair, Washington,

5   D.C.

6      Q.     Had you had any training before then

7   or was that your first time going to training?

8      A.     That was my first long-time training.

9      Q.     How many years do you have in?

10     A.     I have 30 years.

11     Q.     You can retire tomorrow if you want

12   to?

13     A.     I can retire this minute.  Well, I

14   don't have the age.  I'm 52.  You are right, I

15   can retire as we speak.

16     Q.     So that was your first training, this

17   Armed Forces situation?

18     A.     Yes.

19     Q.     No other training at all?

20     A.     With BLM?

21     Q.     Yes.

22     A.     Now, I have prior training.

000137

1    Q.   I'm talking about BLM training.

2    A.   Yes.

3    Q.   How long have you been at BLM?

4    A.   Eleven years.

5    Q.   This is your first one in 11 years?

6    A.   First long-term training in 11 years.

7    Q.   "Long term" meaning --

8    A.   It's not the regular two-week courses

9  they send you to.  I'm talking about the

10  courses that are three months or more is long

11  term.  That's what I'm talking about.

12    Q.   So you have had no training over three

13  months, other than this, since you have been

14  here for 11 years?

15    A.   Correct.

16    Q.   But you have had a lot under three

17  months?

18    A.   Yes.  I have had two- and three-weeks

19  training, which enhances your skills over the

20  years.  I have had that.  I have done some on

21  my own.  Most of it I have done on my own.  I

22  have gone back to graduate school and things

000123

1   like that.

2        Q.    When you came to BLM 10 or 11 years

3   ago, what was your grade?

4        A.    I was a GS-13.

5        Q.    You got one promotion since you have

6   been here?

7        A.    I got a promotion based on filing a

8   grievance.

9        Q.    A grievance or complaint?

10       A.    I'm sorry.  Complaint.  It was a

11  similar situation.  I said, "Here are the

12  qualifications."  I had a supervisor who went

13  out of her way to discriminate against me.  It

14  was proven.  That's how I got promoted.  Let me

15  just tell you, Mr. King, even though it is

16  disheartening for me to say that, every African

17  American GS-13, 90 percent of the African

18  Americans in BLM have had to file a complaint

19  to get promoted above GS-13.  That is

20  unnecessary.  That includes Denise Meridith,

21  who is the state director SES, and it includes

22  Larry Bembrey, who died a couple of years ago.

000039

1        It includes other folks I could name.

2                It is just a pattern.  It is a pattern

3        in that -- I know it is hard to take in this

4        day of the 21st Century where we are talking

5        about we are going into the new millennium, and

6        we still have, not a glass ceiling, a steel

7        ceiling against black individuals.  That is

8        just the way it is.  It is something that you

9        have to decide -- in my case, yes, I have 30

10       years in.

11               I didn't hear anybody say anything

12       about having all these discriminatory practices

13       and procedures while I was a Vietnam veteran.

14       I didn't see any barriers when they had me

15       doing a hundred combat missions.  I didn't see

16       any of that.  Then I come back to this country

17       that we are fighting for and someone is trying

18       to impose standards on you.  What standards are

19       you talking about?  What is it that we, as

20       African American males, don't have?  Is it

21       budget?  I have that.  Is it management

22       analysis?  I have got that.  Is it supervisory

000140

1    experience?  I've got that.  Is it combat

2    experience?  I've got it.  I'm a military

3    officer.  I'm a lieutenant colonel.  I'm very

4    proud of all that.  Then you tell me, what is

5    it?

6              You tell me you want somebody who

7    worked on the Hill.  I worked on the Hill.  You

8    say you want somebody who worked overseas.  I

9    worked internationally.  I worked with the

10   Congressional delegation.  I worked as a

11   supervisor.  I worked as a budget analyst,

12   budget officer, management analyst.  Well, what

13   is it?

14      Q.    So what I think I hear you say is, but

15   for your race, sex, and prior EEO activity, you

16   would not have to face these barriers?

17      A.    That's exactly what I'm saying.

18      Q.    Issue 6:  "April 1999 and April 2000,

19   management officials refused to allow you to

20   apply for career-enhancing growth training."

21   What is behind that?

22      A.    What is behind that is, again -- this

000171

1    date isn't --

2         MR. KING:  Do you want to go off the

3    record for a second?

4         THE WITNESS:  Yes.  I'm sorry.

5         (Discussion held off the record.)

6         BY MR. KING:

7    Q.    Mr. Hill, are you ready?

8    A.    I'm ready, sir.

9    Q.    Mr. Hill, I want to go to Issue Number

10   6.  It is my understanding, after discussing

11   with you off the record, that you believe that

12   Issue Number 6 should be restated in terms of

13   the date.  Let me state it as it is now, and

14   then I want you to tell me how it needs to be

15   changed.

16   A.    Okay, sir.

17   Q.    "In April 2000, management officials

18   refused to allow you to apply for a

19   career-enhancing growth training."  How should

20   that be stated in terms of date?

21   A.    That should be November 1999 and April

22   2000.                    000142

1     Q.     Go on and tell me how you were refused

2     the opportunity to apply for a career-enhancing

3     growth training in November of '99.

4     A.     In this case I had talked with the

5     Office of Secretary officials, Dr. Willie

6     Taylor and Assistant Secretary Walker -- I

7     think that's his name.  We had agreed upon and

8     worked out with Peter Niebauer, my supervisor,

9     a career training, working in the Office of the

10    Secretary, Office of Environmental Policy.

11    Subsequent to that -- in the process of doing

12    that, Mr. Warren Johnson, who was the AD for

13    HRM, and Mr. Robert Doyle, who was the AD for

14    Business and Fiscal Resources, refused to allow

15    me to continue on the detail, for no obvious

16    reason.

17    Q.     So, then, the issue is not that they

18    stopped you for applying in November of '99.

19    You were already on the detail but then they

20    took you off the detail?

21    A.     They took me off the detail.

22    Q.     So, it is not applying.  It is

000143

1    actually being removed from the detail.

2         A.    Being removed from the detail.

3         Q.    Tell me, why is your being removed

4    from the detail discriminatory?

5         A.    It was discriminatory because I was

6    the only one who was subjected to that.  There

7    were other folks who were on details besides

8    myself, non-African American men, who were not

9    called back, were not subjected to being

10   brought back and then put in a position where

11   you are not being allowed to grow in your

12   career and in your abilities.  I was the only

13   one who was subjected to that.

14        Q.    Who were the other people who were not

15   subjected to that?

16        A.    One was Carl Zulick, Z-U-L-I-C-K.

17        Q.    He was doing the same thing you were

18   doing?

19        A.    Well, he was allowed to go on a

20   career-enhancing detail.

21        Q.    But was he doing the same thing you

22   were doing?                    000344

1    A.    That, I don't know.  We can't say "the

2    same thing" -- or I would say I don't think any

3    of us were doing the same thing because you

4    were in different offices in different

5    agencies.

6        Q.    Tell me something, what were the

7    reasons that management gave you for taking you

8    off the detail?

9        A.    They gave me none.  That's what my

10    sole point is.  When I requested and asked what

11    the reason was, they never gave me one.

12        Q.    How long was the detail to last?

13        A.    A year.

14        Q.    How long were you on it?

15        A.    I was on it for about two months.

16        Q.    Then you were reassigned back to what

17    you were doing?

18        A.    Back to what I was doing, prior to me

19    going to the Industrial College.  This is

20    another thing that bothers me about this whole

21    thing, because you are going away to school.

22    You're training is such that you are hoping to

000145

1    move forward in the executive development area,

2    yet the same officials who are saying they are

3    all for diversity and want to support you are

4    the same ones who are putting the kibosh on you

5    and putting barriers of you not being able to

6    do something.  It doesn't make sense.  It makes

7    sense in my mind where I feel it is a racial

8    issue.  But it doesn't make sense when you are

9    talking about productivity and how you treat an

10   employee.

11        Q.    Those persons who are on details and

12   who were similarly situated as you, were they

13   all white?

14        A.    No, I think there was one African

15   American female.

16        Q.    Did she get pulled back?

17        A.    Yes, eventually she was pulled --

18   let's see.  Let me think what happened to her.

19   No, I think she completed her detail.

20        Q.    What was her name?

21        A.    Her name was Constance Broadus.

22        Q.    Let's take you through April of 2000.

1      How did management refuse to allow you to apply

2      for a career-enhancing program there?

3           A.     That was on the SES Development

4      Program Number 11.

5           Q.     The next one?

6           A.     The next one.

7           Q.     They wouldn't let you go there?

8           A.     They wouldn't let me go there.   I

9      talked with them about it.   Actually, I had

10     talked with Robert Doyle, the AD for business

11     fiscal resources, and a Robert Donelson,

12     D-O-N-E-L-S-O-N, who, at the time, was the

13     acting group manager.   I felt that by me going

14     to the Industrial College it was equivalent to

15     the SES Development Program, but he wasn't sure

16     of that.   He said if I wanted to apply, that's

17     fine.

18          Q.     Wait a second.   You said that you

19     thought going to the Industrial College was

20     equivalent to being in the SES Development

21     Program?

22          A.     Yes.                    000147

1    Q.    That's what you felt?

2    A.    That's what I felt.

3    Q.    Well, then why would you be asking to

4    go into the SES Development Program if you are

5    already in something equivalent that you felt?

6    A.    Because he said he thought that wasn't

7    the case.

8    Q.    But you felt --

9    A.    Yes, I felt it.  I thought that, per

10   OPM regulations, it was equivalent.  I need to

11   apply --

12   Q.    I'm a little confused.  When you

13   talked to me earlier about Issue Number 5 or

14   SES 10, you indicated to me that you felt they

15   were wrong in not allowing you to go into

16   this program and that it was going to be

17   career-enhancing and so forth and so on.  Now

18   I'm hearing you say that you were already in

19   this program with the Industrial War College

20   and that that is equivalent to the SES

21   Development Program, in your mind.  So, if it

22   is equivalent, in your mind, to the SES

000145

1    Development Program, then why are you saying

2    your not going to the SES Development Program

3    is somehow or another discriminatory, in that

4    you are already in an equivalent program that

5    you state, in your mind, as being equivalent?

6        A.    Right.  The reason being, similar to

7    when I went to the Capitol Hill on the American

8    Political Science Association Correctional

9    Fellows Program.   That's a separate program

10   than the BLM correctional program.   When I

11   applied to the Congressional BLM program, I was

12   never accepted by BLM.   Never.   But when I

13   applied to the APSA, which is more stringent

14   and requires more qualifications than what is

15   accepted, when I came back -- how the process

16   worked was that, generally, when you go on the

17   Hill, you come  back and be a field manager.

18   Then, when I went, the thought was, well, yes,

19   you went but you didn't go under the BLM

20   program.  So they were changing the rules, in

21   my mind, that I was being qualified.  In my

22   mind, I had already been qualified but yet BLM

000149

1  was telling me they were changing the rules

2  again.

3          The rules were, yes, you might have

4  thought you were in the SES equivalent program

5  in ICAF, but in our interpretation, it is the

6  SES Development Program that qualifies you for

7  the SES.  So I was saying that if that's the

8  challenge, then, my challenge is if you are

9  telling me that -- and this is what

10 Mr. Donelson was telling me -- that if that's

11 the case, then I'm putting my application in.

12     Q.    He told you that after you were denied

13 under Number 10?

14     A.    He told me when I was applying for

15 Number 11.

16     Q.    After Number 10?

17     A.    After Number 10.

18     Q.    Who is the RMO?  Was it Donelson?

19     A.    Yes, Donelson.

20     Q.    What's his first name?

21     A.    Robert.

22     Q.    What is his position?

000150

1    A.    He was the acting group manager.

2    Q.    And it was his responsibility to make

3    the recommendation?

4    A.    Yes.  Again --

5    Q.    This would also go to the same man,

6    Doyle?

7    A.    Right, Robert Doyle.

8    Q.    Robert Doyle turned you down again?

9    A.    He turned me down again.  It never

10    went forward.  At least with Number 10, at

11    least I got a marked-up response.  In Number

12    11, I received nothing.

13    Q.    You don't know whether or not -- you

14    don't know whether Donelson recommended you or

15    not, do you?

16    A.    No, I don't.

17    Q.    Again, I assume that you are saying

18    that this is discriminatory because of your

19    prior EEO activity?

20    A.    Yes, I am.

21    Q.    That these people had knowledge of

22    your prior EEO activity and, for that reason,

000151

1       they took actions to deny you the opportunity?

2           A.    Yes, sir.

3           Q.    Let's go to Number 7:  "In September

4       1999, management officials allowed your

5       co-workers and peers to have input on your

6       performance appraisal."  Is that stated

7       correctly?

8           A.    Yes, it is, sir.

9           Q.    Tell me, how is that discriminatory?

10      Let me hear your side of it.

11          A.    My side of it is that I had not

12      received a performance appraisal for Fiscal

13      Year '98.  I had written my supervisor, Peter

14      Niebauer, and Roger Hildebeidel -- that's

15      spelled H-I-L-D-E-B-E-I-D-E-L -- a year before.

16      They had refused -- I had written them -- faxed

17      to them copies of my performance appraisal and

18      my accomplishments, which were, I felt,

19      outstanding.  They refused to not only give me

20      an appraisal but refused to even give me any

21      type of award.  I told Mr. Doyle this.  He then

22      claimed that he checked and said, in effect,

000152

1      that the supervisor had retired and the other

2      one was on a detail.

3          Q.    I think I'm hearing you, but I'm not

4      sure I understand.

5          A.    Okay.

6          Q.    This issue states that your co-workers

7      and your peers had input on your performance

8      appraisal.

9          A.    Yes.

10         Q.    Now, who were the coworkers --

11         A.    Where am I going with this?

12         Q.    Yes.

13         A.    That's where I'm going.

14         Q.    All right.

15         A.    What I was making sure of is that it

16     is on the record who my supervisors were.  They

17     were  in contact with me to make the decision,

18     and refused to do it.  The person that

19     Mr. Doyle said he contacted was a Joe

20     Federline.  Joe Federline is a co-worker of

21     mine.  As I told Mr. Doyle, if anybody would

22     know my work, it would be my customers; not a

000153

1    fellow co-worker.  I asked him who else had

2    been subjected to that.  Mr. Doyle said I was

3    the only one.

4        Q.    But you have to deal with this issue

5    of how coworkers had input on your performance.

6    You said Joe Federline did?

7        A.    Yes, Joe Federline.

8        Q.    What did Joe Federline do?

9        A.    All I know is Joe Federline gave

10    information on the quantity and quality of my

11    work to Bob Doyle, which he had no knowledge

12    of.

13        Q.    Doyle asked him or he volunteered?

14        A.    No, Doyle asked him.

15        Q.    Who else other than Federline?

16        A.    That, I don't know.

17        Q.    So he is the co-worker and peers you

18    are talking about?

19        A.    Yes, he is.

20        Q.    It says "co-workers," but you are

21    talking about one guy.

22        A.    Mr. Doyle told me he asked co-workers.

Word-for-Word Reporters & Transcribers
(301) 431-3900    (202) 775-1842

He told me plural. But he never told me who
the other persons were. The only person he
mentioned was Joe Federline. He said "Joe
Federline and others." He never told me who
the others were.

Q.    Okay.

A.    So then I became upset, of course.

Q.    Did you ever speak to Joe about it?

A.    No, I did not.

Q.    Did you ever see the results of him
having input on your performance appraisal?

A.    I didn't see anything there that was
negative. It just was a bland. It wasn't
anything outstanding.

Q.    What was your performance appraisal?

A.    Achieve.

Q.    Is it achieve or non-achieve?

A.    It is achieve or non-achieve.

Q.    There are two levels?

A.    Yes, achieve and non-achieve.

Q.    So, how were you harmed?

A.    Well, you are harmed because, if you

000155

1   achieved, you are just doing your work.  If you

2   are doing above that, then someone has to say

3   -- or you have to show where you have done an

4   outstanding job on something.

5        Q.    You still get achieve, don't you?

6        A.    You get an achieve but you get an

7   award, a monetary award.  In this case you

8   don't get the monetary award.  Then you are

9   asking yourself, why are you asking Joe

10  Federline input when my supervisors were there

11  all the time?  That's my question.  My question

12  is very specific.  My supervisors, Peter

13  Niebauer and Roger Hildebeidel, were available

14  for Robert Doyle to get input.

15       Q.    Your supervisors were Peter Niebauer?

16       A.    Yes.

17       Q.    And who else?

18       A.    Roger Hildebeidel.

19       Q.    How do you know that Joe had input on

20  your performance appraisal?

21       A.    I know that Joe Federline had input

22  because Robert Doyle said, "Joe Federline and

000156

1   others." I asked him, "If you didn't ask my

2   supervisors, how did you get input on my work?"

3   I was saying I did outstanding work and he was

4   saying he didn't have any knowledge of that.  I

5   questioned him and said, "You had a knowledge

6   because both of my supervisors were here for

7   you to ask." He said, "Well, I asked your

8   peers." I said, "Who is that?" He said, "Joe

9   Federline and others" was his response.  Then I

10  became irate.  How in the world -- you didn't

11  do this to anybody else?  Why me?

12      Q.   Okay.  But your major complaint here

13  is that you did not get an award?

14      A.   Right.  We are talking economics, yes.

15      Q.   Other people within your group got

16  awards?

17      A.   Got awards, yes.

18      Q.   Who is that, please?

19      A.   Including Joe Federline, Ron Donelson,

20  Peter Ertman.

21      Q.   Let me go to Number 8.  Would you look

22  at that one and tell me whether or not Number 8

1    looks like it might be correct?

2        A.    Yes.

3        Q.    Number 8 reads:  "In August 2000,

4    management officials falsified and fabricated

5    Mr. Hill's personnel documents."  Tell me what

6    your position is on that one and how was that

7    discriminatory?

8        A.    That is a tie-in with Number 7.  That

9    means you are not getting the correct

10   information on my performance -- on my

11   performance appraisal that goes into my

12   personnel file.

13       Q.    When you say something has been

14   falsified, you are saying someone has lied

15   about it.  What was the lie?

16       A.    The lie was that it is not telling the

17   truth.  The lie is that if you are doing an

18   achievement and someone is not telling someone

19   that you have done that, that's a lie.  That is

20   not telling the truth.  If you are going to say

21   everyone -- if you are going to say -- if you

22   are going to make a point that there are some

000158

1    folks there who have done outstanding work and,

2    yet, an individual who has done outstanding

3    work, you are not going to say he or she did

4    it, then you are not making a true statement.

5        Q.    It is your contention that Number 7

6    and Number 8, then, are really one and the

7    same?

8        A.    Yes, it is.

9        Q.    All right.  You have already answered

10   Number 7, which means that you already answered

11   Number 8 then?

12       A.    Yes.

13            MR. KING:  Off the record.  Let's take

14   a lunch break.  To be back on the record at

15   12:00.

16            (Whereupon, at, 11:09 a.m., the

17   deposition was adjourned for the luncheon

18   recess, to reconvene at 12:00 p.m., the same

19   day.)

20

21                              000159

22

```
 1          A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

 2                          Tuesday, May 1, 2001

 3                          12:02 p.m.

 4    Whereupon,

 5                   MILTON E. HILL

 6    resumed as the witness and, still under oath,

 7    was further examined and testified, as follows:

 8                   EXAMINATION (RESUMED)

 9          BY MR. KING:

10          Q.    Mr. Hill, it is my understanding that

11    you have some additional information that you

12    want to put on the record with regard to issue

13    Number 6.  Would you, at this time, set forth

14    what those points are?

15          A.    Yes, sir, Mr. King.  I forgot to

16    articulate the point about it was two

17    career-enhancing trainings that I was alluding

18    to.  One was the SES development training

19    follow-up on Number 11, but there was also the

20    Carnegie-Mellon executive development training,

21    which had been on IDP, Individual Development

22    Plan, for the past eight years, that I was not
```

000160

1    allowed to attend.  The only reason given was

2    the lack of funds, which I don't think was

3    true.  The other one was that nobody knew about

4    it, which that wasn't true either.  Those were

5    the two trainings.

6        Q.    Who signed your IDP for the last eight

7    years?

8        A.    That was Mr. Peter Niebauer.

9        Q.    For eight years he signed them?

10       A.    For four years.  I was only there for

11   four years.  Prior to that it was Patricia

12   Harvey.

13       Q.    Both of them told you that even though

14   it was on your IDP, the Agency didn't have any

15   money for you to go?

16       A.    Well, the April time frame, the

17   Carnegie-Mellon one, this is what

18   Mr. Federline said.

19       Q.    Federline was not your supervisor.

20       A.    He was acting.  During this period of

21   time, he was in the -- when Mr. Niebauer

22   left -- he retired in November or December of

1      '99.

2          Q.    So Niebauer is not here anymore?

3          A.    He is not here.  He left the Agency in

4      December of '99, I think.

5          Q.    Where can I find Niebauer now?

6          A.    He is still in the area.  His phone

7      number will be available from Mrs. Karen Ryan.

8      She is the personnel officer in the Eastern

9      states.  She handles the retirement area.  They

10     have points of contact for all the federal

11     employees.  He is still in the D.C. area.

12         Q.    Okay.  So, it is Peter Niebauer who

13     turned down your request to go to

14     Carnegie-Mellon

15         A.    Actually, it was Mr. Joe Federline who

16     turned it down.

17         Q.    Did Mr. Federline turn it down with a

18     memo or did he just tell you that you can't go?

19         A.    He turned it down with an e-mail, I

20     think, that said I couldn't go.

21         Q.    Do you have a copy of that e-mail?

22         A.    Let me see.

000162

1      Q.     If you cannot find it now, get

2      yourself a piece of paper and make a list of

3      these documents that I will be giving you as we

4      go forward.  I would like to have that e-mail

5      if you have a copy of it.  Give it to me when

6      you give me your rebuttal.  Okay?

7      A.     Okay, sir.

8      Q.     I'm going to move now to Number 9.

9      Would you look at Number 9 and tell me whether

10     or not it has been framed correctly?

11     A.     Yes, it is framed correctly.

12     Q.     Let me state it:  "In September 1999,

13     BLM officials refused to provide Mr. Hill

14     travel vouchers and funds in order to perform

15     his job and tasks."  Let me hear your position

16     with regard to this.  Tell me, why is that

17     discriminatory?

18     A.     What happened there, I was placed on

19     a detail unbeknownst to me.  This is the detail

20     I was previously alluding to in the Office of

21     the Secretary in the small business office.

22     I was assigned there after I came from

000363

1    the Industrial College of Armed Forces -- ICAF

2    is the acronym -- unbeknownst to me.  When I

3    got there I required office space and travel

4    and some other things.  When I requested that

5    from BLM officials, specifically Peter Niebauer

6    and Robert Doyle and then subsequently Warren

7    Johnson, it was never provided.  I sent them a

8    memo dated September 13 on that matter.

9        Q.    Who would you say was the principal

10   response management official that you were

11   complaining about here with regard to your

12   travel vouchers and funds?

13       A.    It would be Mr. Peter Niebauer and, I

14   guess, Mr. Robert Doyle.

15       Q.    Okay.  You feel, again, that that was

16   discriminatory because of your race, sex, and

17   prior EEO activity?

18       A.    Yes.  To put in blunt terms, I think

19   it was -- I felt, anyway, it was a continuance

20   of actions.  I think it was reprisal.  I think

21   it was because of my race and sex and also

22   because of my prior EEO activity.

1          Q.      Where did you ask them to -- you may

2      have told me this already.  Where did you ask

3      them to provide you travel monies?  Where were

4      you going?

5          A.      I was going to the U.S. Hispanic

6      Chamber of Commerce Conference.  They asked me

7      specifically to do a presentation, along with

8      the Office of the Secretary.

9          Q.      When was this?

10         A.      This was September 1999.

11         Q.      These gentlemen turned you down?

12         A.      Yes.

13         Q.      What other trip did you try to make

14     that was job related that they turned you down

15     on?

16         A.      We, meaning the Office of the

17     Secretary, were also going to the National

18     Black Chamber of Commerce Conference in South

19     Carolina and in the Midwest, and I didn't have

20     a travel authorization -- in order to travel, I

21     needed a travel authorization, which is called

22     a TA.  It was never provided.

000165

1       Q.      Now, you were working on detail in the

2   Secretary's Office, right?

3       A.      Yes, sir.

4       Q.      But you were asking, though, the BLM

5   people to pay for your travel?

6       A.      Yes, sir.

7       Q.      Is that normal?

8       A.      That is normal.  On a detail, the

9   person's salary and/or travel expenses are paid

10  by the agency he or she is coming from or

11  detailed from.

12      Q.      Niebauer was not actually supervising

13  you on a day-to-day basis.  That was being done

14  by whoever was involved as the supervisor at

15  the Secretary's Office, right?

16      A.      Correct.

17      Q.      What is the process?  Your supervisor

18  in the Secretary's Office writes a memo to

19  Niebauer, asking for the money and

20  justification?

21      A.      No, a travel authorization is prepared

22  by the Agency; in this case, the Bureau.  Then,

1    whether you are traveling with Secretary of

2    State or -- Department of State or whether you

3    are traveling with the Department of Defense,

4    whatever your detail is, that's what the travel

5    authorization covers.

6        Q.    From what I'm hearing, that is a

7    blanket travel authorization.

8        A.    That's exactly right.

9        Q.    Did you get a blanket travel

10   authorization when you went over there?

11       A.    Yes, I did.

12       Q.    If you had a blanket one, then why

13   couldn't you use it?

14       A.    No.  Oh, I'm sorry.  I misunderstood

15   you.  When you said "over there," I thought --

16       Q.    Over to the detail in the Office of

17   the Secretary.

18       A.    No, I didn't have one.  We were

19   requesting that they just give us a blanket

20   travel authorization, so we wouldn't have to be

21   going back all the time.

22       Q.    Is it normal to get a blanket one?

009167

1    A.    It is normal.

2    Q.    Do you know of people who are not of

3    your particular group who got a blanket one?

4    A.    Yes.

5    Q.    While they were on detail?

6    A.    Yes.

7    Q.    What are their names?

8    A.    Everyone on detail from Washington

9    Office 800 had a blanket -- everyone from

10   Washington Office 850 who were on a detail got

11   a blanket travel authorization.  It was normal

12   procedure to do this.

13   Q.    Everyone got a blanket but you?

14   A.    But me.

15   Q.    Okay.  Were you allowed to travel at

16   all -- now, that was a two-month detail.  Am I

17   right?

18   A.    Yes, it was a two-month detail.

19   Q.    So, what --

20   A.    What happened?

21   Q.    Right.

22   A.    What happened was we went to -- I

1          should say Mr. Robert Faithful, who is the

2          director, went to Robert Doyle, I think, and

3          subsequently I received the blanket travel

4          authorization.

5               Q.    So you got it?

6               A.    So, I got it.

7               Q.    But it was after the Black Chamber of

8     Commerce meeting?

9               A.    Right.  That's exactly right.

10              Q.    Did you travel at all on it?

11              A.    I traveled just to the Hispanic

12    Chamber of Commerce Conference.

13              Q.    You were denied one trip, really?

14              A.    Yes.

15              Q.    What basis did they give you for your

16    denial?

17              A.    They did not give me one.

18              Q.    By "they," you mean Doyle and

19    Niebauer?

20              A.    Yes.

21              Q.    Did they do it in writing?

22              A.    No, sir.  I called them and I sent

1    them a September 13 e-mail that they never

2    responded to.

3        Q.    Let me take you to Number 10.  Please

4    examine that one and tell me whether or not

5    that comports with the issue as you understand

6    it to be.

7        A.    (Witness reading.)  Yes, sir, it does.

8        Q.    Number 10 states:  "In January 1999,

9    BLM managers attempted to degrade and

10   dehumanize Mr. Hill and deliberately made false

11   statements against him."  Give me your position

12   in this regard.

13       A.    On this regard is where, through a

14   Freedom of Information Act request, I received

15   copies of testimony from Mr. Peter Niebauer,

16   where he gave to U.S. investigators where I was

17   applying for top secret clearance to attend

18   Industrial College, which I received.  However

19   what was disturbing about the testimony were

20   the false statements made about my prior EEO

21   grievances and complaints; false statements

22   that I filed a complaint on Ms. Baca, B-A-C-A,

00170

1      and other information.  For example, he quotes

2      "He always feels that he is being discriminated

3      against" and some other derogatory statements,

4      which I would include for the record since I

5      won't read all of them.

6          This is just only one occasion, where

7      on prior occasions, I felt it was a continuous

8      habit of management officials, dating back to

9      the prior Case 97036, where statements were

10     made by Ms. Carolyn Burrell and Twinkle

11     Thompson, which I felt were false and --

12     Q.    What kind of Thompson?

13     A.    Her name is Phyllis, P-H-Y-L-L-I-S.

14     They call her Twinkle.  She was making the

15     statement that she didn't have any input in my

16     being assigned or not assigned to certain jobs.

17     Then, subsequently, we find that she did have

18     that kind of input.  They were saying negative

19     things about persons -- about me, particularly,

20     about filing EEO grievances and discriminatory

21     practices and claiming that discriminatory

22     practices were done against me.

000171

1    Q.    Besides Peter Niebauer, who else was a

2    manager there that tried to degrade you?  This

3    woman?

4    A.    This woman.

5    Q.    Twinkle Thompson?

6    A.    Twinkle Thompson.  I think that's a

7    good question that you have, because Tom Fry,

8    who was the director, asked me the same thing:

9    Who were these discriminating officials who I

10   felt were discriminating against African

11   Americans and me in particular.  I gave him,

12   which I will provide you also, a list of those

13   persons, and I can get into the individual

14   complaints -- individual items on them if you

15   wish.

16   Q.    Okay.  Let me move on to Number 11.

17   Would you examine that one for me and tell me

18   if Number 11 comports with your understanding

19   and what the issue should be.

20   A.    (Witness reading.)  Yes, sir, it does.

21   Q.    Number 11 reads:  "In August 2000,

22   management officials allowed other management

1    officials, not in Mr. Hill's chain of command,

2    to negatively impact his career."  Let me hear

3    your point on that.

4        A.    That one is similar -- that should be

5    combined with Number 10, and also with persons

6    having input to -- which we talked previously

7    about -- my performance appraisal.  That's what

8    I was alluding to there.

9        Q.    That should be combined with Number 10

10   and also Number 7?

11       A.    Yes, sir.

12       Q.    Am I right?

13       A.    Yes, sir.

14       Q.    You don't have any additional

15   information to add except that you are talking

16   about Mr. Federline?  He is the only one that

17   you are talking about, right?

18       A.    I'm talking about Mr. Federline and

19   Twinkle Thompson.

20       Q.    Well, Twinkle wasn't talked about in

21   Number 7.

22       A.    Right.        000173

1      Q.     Twinkle was involved in the

2    dehumanizing and degrading comments?

3      A.     Yes.

4      Q.     You are saying that Twinkle also had a

5    role to play with regard to input on your

6    performance appraisal?

7      A.     Yes, and she is not in my chain of

8    command.

9      Q.     What is it you think Twinkle Thompson

10   did, again?

11     A.     To be specific about one is that she

12   was allowed input on whether I should or should

13   not be attending any type of senior level

14   training.  She was also involved with me not

15   going or not being selected for the BLM

16   Congressional Fellows Program.  Again, she is

17   not in my chain of command.

18     Q.     You said she is not in your chain of

19   command?

20     A.     She has never been in my chain of

21   command.

22     Q.     What is her position?

1        A.      She is special assistant to Nina

2     Hatfield, the deputy director.

3        Q.      So, she advises Nina Hatfield?

4        A.      Yes.

5        Q.      And Nina Hatfield is in your chain of

6     command?

7        A.      Yes.

8        Q.      At the top?

9        A.      Yes, she's at the top.

10       Q.      So you are saying that staff people

11    who work for people who are in your chain of

12    command should not be viewed as being in your

13    chain of command?

14       A.      No.  I'm saying, specifically, that

15    staff people who are special assistants, as

16    Twinkle Thompson is, should not be involved in

17    personnel HRM matters that are not in their

18    chain of command.  The AD for human resource

19    management is the one who should be deciding

20    that; not a special assistant.

21           The reason I'm alluding to that is

22    because it seems to me this is one of those

1    areas where the glass ceiling -- and, in my

2    case, it is a steel ceiling -- becomes real.

3    That's because you have folks who are in the

4    "inner circle" who are making decisions about

5    other people which doesn't show up on the

6    organizational chart.  In reality, as the

7    operation runs, these are the people who are

8    keeping people like myself, an African American

9    man, out of certain positions just out of a

10   like or dislike for them.

11       Q.    Let me take this to another step here.

12   Mr. Hill, I'm hearing you say that it is your

13   view of management that a management official

14   should not discuss personnel matters with his

15   staff people who are his special assistants;

16   that what he should do is discuss personnel

17   matters with the personnel officers.

18       A.    No.  What I'm saying specifically is

19   that special assistants should not be imposing

20   their discriminatory and racist views to upper

21   management that negatively impact employees.

22   That's specifically what I'm saying.  I don't

000176

1    have any problem with them making a decision

2    based on good personnel management -- good

3    personnel and management policies.  What I'm

4    saying, they are making policies and giving

5    advice based on racist and sexist views.

6    That's specifically what I'm saying.

7        Q.    Okay.  You have some conclusions

8    there, racist and sexist views.  What support

9    do you have for that?

10       A.    I have the support of just the

11   statistics of the Bureau of Land Management.

12   Their overall statistics over the past 10 to 15

13   years show the same thing.  Even one of their

14   top managers, Denise Meridith, had an article

15   in one of the government magazines that alluded

16   to the same thing; that there is widespread

17   underrepresentation of upper management in

18   minorities, and it is based not on that you

19   can't find minorities, but because of racial

20   policies.

21       Q.    Okay.  Let me take you to Number 12.

22   Would you examine that to see whether or not

Word-for-Word Reporters & Transcribers
(301)431-3900   (202)775-1842

1    that comports with your understanding of what

2    that issue ought to be?

3        A.    (Witness reading.)  Yes, sir, it is.

4    That one also --

5        Q.    That is correct, right?

6        A.    Yes, sir.  Excuse me.

7        Q.    Let me read it.  "In December 1999 and

8    July 2000, management officials deliberately

9    and consistently assigned Mr. Hill to

10   non-career-enhancing details and jobs, without

11   his approval and without consulting him."  You

12   are going to tell me that this should be

13   combined with something else?

14       A.    Yes, sir.  I'm sorry.  That's what I

15   was alluding to.  That should be combined with

16   Number 7.  I think we went over Number 7 and

17   Number 10, where we -- what, specifically, I

18   was talking about, when I came back from the

19   ICAF training, without any input from me,

20   without my knowledge, I was unceremoniously

21   detailed to the Office of the Secretary, which

22   allowed -- then my peers were allowed to act in

Word-for-Word Reporters & Transcribers
(301)431-3900   (202)775-1842

1      group manager jobs and I was not.

2          Q.    You say that Number 12 should be

3      combined with which one?

4          A.    I think, sir, it is Number 7, Number

5      10 -- just a minute.  Let me make sure that my

6      numbers are correct.

7              MR. KING:  Okay.  We will go off the

8      record right now.

9              (Off the record.)

10             MR. KING:  Back on the record.

11             THE WITNESS:  Yes, sir, I think Number

12     12 is part of Number 7 and Number 10, and,

13     also, combined with Number 13, which we haven't

14     gotten to yet.

15             BY MR. KING:

16         Q.    Okay.  So you don't have to add

17     anything else because we have done 7 and 10.

18     Do you want to add anything else to Number 12?

19         A.    The addition is the rewriting of a

20     position -- it is the -- just a minute.

21             MR. KING:  Off the record.

22             (Off the record.)   000179

1          THE WITNESS:  The only other addition

2     is the re-write of a position that I was in.

3     I was the -- I had contested the rewriting of

4     a business and economic development program

5     position -- which was, in my mind, a

6     downgrade -- in an attempt to narrow the focus

7     of the management analyst job that I was

8     originally reassigned to.  That was done by Mr.

9     Federline and Mr. Doyle and Mr. Walker.  They

10    sent me an e-mail --

11          BY MR. KING:

12        Q.    What is Mr. Walker's first name?

13        A.    That is Tom Walker.  He is the deputy

14    assistant director.  What that did,

15    effectively, was reassigned the job that I had,

16    which I felt was more career enhancing, and

17    they narrowed the scope to a less of a focus of

18    a job.

19        Q.    Now, let me ask you some questions

20    about Number 12.

21        A.    Okay, sir.         000150

22        Q.    You say that management consistently

1    assigned you to non-career-enhancing details

2    and jobs.  What were those jobs again?

3        A.    As an example, you are in a position

4    in what you want to do as you move up the

5    career chain.  You want jobs that are highly

6    visible, jobs that are career enhancing -- and

7    "career enhancing" means that it allows you to

8    do public policy.  You are in public policy and

9    you are moving away from more the technical

10   things.

11       Q.    Tell me the jobs that they assigned

12   you to.

13       A.    The jobs that they would assign me to

14   was the business and economic development

15   program job only.  That is a very narrow --

16       Q.    That's the one where you worked for

17   only two months?

18       A.    No.  That's the one where they were

19   rewriting the job.  The job I was in was a

20   management and program analyst job.  Then

21   Mr. Federline and Mr. Walker and Mr. Doyle, in

22   my view, conspired to rewrite the job that I

1    was in, took me out of the 343 and 345 series,

2    and narrowed the focus of the job through a

3    re-write.  They took duties that I had in my

4    job, which included the ability to be more

5    expansive in your job, meaning that you are

6    doing policy, you are working with the

7    department, you are working with other areas;

8    where they rewrote the job and where it

9    narrowed the focus.

10        Q.    That's one detail, right?

11        A.    No, that's not a detail.  That's a job

12   I was in that they redid.

13        Q.    I want you to talk to me about the

14   non-career-enhancing detail.

15        A.    The detail, specifically?

16        Q.    Detail 1, detail 2.

17        A.    Okay.  Detail 1 was the acting

18   Associate State director job in California,

19   which was open.

20        Q.    So you were detailed into that job?

21        A.    No, I applied to this --

22        Q.    No.  No.  You've got to look at Number

                        000152

1    12 now.  Number 12 is saying that you were

2    consistently assigned to non-career-enhancing

3    jobs without your approval and without

4    consulting you.  I need to know, what were

5    those non-career-enhancing job details?

6        A.    Now, I get you.  I'm sorry.  The one

7    job was to the Office of the Secretary.  There

8    was never --

9        Q.    That's the one for two months?

10       A.    Yes.  There was never any paperwork.

11       Q.    They didn't ask you about it?  They

12   just assigned you?

13       A.    Yes.  No, paperwork or nothing.

14       Q.    Then you got reassigned, in two

15   months, back out of that one, right?

16       A.    Back out of that one.

17       Q.    Now, give me another one.  Or was that

18   the only one?

19       A.    No, I have that.  Number 12 should

20   actually read, not so much as -- it's a

21   misnomer.  It is not "consistently assigned"

22   but consistently not assigned to

000153

1    career-enhancing details and jobs.

2         Q.    What does that mean?  Are you saying

3    they did not put you in career-enhancing jobs?

4         A.    That's right.  That means what you

5    have to do to move up the ladder is to get

6    details where you are working in visible public

7    policy.

8         Q.    I understand all that.

9         A.    Those are specifically -- for example,

10   the National Performance Review as an analyst

11   for NPR, the other is the office of the --

12        Q.    Mr. Hill, let's go back to Number 12

13   again.

14        A.    Okay.

15        Q.    Other than the Office of the Secretary

16   for that two months, what other assignment did

17   they send you to without your approval that was

18   non-career-enhancing?

19        A.    The other one was -- I don't have the

20   exact name of it.  I couldn't find it.

21        Q.    Okay.  You cannot find the other one.

22   So, essentially, all we are talking about, at

1    this moment, is one.

2        A.    One.

3        Q.    And they assigned it to you for two

4    months.  Now, when I talk to you on your

5    rebuttal I'm going to ask you to give me the

6    names of the other non-career-enhancing details

7    that they assigned you to without your

8    approval.  All right?

9        A.    Okay, sir.

10       Q.    I'm going to Number 13.  Would you

11   examine Number 13 to see whether or not that

12   particular issue, as stated, comports with what

13   you think ought to be said there?

14       A.    (Witness reading.)  Yes, that's

15   correct.

16       Q.    I will read it.  "In December 1999,

17   management officials deliberately attempted to

18   steer Mr. Hill away from career-enhancing

19   assignments and into less visible and

20   non-essential jobs."  What's the difference

21   between that, Mr. Hill, and Number 12?

22       A.    They are the same.  They should be

000185

1    combined. Actually what that is, where I had

2    alluded to previously, where when I came back

3    from the ICAF, again, I was reassigned, without

4    any paperwork, without my knowledge or

5    approval, to the Office of the Secretary. But,

6    simultaneously, Mr. Federline and Mr. Donelson

7    was then detailed as acting group managers in

8    the job and I was not.

9        Q.    All of you were 14's?

10       A.    Yes, sir.  I felt this was done

11   deliberately, and subsequently resulted in a

12   pre-selection of a job.

13       Q.    Who got pre-selected?

14       A.    Mr. Federline.

15       Q.    So he went from being a coworker to

16   being your boss?

17       A.    Exactly right.

18       Q.    Let's go to Number 14.  Would you read

19   that one, please, and tell me --

20       A.    "In January 1999, management officials

21   falsified Mr. Hill's work accomplishments."

22       Q.    Is that correct?

000186

1    A.    That should be changed.  What I'm

2    alluding to here is the non-awarding of --

3    non-granting of an award and persons not --

4    particularly Mr. Doyle and Mr. Niebauer -- not

5    providing truthful information on my work

6    accomplishment, therefore, resulting in me not

7    being compensated for outstanding work.

8    Q.    Let me just look at this Number 14.

9    You are saying it should be combined with

10   Number 8.  There are two different dates there.

11   It's August of 2000 and January of 1999.

12   A.    What happened is that we got -- it is

13   not sequential order but in the order as I

14   wrote them down.  So, that's why there are

15   different dates there.

16   Q.    But in trying to answer Number 14, you

17   are saying, in January of 1999, they did the

18   same thing as they later did in August of 2000,

19   in falsifying something?

20   A.    Yes.  I'm saying that that has been --

21   I guess what would have been a better phrase of

22   that, instead of documenting each case, as I

000157

1    was attempting to do, is to say there has been

2    a recurring pattern.  There is a consistent

3    pattern on a yearly and almost quarterly basis.

4    I feel it's retaliatory methods based on my

5    involvement -- previous involvement, as well as

6    my involvement with the EEO process and because

7    of my race and sex.  That's how it should be

8    phrased.  It is not phrased correctly.

9        Q.    What specifically did they do in '99

10   to falsify your work accomplishments?

11       A.    It was the same pattern.  I received

12   no -- '99 was when I originally was supposed to

13   get the '98 appraisal.  It never came until the

14   fall of 1999.  Then, the following year, the

15   same thing happened again.  It has been a

16   consistent pattern over a period of time; in

17   this case, four to five years.

18       Q.    Who was the responsible management

19   official in Number 14?

20       A.    In Number 14 the responsible

21   management officials were Mr. Peter Niebauer

22   and Mr. Robert Doyle.

000155

1      Q.    Okay.  Let's go to Number 15.  Would

2    you read that and tell me if that comports.

3      A.    Yes.  That states:  "In November 1999,

4    management officials refused to submit

5    Mr. Hill's application for the Assistant

6    Director Eastern States Office Position."

7      Q.    When you say "they refused to submit

8    it," you normally would do that, wouldn't you?

9      A.    Yes, sir.  I normally would have done

10    that.  What transpired here was I had a meeting

11    with the director, Tom Fry, and Mr. Warren

12    Johnson, AD, during that period of time, where

13    we talked about my concerns on what my

14    perception of the practices or lack thereof of

15    getting minorities in certain leadership

16    positions in the Bureau of Land Management.

17      Mr. Tom Fry, who was the director at

18    the time, was asking me what positions would I

19    be interested in.  I informed him that one of

20    the positions was the Assistant Director

21    Eastern States Office, which is in Springfield,

22    Virginia.  He wanted my application.  He said

000159

1    that when a position came open he would make

2    sure it would be submitted and I would have an

3    opportunity to compete.

4        Q.    You are saying that that never

5    happened?

6        A.    I'm saying that never happened.

7        Q.    Who filled the position?

8        A.    I think it was a lateral transfer by

9    Mr. Mike Nedd, N-E-D-D.

10       Q.    Mr. Mike Nedd is an African American

11    male, isn't he?

12       A.    Yes, sir, he is.  He is a friend of

13    mine.

14       Q.    Okay.  So the responsible management

15    official, then, for Number 15 would be who?

16       A.    It would be the director, Tom Fry, who

17    is now out of the BLM.  He was a political

18    appointee.

19       Q.    Let's do Number 16.  Read it for me.

20       A.    "Since August 1998, management

21    officials refused to provide Mr. Hill's

22    performance appraisal and comparable awards."

000190

1    Q.    What's the difference between that and

2  the previous ones we have looked at already?

3    A.    They are the same.

4    Q.    That would be the same as Number 7.  I

5  guess it would have to be 7, I guess.

6    A.    Yes, 7.

7    Q.    Let me just see if we have some more

8  stuff here.

9    A.    That's what I was looking at, sir.  I

10  think I can --

11    Q.    Have you had a performance appraisal

12  as of that time, August 1998?

13    A.    Yes, sir, I have gotten one.

14    Q.    Have you received any awards at all?

15    A.    No, sir, I have not.  That's the same

16  as Number 7.  Also, that -- really, management

17  has done a performance appraisal but the

18  contention now would be the comparable award.

19    Q.    Okay.  The performance appraisal was

20  achieved?                    000191

21    A.    Yes, sir.

22    Q.    Now, if you want to say anything else

1    to support your allegations here, 1 through 16,

2    it is time to say it now, and then I will get

3    into some other matters.

4        A.    No, I don't have anything else.

5        Q.    Tell me something, what relief are you

6    seeking Mr. Hill?

7        A.    The relief I am requesting is, for

8    fiscal years 1992 to 2000, a monetary award of

9    a minimum of $7500 per year be awarded for

10   exceptional work accomplished and never

11   compensated for.

12       Q.    Anything else?

13       A.    No, sir.

14       MR. KING:  Well, let me thank you for

15   your time.  We are going to end the interview,

16   recognizing that I'm going to take another

17   statement from you, in a matter of a few days,

18   after I have talked to some other management

19   officials.

20       THE WITNESS:  Okay, sir.

21       MR. KING:  Where can we mail this

22   transcript to you, Mr. Hill?   000192

1          THE WITNESS:  4110 Belt Road, B-E-L-T,

2     Capitol Heights, Maryland, 20743.

3          MR. KING:  When you get it, I want you

4     to review it, sign it, and then send it back to

5     me, Fed Ex it overnight, at government expense,

6     to:  Lonnie King, 9537 Kilimanjaro Road,

7     Columbia, Maryland 21045.  If you want to ask

8     me any questions about any part of this, you

9     can call me at (301) 596-3301.

10          Let me thank you very much.

11          (Whereupon, the interview was

12     concluded at 1:10 p.m.)

13

14

15

16

17

18

19

20                    000193

21

22

1      UNITED STATES DEPARTMENT OF THE INTERIOR

2          BUREAU OF LAND MANAGEMENT

3          WASHINGTON, D.C.   20240

4        COMPLAINT OF DISCRIMINATION

5    ------------------------------------------x

6    Filed by:    MILTON E. HILL

7    Filed against:  Bureau of Land Management

8    Office:

9    Case No.:    LLM-00-042

10   ------------------------------------------x

11        ACKNOWLEDGMENT OF CLAIMANT

12     I, MILTON E. HILL, do hereby acknowledge
that I have read and examined pages 1 through
13   92, inclusive, of the transcript of my
deposition taken on Tuesday, May 2, 2001, and
14   that:
(Check appropriate box)

15

16     [ ]  the same is a true, correct, and
complete transcription of the answers
given by me to the questions therein
17   recorded.

18     [ ]  except for the changes noted in the
attached Errata Sheet, the same is a
19   true, correct, and complete
transcription of the answers given by
20   me to the questions therein recorded.

21   16 June 01

22   Date           Signature

000194

## ERRATA SHEET

INTERVIEW OF:        Milton E. Hill

TAKEN ON:            Tuesday, May 1, 2001

IN THE MATTER OF:    Complaint of Milton E. Hill

| PAGE | LINE | AS APPEARS IN TRANSCRIPT | CHANGE TO |
|------|------|--------------------------|-----------|
| 27 | 13 | | ( Exhibit 27 ) |
| 33 | 2 | | Start |
| 39 | 13 | | 1 N . I am a |
| 26 | 18 | | (Exhibits 23, 24, 26) |
| 26 | 21 | | (Exhibit 13 ) |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Distribution:        Lonnie King/pl

000195

1      CERTIFICATE OF REPORTER

2          I, Prudence P. Lindsey, do hereby certify

3      that the foregoing proceedings were taken by me

4      in stenotype and thereafter reduced to

5      typewriting under my supervision; that I am

6      neither counsel for, related to, nor employed

7      by any of the parties to the action in which

8      these proceedings were taken; and further, that

9      I am not a relative or employee of any attorney

10     or counsel employed by the parties hereto, nor

11     financially or otherwise interested in the

12     outcome of the action.

13

14

15

16     _____

17             PRUDENCE P. LINDSEY

18             Notary Public

19

20

21             000196

22

# PRIVACY ACT NOTICE TO COMPLAINANT
# FOR DISCRIMINATION COMPLAINTINVESTIGATION INTERVIEW

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, sections 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, sections 1303-1304; Title 42, United States Code, section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data you supplied previously and information developed by investigation to resolve your equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve your equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, to the intelligence agencies of the Federal Government, or to others for uses published in the Federal Register.

### EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary. However, failure to furnish the information will result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____          _____
Signature of Interviewer           Signature of Complainant

                                   _____
                                   Date

                                   _____
                                   Place

000197

REBUTTALS

000498

Roger Hildebeidel

p 5   line 11, 12.   This a total lie. Since
my return from DCAF on Sep 98, mr.
Hildebendel have seen each other
two or three times a month both at
"L" Street and main Interior building

p 7   lines 1-21.   Total lie   During
my 38 years as a military officer,
my 7 years as a civil servant, and
my 35 years as an entrepreneur,
I have never changed into anyone's
office, whether they were my
subordinates or superiors. I had
applied for the DCAF position
a year before my application
sat in the AD, BFIR office for ony
four months. I returned from travel.
and talked with Beverly Davis, the
ADBFR secretary about my application.
She said it was on Roger Hildebendel's.
desk and he was not signing it
and to come pick it up. When I
picked the application up, mr Hildebendel
gave me a letter and said I could
always appeal it, if I wished. What I did

exhibit

LLM-00-042
Joseph    Federline

1) Mr Federline selected as the acting group manager by Robert Doyle for over 8 years. I was never given the opportunity. This was done to ~~enhance~~ o chance his "preselection" for the group manager Property and Acquisition Group position

2) p 6-7. The training turned down by Mr. Federline had been in my FDP for over seven years. It was training to assist my growth as a Junior executive.

3) p 8. I never complained about an up to date position. I complained that my PD was submitted over three years ago and it was never returned to me by the personnel office My other complaint was whenever I worked with Mr. Federline, he always attempted to give me low level clerical work and taskings he did not want I felt it was an attempt to degrade and dehumanize me.

Joseph    Federline

The August 2000 meeting was basically a "set up". A personnel General (Dawn Phillips), the EO Officer (Gloria Ennis) and myself and Joe Federline met. They had basically re-written my PD (position description) to a do nothing, dead end, high level clerical job with no meaningful purpose. Gloria Ennis stated management had asked her to attend. I stated to them all that I was not being treated fairly by management, I was being targeted, suppressed, degraded, dehumanized and discriminated against. I had just returned from executive level training (ICSF) and management (including Federline) was trying keep me from moving forward executive level positions, utilizing my skills and demeaning me. I told them that I was not in agreement with the rewriting of my PD and the deliberate misuse of my skills. Mr Federline and Ms Phillips stated that I should address that to upper management and they were just "following orders". Ms Ennis stated "evidently management doesn't want you if they have not selected you for jobs."

(3)

<u>Joye Federline</u>

I also disagreed with the entire write up done by Federline on the PD, particularly my reporting to the Procurement Chief. I said the position should report to the AD, BFSR, or directly to the BLM Deputy Director. As a Senior Business manager for the BLM, that's ~~the level~~ I should have been. I also said ~~as written~~ in reality the job should be abolished and the duties incorporated with the Procurement Chiefs. Mr Federline the stated that I was asking for a reassignment similar to Peter Ertman, an analyst in WO-850 whom management has helped to be put on a detail outside of WO.850 several weeks ago.

p10 line 14-20. Mr Federling, with the approval of Robert Doyle and Tom Walker rewrote my PD whereupon the job and tasking became deadeng clerical, low priority

000202

Joseph Federline

P13, I communicated with Mr Federline on a daily and weekly basis, periodically given him updates on my work. P13 line 16 is not true.

P13 line 19- not true. Mr Federline and I disagreed on his attempts to always give me assignments that were clerical in nature, demeaning, and generally GS 7 level and below. When Peter Niebauer was the group manager, I complained to him about this treatment. He stated, "you know how Joe is. Just do what you can and work around him." And that is what I have done

000293

Joseph Federline

p 14. - This is retaliation not documentation
(lines 5-9) As a management analyst
and Business Manager 95% to 97%
of my job is away from working on
the Bldg. That's the nature of extreme,
analyses, etc I seldom have any
need to interact, on a daily basis, with
persons in the immediate office on the field
we all work pretty much independently
The job was set up as a
misassignment artificially and
deliberately

000204

WARREN Johnson

① p 4 lines 10-22: Warren Johnson, along
with Nina Hatfield, is the official(s) responsible
for personnel actions or nonactions
in the BLM. He plays a direct and
indirect role in these matters.

② p6 lines 1-6. I was not interviewed
for the position. I had previously met
with Mr. Johnson while attending
ICDP. I gave him copies of my resume,
we talked about my career goals and
opportunities available in the BLM, and the
hiring "climate" of the BLM. He told me
job openings would be coming up in the
HRM office - that I should apply and
"he was looking for strong managers
with good decision making abilities

③ p6 lines 18-22, p7. These statements
are absurd. Ms Stewart's work has basically
been as a technician. Also, the original
vacancy announcement stressed more management
skills desired. When Mr Johnson found
out I had applied, he recalled the
announcement, rewrote it to get the

Warren Johnson

skills g Ms Stewart, and re-advertised the position. Invariably, preselecting Ms Stewart for the position. Basically, Mr. Johnson hired a 6515 technician. The statements g "Recency", 3c—35 years experience are all buzzwords. It should be noted that I applied for the AD WRM position in 1988 when Mr. Johnson was selected. I never made the Cert. I also applied for the Dept g the Interior SES Personnel Officer position — the selectee was Carolyn Cohen. I made the cert. The BLM's personnel selection process is corrupt and biased.

④ pp10-13. Mr. Johnson does not know how the process works because there is no process

Twinkle Thompson

① Ms Thompson's entire testimony is untrue

② I was specifically told by Peter
Niebauer, Marilyn Johnson, Patricia Harvey,
and Carolyn Burrell all told me
Ms Thompson was directly responsible
for my selection for the BLM Congressional
Fellows Program, ICAF, selection as
field manager, and contacting ~~Congre~~
Senators from New Mexico and Arizona
to prevent them from bringing me on
their staff as part of the American
Political Association legislative program.
I was specifically shown a write up
by Twinkle Thompson to the Deputy
Director stressing the need to not
send me to ICAF. The write up
was shown to me by Carolyn Burrell
and ~~Twinkle Thompson~~ and Marilyn
Johnson

Nina Hatfield

① p5, lines 5-22. Nina Hatfield "preselected" Amy Leaders for the Las Cruces (NM) job. Ms Leaders was previously "detailed" to New Mexico, per the direction of Ms Hatfield. The number of positions Ms Leaders had "of great responsibility" were all pre-arranged and preapproved by Ms Hatfield

② p4, lines 11-22, there was no vacancy announcement because Ms Hatfield in collusion with the New Mexico State Director, pre-selected Ms Leaders for the job (and) deliberately lateral transferred Ms. Leaders into job without competition. Similar actions were done for Jan Gembly, Carolyn Burrell, Marilyn Johnson, Kerwyn Keith, etc.

③ p6. The "wide range of experience", Ms Hatfield says Ms Leaders has are the same I have. Plus, I have more,

000205

Nona Watfield

(4) p7 lines 9-22; Page 8 lines 1-8. Ms Watfield is not telling the truth. Ms Watfield has specifically asked me over the past 8 years what my career aspirations were and my background. This was done in Ft Mitchell, KY, in meetings with Patricia Harvey, in her capacity as the AD, BPM and as the Deputy Director. In addition, she has reviewed by application packets for the BLM Congressional Fellows Program, Request for Field assignments, National Defense University. She denied my participation in each of the programs. The program Ms Watfield is alluding to it was not training, I was returning from my two week training (US Army Reserve) in Ft Quachuca, AZ when I mentioned to her my interest in working in New Mexico

000209

Robert Doyle

p5 - Mr Doyle and I talked on several occasions during my last year at FCAF and upon my return to the BLM concerning job vacancies, and, my career concerns and aspirations ( exhibit
Mr. Doyle feigning subjective memory loss

p6  Mr Foerland and Ms Velesco were not better candidates than me. Mr Doyle never articulate what "stronger qualities" these two had over me

p7-19 ~ Mr Doyle never initiated any meetings with me, I initiated all the meetings. And, in each of the meetings he asked the EEU Officer, Gloria Ennis to sit in. I present my concerns to Mr Doyle exhibit BLM 00-043 Regardy EEU counseling ), none of the issues were addressed. Plus, my supervisor had ample time to do my appraisal for FY 97 and 98 because he did not retire until 1 Nov 2000

000250

Mr Doyle declares I was denied the SES B/O Training because he was new on the job and he did not know me. This is strictly B.S. He did not know Kenvyn Keith (white male) but selected him both for the Capitol Hill assignment and the SES B/O Training.

If Mr Doyle never saw any of my performance appraisals how was he able to give me one and sign it?

I never called Mr Doyle a racist. that's a blatant lie.

# Thomas Fry

(1)    Mr Fry's entire responses are false.

(2)    I met with Mr. Fry on two occasions and responded to him via written correspondence regarding my mistreatment, misassignments, and discriminatory practices taken against me by DOI/BLM managers. Assistant Secretary John Barry asked me to meet with Mr. Fry also, which I did. To no avail. Mr. Fry refused to do anything.

(3)    Warren Johnson, AD HRM sat in on two of the meetings I had with Mr. Fry. Mr. Fry instructed him to resolve my issues. He did nothing.

(4)    Mr. Fry refused to assist me in resolving my issues and instructed his secretary to not return my calls. Although Mr. Fry promised to have my resume forwarded and considered for the Associate State Director, ESO, position (Eastern States Office), it was not done.

000212

LLM-00-04a
Robert Donelson

After Peter Niebauer retired and when he was on a detail, Donelson and Federline were selected as Acting Group managers. I was never provided the opportunity to act. Again, my career objectives, including training, were given to Mr. Donelson and his predecessors. My receiving more training than anyone in the organization is not true. Plus, other persons in the organization (w.g. 50) never displayed an interest to my knowledge, of being senior executives. It should be noted that Mr Donelson was part of the conspiracy with Walter Johnson and Robert Doyle to try to "set me up" on a bogus cell phone scam involving the US Army Reserves.

page 5. - Mr. Donelson refused to sign and ~~Exhibit~~ forward my application for the SES A Training. No reason was given to me.

000243