UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MILTON HILL,<br><br>    Plaintiff,<br><br>    v.<br><br>DIRK KEMPTHORNE, Secretary,<br>U.S. Department of the Interior,<br><br>    Defendant. | Civil Action No.  06-1233 (JDB) |

## MEMORANDUM OPINION

Plaintiff Milton Hill, a former employee at the United States Department of the Interior ("the Department"), brings this action against defendant Dirk Kempthorne in his official capacity as the Secretary of the Department, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  Currently before the Court is the Department's motion for summary judgment.  Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court will grant in part and deny in part the Department's motion.

## BACKGROUND

Hill was employed at the Department of the Interior from 1990 until 2002.  See Am. Compl. ¶ 5. During his time at the Department, Hill took advantage of several detail and fellowship opportunities.  From October 1994 to February 1996, Hill worked on Capitol Hill in an American Political Science fellowship detail.  See Milton E. Hill Dep., Aug. 6, 2007 ("2007 Hill Dep."), at 22-25.  And from July 1998 to September 1999, Hill participated in a management training program at the Industrial College of Armed Forces.  Id. at 37-38.

In February 1999, a vacancy announcement was posted for a GS-15 human resources

position.  See Def.'s Doc. Response at 1-4.  The announcement described the position as a "Human Resources Specialist, Supervisory," and the closing date was listed as March 11, 1999. Id.  Both Hill and Concetta Stewart applied for the position, but neither was chosen at that time. Instead, the position was readvertised in April 1999 in a new vacancy announcement as a "Supervisory Personnel Management Specialist."  Id. at 5.  Both candidates applied again, and both names were referred to the selecting official as being among the best qualified applicants; Concetta Stewart was selected.  Id. at 42-43.

While Hill was still participating in the training program at the Industrial College of Armed Forces, the Department's 1998 performance evaluations became due.  On January 30, 1999, Hill sent a letter to his Department supervisor, Peter Niebauer, informing him that he had not received a 1998 performance evaluation or an accompanying award.  See Jan. 30, 1999 Letter from M. Hill to P. Niebauer.  Hill was subsequently evaluated and received an "achieved" rating in all critical areas, and on June 30, 1999, Hill signed and initialed the evaluation.  See 1998 Appraisal at 2-4.  The day before he signed the performance appraisal, Hill met with Robert Doyle, the Acting Assistant Director of Business and Fiscal Resources to discuss the results, and he met with Doyle again on August 5, 1999.  See Record of Investigation at 54-56.  At these meetings, Doyle told Hill that he had received input from Hill's peers to help him prepare the performance evaluation.  Hill was upset at this information and believed Doyle's actions were inappropriate.  He thereafter wrote a letter to Doyle on September 22, 1999, asking Doyle why he had sought the input of his colleagues, id., and Hill later contacted an Equal Employment Opportunity ("EEO") counselor on October 12, 1999, to complain about his performance appraisal.  See Record of Investigation at 33.

In September 1999, Hill returned to the Department of the Interior and was assigned to

the Office of Small Business, which was supervised by Robert Faithful.  See 2007 Hill Dep. at 38.  On September 13, 1999, Hill sent a memorandum to Niebauer requesting travel authorization for his "upcoming participation and presentations in several conferences," but Hill did not receive any travel funds in time to attend the Black Chamber of Commerce meeting two days later on September 15, 1999.  See Sept. 13, 1999 Letter from M. Hill to P. Niebauer; Milton E. Hill Dep., Mar. 19, 2002 ("2002 Hill Dep."), at 168-69.  He did, however, receive travel funds as requested for his attendance at the Hispanic Chamber of Commerce meeting that was held in the latter part of September or October 1999.  See 2002 Hill Dep. at 170.

At the end of September 1999, Niebauer retired from the Group Manager position of his division.  Until the position was formally filled, Joseph Federline and Robert Donelson alternated as Acting Group Manager, but Hill was not given this same opportunity.  See Decl. of Robert Doyle ("Doyle Decl.") ¶ u.  Two months later, in November 1999, Hill met with the Director of the Bureau of Land Management ("BLM"), Tom Fry, and BLM's Human Resources Director, Warren Johnson, to discuss his concerns about not being selected for various jobs.  See 2007 Hill Dep. at 97.  During this meeting Hill expressed his interest in the Assistant Director position of the Eastern States Office.  Hill contends that Fry thereafter offered to submit Hill's application for this position if it ever became vacant.  Id. at 100-01.  However, Hill admits that he had no confidence in Fry's offer of assistance and that he did not actually believe that Fry was going to submit his application as indicated.  Id. at 101-03.

Fry subsequently learned that Hill had sent a letter to Senator Paul Sarbanes on October 13, 1999, naming Fry "as a top-level management official" that had assaulted his career and his future at the Department.  See Oct. 13, 1999 Letter from M. Hill to Sen. P. Sarbanes.  Fry was upset that Hill failed to mention any such allegations or problems during their November

meeting. In response, therefore, he wrote a letter to Hill explaining that he had decided to recuse himself from any future matters affecting Hill's career. See Nov. 23, 1999 Letter from T. Fry to M. Hill. Fry therefore never submitted Hill's application for the Eastern States Office position, but Hill submitted his application himself in November 1999. See 2007 Hill Dep. at 109-10; 2002 Hill Dep. at 324, 330-31.

Around this same time, although he had been assigned to the Office of Small Business, Hill began working in the Office of Environmental Policy for Dr. Willie Taylor. After consulting with Johnson, Dr. Taylor submitted a formal proposal to Doyle for Hill to perform a six-month detail at the GS-14 level in the Office of Environmental Policy. See 2002 Hill Dep. at 194. It is unclear, however, whether this detail was ever officially approved by management. See Nov. 3, 1999 Letter from M. Hill to T. Fry. In December 1999, Hill was asked to resume work for the Bureau of Land Management, and in February 2000, he was told to return permanently to his duties at BLM. See 2002 Hill Dep. at 200-01.

During this time, Hill often complained that he did not have an updated position description. When Federline became Hill's supervisor in mid-2000, Doyle asked Federline "to ensure that everyone he supervised had a current position description and performance rating plan, including [Hill]." Doyle Decl. ¶ w. Therefore, on July 20, 2000, Federline signed a new position description for Hill as a Senior Business Management Specialist at the GS-14 level. See July 2000 Position Description at 1. Hill apparently objected to his new title, however, and argued that the switch from Senior Business Manager to Senior Business Management Specialist made his job more clerical and less of a managerial position.

On October 6, 2006, Hill filed an amended complaint with this Court alleging retaliation in violation of Title VII. Hill alleges that he engaged in protected activity on June 29, 1999,

-4-

August 5, 1999, and September 22, 1999, when he met with and then wrote a letter to Doyle complaining about his 1998 performance evaluation; when he met with Assistant Secretary John Berry in October 1999; when he wrote letters to Senator Sarbanes, Senator Warner, and Representative Wynn in October 1999 complaining about his treatment at the Department; and when he met with Tom Fry in November 1999.  See Pl.'s Supp. Interrog. Resp. at 11-12.  In his amended complaint, Hill alleges eight counts of retaliation based upon his 1998 performance evaluation (Count 1), his failure to receive travel funds to attend the September 15, 1999 convention (Count 2), the early termination of his detail to the Office of Environmental Policy (Count 3), his rewritten position description as a Senior Business Management Specialist (Count 4), his non-selection as acting supervisor (Count 5), the refusal of a training opportunity (Count 6),[1] the rewritten human resources position description (Count 7), and Fry's failure to submit his application to the Eastern States Office in November 1999 (Count 8).

The Department has now moved for summary judgment.  The Department contends that Hill did not timely contact an EEO counselor for some of his claims, that he cannot establish a causal connection between all of his claims and his protected activity, and that, in any event, he has failed to rebut the Department's legitimate, non-retaliatory justifications for the challenged events.

## STANDARD OF REVIEW

**I.     Summary Judgment**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[1] Pursuant to Hill's oral motion, Count 6, alleging race and sex discrimination, was dismissed on August 30, 2007.  See Aug. 30, 2007 Order, Docket No. 11.

matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## II.  The McDonnell Douglas Framework

The framework for establishing a prima facie case of retaliation was introduced for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence.  Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  In order to make out a prima facie case of retaliation, a plaintiff must demonstrate: "(1) that she engaged in statutorily protected activity; (2) that the employer took an

adverse personnel action; and (3) that a causal connection existed between the two." Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (quoting McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984)); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999). Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), an adverse employment action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination. See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's burden, however, is merely one of production. Burdine, 450 U.S. at 254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

Where assessment of the employer's legitimate, nondiscriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." See Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494(D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)). "Whether judgment as a matter of law is appropriate in any particular

case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. Dist. of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

In other words, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is retaliation vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.  Examination of that issue in this setting therefore requires consideration of all the relevant circumstances in evidence, including the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful retaliation), and any properly considered evidence supporting the employer's case.  Reeves, 530 U.S. at 147-48; see also Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1151 (D.C. Cir. 2004); Lathram, 336 F.3d at 1089; Waterhouse, 298 F.3d at 993; Aka, 156 F.3d at 1290.

## DISCUSSION

### I.     Failure to Exhaust Administrative Remedies: Count 1

A federal employee alleging retaliation in violation of Title VII must timely exhaust his or her administrative remedies.  See Harris v. Gonzales, 488 F.3d 442, 443 (D.C. Cir. 2007); Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); Thorne v. Cavazos, 744 F. Supp.

348, 350 (D.D.C. 1990). Failure to do so will ordinarily bar a judicial remedy. See Brown v. Marsh, 777 F.2d 8, 13 (D.C. Cir. 1985); see also Rattigan v. Gonzales, 503 F. Supp. 2d 56, 68 (D.D.C. 2007). The employee is first required to contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). Should the matter remain unresolved after informal counseling, the employee may file a formal discrimination complaint with the agency. See Bowie v. Ashcroft, 283 F. Supp. 2d 25, 33 (D.D.C. 2003).

Here, the parties agree that Hill contacted an EEO counselor on October 12, 1999, to complain about his 1998 performance appraisal. See Record of Investigation at 33. However, Hill signed his evaluation on June 30, 1999, fully aware of the rating, the lack of a monetary award, and the lack of any complimentary narrative in the appraisal. See 1998 Appraisal. Hill also admits that during his meetings with Doyle on June 29 and August 5, 1999, he learned that his co-workers had input into his evaluation. See Record of Investigation at 54-56. Because Hill was therefore aware of all of the allegedly retaliatory aspects of his performance evaluation by August 5, 1999, at the latest, the Department contends that Hill failed timely to contact an EEO counselor for Count 1. Instead of initiating contact within forty-five days as required by Title VII, Hill waited sixty-eight days to contact an EEO counselor. This violates the statutory scheme of Title VII, and hence Count 1 is time-barred.[2]

---

[2] In an attempt to overcome his failure timely to contact an EEO counselor, Hill makes a disingenuous attempt to reframe this allegation in his opposition. Contrary to the claim submitted to the EEO office and contrary to the explanation expressed in the amended complaint, Hill now argues that Count 1 revolves around Doyle's failure to amend the 1998 evaluation as requested in a memorandum sent on September 22, 1999. See Pl.'s Opp'n at 11. But Hill failed to present this claim to the EEO office and the September 22, 1999 memorandum makes no request for such an amendment; Hill therefore cannot demonstrate that he properly exhausted the claim in Count 1.

## II.    Insufficient Causal Connection: Counts 4 and 7

For Counts 4 and 7, Hill attempts to rely on temporal proximity between his protected activity and the alleged retaliatory actions to establish the requisite causal connection for his prima facie case of retaliation.  See Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006) (stating that a plaintiff may establish a causal connection by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity").  Title VII, of course, does not say that retaliation must be immediate for it to be actionable.  But the case law does establish that, if the only circumstantial evidence of causation is temporal proximity between the protected activity and the alleged retaliatory action, then those events must be very close in time for that evidence to be sufficient for a jury to infer a retaliatory motivation.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Indeed, judges of this court have held that the passage of just two months may create too wide a temporal chasm to give rise to an inference of a causal connection.  See Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003); see also Thompson v. Dist. of Columbia, 2008 WL 3974306, at *6 (D.D.C. Aug. 28, 2008) (rejecting lapse of nine months); Medina v. Dist. of Columbia, 517 F. Supp. 2d 272, 294 (D.D.C. 2007) (rejecting lapse of ten months); Willingham v. Gonzales, 391 F. Supp. 2d 52, 61-62 (D.D.C. 2005) (rejecting lapse of six months).

In Count 4, Hill alleges that Joseph Federline and Thomas Walker rewrote his position description as an act of retaliation for the protected activity he engaged in from June 1999 through November 1999.  See Pl.'s Supp. Interrog. Resp. at 5-6, 11-12.  In the rewritten position description, Hill's title changed from Senior Business Manager to Senior Business Management Specialist at the GS-14 level.  According to the record before this Court, Federline finalized and signed the new position description for Hill on July 20, 2000.  See July 2000 Position

Description.  Because this was eight months after the last of Hill's protected activities, Hill cannot establish a causal connection for this claim based upon temporal proximity.

Hill's attempt to establish a causal connection for Count 7 fares no better.  In Count 7, Hill alleges that he applied for a human resources position at the GS-15 level in February or March 1999.  According to Hill, when Warren Johnson learned that Hill had applied for the position, he rewrote the job description to fit another candidate's qualifications.  See Am. Compl. ¶ 13.  The position was then readvertised from April 1999 through May 1999 with a title change from "Human Resources Specialist, Supervisory" to "Supervisory Personnel Specialist," but the major duties and the "knowledges, skills, and abilities" remained the same.  See Def.'s Doc. Response at 2, 6-7.  Once again, Hill argues that the position description was rewritten in reprisal for the protected activity he engaged in from June 1999 through November 1999.  It is readily apparent, however, that the rewriting of this position in April 1999 cannot in any sense constitute reprisal for the protected activity Hill engaged in two months later.  See Prince v. Rice, 2008 WL 3486132, at *8 (D.D.C. Aug. 14, 2008).  Hill has therefore failed to establish a causal connection for this claim.

Hill also attempts to argue that his non-selection for the human resources position was an act of retaliation.  There is no need to engage in a lengthy discussion regarding whether Hill has satisfied his prima facie case burden on this point because the Department has proffered a legitimate, nondiscriminatory explanation for selecting Concetta Stewart.  When a defendant proffers a legitimate, nondiscriminatory explanation, the D.C. Circuit has indicated that district courts should dispense with the typical McDonnell Douglas burden-shifting framework and proceed directly to the final inquiry: whether the plaintiff has produced sufficient evidence to permit a reasonable jury to conclude that the alleged adverse employment action was the result of

unlawful retaliation. See Adeyemi, 525 F.3d at 1226.

Here, the Department engages in a thorough comparison of the selectee's and Hill's qualifications and asserts that Stewart was better qualified for the position. See Decl. of Warren Johnson ¶ i; Def.'s Mem. at 34-35. The remaining question, then, is whether Hill has adduced sufficient evidence to permit a reasonable jury to conclude that the non-selection was actually undertaken in retaliation for Hill's protected activity. Because Hill fails to respond to the Department's argument at all, and hence fails to produce any evidence sufficient to create a genuine issue of material fact regarding the candidates' qualifications, the Court concludes that he has not produced sufficient evidence to permit a jury to conclude that the Department's explanation was a pretext for unlawful retaliation. Accordingly, the Court will grant the Department's summary judgment motion as to Counts 4 and 7.

**III.   No Adverse Action: Count 8**

An adverse employment action is necessary to sustain a claim of retaliation, just as it is for disparate treatment claims. However, in the retaliation context, an employment action that is "materially adverse" is considered more broadly to include one that is "likely" to "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68, 70; Ginger v. Dist. of Columbia, 527 F.3d 1340, 1346 (D.C. Cir. 2008). The threshold is lower than the standard for an "adverse" employment action for discrimination claims (which requires a tangible impact on the terms, conditions or privileges of employment) because the statute is intended to provide broad protection to encourage disclosure of discrimination. White, 548 U.S. at 63-67.

Applying this lower standard to the facts alleged here, the Department argues that, nonetheless, there is no adverse action adequately alleged in Count 8 regarding Fry's failure to

submit Hill's application to the Eastern States Office in November 1999. The Court agrees. First, it is undisputed that the Assistant Director position was not vacant in November 1999. See Decl. of Valerie Turner ¶ 3. Thus, Hill cannot demonstrate the utility of having Fry forward his application for the position at that time. Second, Hill stated that immediately following the meeting he did not believe that Fry was going to forward his application in any event. Therefore, he clearly was not relying on Fry's alleged representation. Third, Hill submitted his application himself in November 1999 when he wished to express his interest in the position, and he admits that it is an employee's responsibility to submit his or her own application to apply for a new position. And finally, Fry unconditionally stated in November 1999 that he would be recusing himself from matters affecting Hill's career. See Nov. 23, 1999 Letter from T. Fry to M. Hill at 2. This letter undeniably put Hill on notice that Fry's offers of assistance had been withdrawn. For all of these reasons, the Court concludes that Count 8 lacks an adverse action that would be likely to dissuade a reasonable worker from pursuing charges of discrimination. Accordingly, the Court will grant the Department's motion for summary judgment on Count 8.

**IV.    Genuine Issues of Material Fact: Counts 2, 3, and 5**

In Counts 2, 3, and 5, Hill contends that because he engaged in protected activity from June 1999 to November 1999, his travel request was denied, his detail to the Office of Environmental Policy was terminated early, and he was denied the opportunity to serve as an acting supervisor. The Department in turn argues that Hill cannot establish that these events constitute adverse actions as defined under Title VII. Although the issue is close, the Court concludes that based upon the combined effect of these alleged events, a reasonable worker could be dissuaded from engaging in protected activity to oppose discrimination. See Johnson v. Dist. of Columbia, 2008 WL 3874612, at *12 (D.D.C. Aug. 21, 2008) (concluding "that an employer's

refusal to provide assistance in a pay raise matter would be likely to dissuade a reasonable worker from pursuing charges of discrimination").  Because there are genuine issues of material fact surrounding these allegations, the Court will deny the Department's motion for summary judgment on Counts 2, 3, and 5.

On September 13, 1999, Hill sent a "reminder" memorandum to Niebauer seeking travel authorization to participate in several upcoming conferences, the first of which was scheduled for September 15, 1999.  See Sept. 13, 1999 Letter from M. Hill to P. Niebauer.  However, Hill did not receive authorization to attend the first event, which was the Black Chamber of Commerce meeting.  Based on Niebauer's attitude toward Hill's EEO activity, Hill contends that the denial of this request was retaliatory.  He then cites to an investigative report where Niebauer refers to Hill as an individual who "will do anything for his personal gain" and who "takes advantage of the system." Pl.'s App. at 29.  In the report, Niebauer furthers states that Hill "will file an EEO complaint or grievance at the drop of a hat" and that "he always feels that he is being discriminated against." Id. at 30.  Although it appears that Hill made his travel request rather late -- if the September 13th memorandum was in fact his first request -- the Department has not put forward a legitimate, nondiscriminatory reason to explain why the travel request was denied.  Applying the generous standard explained above, the Court concludes that the denial of travel opportunities asserted in Count 2, especially in connection with the other two claims discussed below, could dissuade a reasonable worker from pursuing charges of discrimination.

In Count 3, Hill argues that the early termination of his detail with Taylor was a retaliatory action.  Hill began working with Taylor in November 1999.  He contends that management knew of and approved this detail and that it was to run for six months.  However, there is a genuine dispute of material fact about the legitimacy of Hill's detail.  As early as

November 1999, Johnson expressed concern as to whether the detail had been approved through the proper chain of command. In response to this inquiry, Hill addressed a letter to Fry explaining that Niebauer had indicated that he was going to handle the paperwork for setting up the detail. See Nov. 3, 1999 Letter from M. Hill to T. Fry. Hill continued to work with Taylor until January or February 2000, when he was then told to return to BLM on a full time basis. See 2002 Hill Dep. at 200-01. Because there is a genuine issue of material fact regarding the legitimacy of the detail and the proper method for funding such a detail, summary judgment is precluded at this time on Count 3.

Lastly, in Count 5 Hill alleges that after Niebauer retired from the Group Manager position of his division, Hill's colleagues alternated as Acting Group Manager but Hill was not given this same opportunity. The Department contends that Hill was overlooked for this temporary supervisory role because he did not express any interest in serving as Group Manager in an acting capacity. However, Doyle states that it is his normal "practice that when a managerial position becomes vacant in [the] office, [he] ask[s] all of the GS-14s within that group if they would be interested in serving as Acting Group Manager." Doyle Decl. ¶ u. Doyle further states that he does not recall "discussing this with Mr. Hill." Id. Because there is a genuine issue of material fact as to whether Hill was formally on detail with Taylor or whether he was still part of Niebauer's division and should have been given the opportunity to serve as Acting Group Manager, the Court will deny the Department's motion for summary judgment on Count 5.

In conclusion, it is worth repeating that when the challenged events in Counts 2, 3, and 5 are viewed individually, the issue is close as to whether these events constitute adverse actions under Title VII. The Court concludes, however, that the combined effect of the conduct plaintiff

alleges could have dissuaded him from engaging in protected activity. Given that combined impact and the genuine issues of material fact that surround these claims, summary judgment is precluded on Counts 2, 3, and 5 at this time.

## CONCLUSION

For the foregoing reasons, the Court will grant the Department's motion for summary judgment as to Counts 1, 4, 7, and 8, and will deny the Department's motion for summary judgment as to Counts 2, 3, and 5. A separate order accompanies this memorandum opinion.

        /s/ John D. Bates
        JOHN D. BATES
      United States District Judge

Date:   September 9, 2008